## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SALLY GOMEZ, TERRI P. ELISBERG,
SHIRLEY GARCIA, LINDA GIVENS,
SCOTT COHERNOUR, DENISE HENDRIXSON,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, SALLY URIOSTE,
JOYCE WINN, JOSEPH RUIZ and DAVE PACHECO,

    Plaintiffs,

vs.             No. CIV 2005-461 JH/KBM

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,

    Defendants.

### REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### OF DEFENDANT PRESBYTERIAN HEALTHCARE SERVICES, INC.

Defendant Presbyterian Healthcare Services, Inc. (Presbyterian), requests the Court

to make the following findings of fact and conclusions of law following the trial of this

action.

### REQUESTED FINDINGS OF FACT

1.  Presbyterian is a nonprofit corporation organized under the laws of the State

of New Mexico with its principal office in Albuquerque, Bernalillo County, New Mexico. It

operates the Presbyterian Hospital and the Presbyterian Kaseman Hospital in

Albuquerque, and regional hospitals, clinics and urgent care centers within the State of

New Mexico.

2.  On August 29, 2000, Presbyterian entered into an agreement entitled

Integrated Support Service Agreement (ISS Agreement) with ServiceMaster Management

Services Limited Partnership (ServiceMaster) to consolidate, restructure and integrate

various technical service and customer service functions within the Presbyterian Hospitals in Albuquerque pursuant to which ServiceMaster was to develop a business plan for the service departments and to supervise and manage the Integrated Support Service. ServiceMaster was subsequently acquired by Aramark Management Services, L.P. (Aramark). As used herein, the name Aramark refers to both ServiceMaster and Aramark.

3.      Under the terms of the ISS Agreement, Aramark furnished management personnel to carry out the purposes of the ISS Agreement, but all responsibility to hire, discipline and discharge service employees was retained by Presbyterian. In practice Aramark consulted and worked in cooperation with the Presbyterian Human Resources Department (HR) with respect to such matters as the discipline of employees and recommendations for the discharge from employment of employees.

4.      Each of the Plaintiffs in this action was at all times an employee of Presbyterian working in a department falling within the scope of the ISS Agreement for which management personnel employed by Aramark had management and supervisory responsibility. Among the Aramark managers who had supervisory responsibility over the Plaintiffs were Bob Hudson, David Foster, Mary Beth Easton and Jerry Biggam.

5.      When the ISS Agreement was entered into, Presbyterian did not give a direction to reduce nor have any intention of reducing the workforce or to terminate any group or class of Presbyterian employees. In fact, one of the purposes for entering into the ISS Agreement was to reduce the level of employee turnover; and during the period that the Agreement was in effect, the employee turnover was substantially reduced.

6.      Each person employed by Presbyterian enters into an Employment Agreement which, among other things, provides that the employment with Presbyterian is

-2-

not for a fixed period of time and may be terminated in circumstances where Presbyterian

deems it to be appropriate. The Employment Agreement also provides that the Employee

Handbook does not constitute a contract or any part of a contract and that the employee's

employment with Presbyterian is not subject to any terms different from or inconsistent with

those stated in the Employment Agreement. Each of the Plaintiffs in this action entered

into such an Employment Agreement with Presbyterian at the time of accepting

employment. In some cases the Plaintiffs signed additional Employment Agreements in

substantially the same form during the course of their employment with Presbyterian.

      7.     The Aramark employees who were engaged to perform duties pursuant to

the ISS Agreement were in all respects qualified by education and training to work as

managers overseeing the work of service employees in a hospital facility such as that of

Presbyterian.

      8.     The ISS Agreement was entered into by Presbyterian and Aramark for the

purpose of improving the quality of the work for which the departments covered by the

Agreement were responsible. The ISS Agreement was not entered into for any unlawful

or improper purpose. Specifically, it was not entered into for the purpose of getting rid of

older, qualified senior employees; and in carrying out its management duties under the ISS

Agreement, Aramark did not act to get rid of employees because they were older or senior.

      9.     None of the Plaintiffs in this action has filed charges or complaints with the

Equal Employment Opportunity Commission, the New Mexico Human Rights Commission

or any other government agency claiming discrimination on the basis of age or on any

other basis.

10. Considerations of age had nothing to do with the termination or the voluntary resignation of any of the Plaintiffs in this action.

11. There was no intention and no practice of Aramark to get rid of employees or to cause them to submit voluntary resignations in order affect any health, retirement or other benefit plan made available by Presbyterian to its employees. None of the terminations or resignations of any of the Plaintiffs in this action had any effect on the cost to Presbyterian of any of its benefit plans.

12. No action was taken against any of the Plaintiffs or which affected any of the Plaintiffs which breached any agreement or improperly deprived them of any rights to which they were entitled under the retirement or other benefit plans provided by Presbyterian to its employees.

13. Presbyterian is not under any contractual or other obligation to continue indefinitely in the future its present retirement plan and other benefit plans. Presbyterian has the right to modify or to terminate its present retirement plan and any other benefit plans which it presently maintains.

14. None or the policies or procedures of Presbyterian was violated in the supervision, management or discipline of any of the Plaintiffs in this action. In no case in which a Plaintiff was terminated or allowed to resign in lieu of termination was there a violation of any policy or procedure of Presbyterian.

15. None of the Plaintiffs in this action was deprived of any rights under the Family Medical Leave Act or discriminated or retaliated against in any matter on account of the exercise of rights granted to employees under the provisions of the Family Medical Leave Act.

-4-

16.     The policies and procedures contained in the Presbyterian Employee Handbook do not constitute a part of the Employment Agreement which Presbyterian has with its employees. In carrying out the discipline of employees, there is no evidence that Presbyterian or Aramark violated any of the procedures relating to discipline contained in the Presbyterian Employee Handbook or in the other policies of Presbyterian.

17.     Presbyterian has not taken any action or failed to take action relating to any of the Plaintiffs which violated an express agreement between Presbyterian and any of the Plaintiffs. The Court has previously ruled by its Memorandum Opinion and Order entered August 10, 2006, that Presbyterian did not breach its express Employment Agreement with the Plaintiffs.

18.     Presbyterian has not taken any action or failed to take action relating to any of the Plaintiffs which violated any of Presbyterian's policies and procedures; and Presbyterian has not violated any claimed implied contract of employment or any covenant of good faith and fair dealing which may exist between Presbyterian and the Plaintiffs.

19.     Presbyterian has not made any negligent misrepresentations to any of the Plaintiffs.

20.     None of the Plaintiffs was terminated or constructively discharged because of age or deprived of any retirement or other benefits because of age.

21.     There is no evidence of any conspiracy between Presbyterian and Aramark to deprive any of the Plaintiffs of rights or benefits associated with their employment by Presbyterian or to deprive them of their employment with Presbyterian.

Requested Findings as to Individual Claims of Frank Pacheco

22.     Frank Pacheco was hired by Presbyterian August 27, 1979, and worked as a cook or a lead cook at Presbyterian until his termination April 14, 2004.

23.     Frank Pacheco signed an Employment Agreement October 7, 1988, with Southwest Community Health Services, a predecessor to Presbyterian, and signed another Employment Agreement with Presbyterian April 17, 1998. Both Agreements provided in part, "I understand that my employment with [Presbyterian] is not for a fixed period of time, and that my employment may be terminated in circumstances where [Presbyterian] deems this appropriate.     However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [Presbyterian] problem-solving procedure which is my sole and exclusive remedy for any dispute. I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [Presbyterian] is not subject to any terms different from or inconsistent with those stated in this Employee Agreement."

24.     On July 11, 2000, Linda Givens, the director who was at that time responsible for the food service area in which Frank Pacheco worked, had a meeting with him at which Ms. Givens pointed out to him that he was a lead employee and was not to contribute to rumors, that he must be careful how he stated his opinions to fellow employees. It had been reported to her that Frank Pacheco was spreading rumors that she, Linda Givens, was doing a bad job. During this meeting, Frank Pacheco was extremely defensive and continuously interrupted.

25.     Linda Givens was a Presbyterian employee, not an Aramark employee, and was one of the former Presbyterian employees who joined this action as a Plaintiff at the

time it was filed. Ms. Givens declined to provide Frank Pacheco with the names of the employees who had complained to her, and the incident did not form the basis for a corrective action or other discipline.

26.    On April 18, 2001, Frank Pacheco was given a notice that his job as lead cook was eliminated and that he was given the position of cook. His rate of pay remained the same. This change was made as a part of a reorganization. The change had no effect on his job duties.

27.    On March 30, 2003, Frank Pacheco became engaged in a dispute with two fellow employees in the food service area, Beth Tapia who was a weekend supervisor and Judy Martinez, over the insistence by Frank Pacheco that Ms. Martinez cut onions and peppers to be held for the morning cook. Frank Pacheco and Judy Martinez were yelling at each other; and Frank Pacheco insisted that Ms. Tapia call their supervisor, Jutta Johnson, at home. Both Beth Tapia and Judy Martinez wrote memoranda about the incident.

28.    On August 29, 2003, Frank Pacheco was given a verbal warning by his manager, Mary Beth Easton, and the executive chef, John Hughes, for his failure to complete work assignments. He was warned that he had failed to take food temperatures on the tray line on a number of days during June, July and August 2003, and that a failure to do so compromised patient safety. He was also given notice that several employees had made complaints of harassment and coercion from him. He was warned that it was a serious offense to harass co-workers in the workplace and that foul language would not be tolerated in the workplace. This verbal notice was the first step in the Presbyterian progressive discipline policy.

29.     Frank Pacheco made no written response and did not request a review of the verbal notice corrective action.

30.     On December 30, 2003, Frank Pacheco received a corrective action memorandum, a summary of council, from Mary Beth Easton and John Hughes for clocking issues and for insubordination. They provided Frank Pacheco a copy of his time card report from 12/07/03 to 12/20/03, which showed that eleven of the twelve days indicated significant unapproved overtime. They advised him that it had been reported to them that he would clock in early then immediately go on break in the cafeteria. They also spoke to him about a loud verbal confrontation with another employee, Glenda Pesina, the Food Service Zone Lead, who was discarding food from the walk in cooler because it was not properly dated and not properly stored, which was a violation of food safety standards.

31.     Frank Pacheco made no written response and did not request a review of the summary of council corrective action.

32.     On January 12 and 13, 2004, Frank Pacheco, along with other food service employees, signed a memorandum setting forth their responsibilities for sanitation and cleanliness in the work area and for safe food handling practices.

33.     On January 13, 2004, Frank Pacheco and other food service employees signed a memorandum concerning the heating of food items and insuring proper temperature on the food line.

34.     On January 30, 2004, Frank Pacheco received a corrective action memorandum from Mary Beth Easton, John Hughes, and Jutta Johnson, a food service supervisor, concerning raw fish in the cafeteria and placing him on loss of good standing. They reported to Frank Pacheco that a customer in the cafeteria had approached David

Foster, an Aramark manager, with two plates of fish which had not been cooked thoroughly. They pointed out that he and other employees had been given a memo concerning the temperature of food items and a memo concerning responsibility for safe food handling practices. Because of the insufficiently cooked food served on the cafeteria line and his responsibility for the cafeteria line, Frank Pacheco was placed on a loss of good standing for a period of twelve months.

35.     Loss of good standing is the third step in the Presbyterian progressive discipline policy. Another corrective action during the period of the loss of good standing will result in dismissal.

36.     Frank Pacheco informed his supervisors that he wanted to write a rebuttal to the corrective action resulting in loss of good standing. No change in the corrective action was made as a result of any rebuttal made by Frank Pacheco.

37.     On April 9, 2004, Judi Rieckenberger, a diet aid, wrote a memo complaining about Frank Pacheco cussing in the workplace and telling new employees how bad people are all around the workplace.

38.     On April 15, 2004, Frank Pacheco received a final corrective action memorandum of dismissal for causing a hostile work environment. The memorandum noted that he had previously been counseled for inappropriate language and summarized the three previous corrective actions, verbal warning, summary of council and loss of good standing. It discussed a confrontation with two food service employees over work space on April 10, 2004. As a result of these incidents, Frank Pacheco was dismissed from employment at Presbyterian.

39.     The incident on April 10, 2004, which resulted in the final corrective action and the dismissal of Frank Pacheco, was corroborated by memoranda from his immediate supervisor, Liz Sandoval, and by two employees involved, Anthony Griego and Angela Ramirez.

40.     In the dismissal of Frank Pacheco and in each of the disciplinary steps leading to the dismissal, the progressive discipline policies of Presbyterian were correctly followed.

41.     There is no evidence that the discipline of Frank Pacheco and his dismissal from employment at Presbyterian was in any way related to his age, gender, race or national origin or any similar factor.

42.     At no time has Frank Pacheco filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that he has been a victim of discrimination or retaliation.

43.     There is no evidence that Frank Pacheco's eligibility for retirement benefits or his right to receive any other benefits available as a result of his employment with Presbyterian was in any way related to either his discipline or his dismissal from employment at Presbyterian.

44.     At the time of the termination of his employment at Presbyterian, Frank Pacheco's base pay as a cook was $12.37 an hour.  The compensation which Frank Pacheco received from Presbyterian for the two full calendar years prior to his termination was $32,083.97 for 2003 and $29,418.57 for 2002.

-10-

45.     At the time of the termination of his employment with Presbyterian, Frank Pacheco was vested in the Presbyterian retirement plan.  Since his retirement, he has been receiving a monthly benefit payment from the retirement plan of $523.16.

46.     In December 2004 Frank Pacheco applied for a job as a cook at Santa Ana Star Casino.  He was hired and started working there December 20, 2004, at $9.50 and hour, which was increased to $9.75 an hour effective April 16, 2005.  He resigned his employment at Santa Ana Star Casino May 20, 2005, to accept employment at Village Inn as a cook at the same wage of $9.75 an hour.

47.     Benefits offered by the Santa Ana Star Casino included medical, prescription, vision and dental coverage, life insurance, a profit sharing and a 401(k) plan, and paid time off.  Employee benefits offered by Vicorp Restaurants, Inc., which operates the Village Inn, include a 401(k) plan, medical, dental, life, dependent life, personal accident and long term disability coverage, flexible spending accounts, a short term salary continuation plan and a long term disability income protection plan.

Requested Findings as to Individual Claims of Terri P. Elisberg

48.     Terri Elisberg was hired by Presbyterian September 20, 1975, as a clinical dietitian, a position which she held until her resignation effective January 1, 2004.

49.     Terri Elisberg signed Employment Agreements with Presbyterian April 2, 1993, November 26, 1997, and April 14, 1998, which Agreements provided, "I understand that my employment with [Presbyterian] is not for a fixed period of time, and that my employment may be terminated in circumstances where [Presbyterian] deems this appropriate.  However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [Presbyterian]

-11-

problem-solving procedure which is my sole and exclusive remedy for any dispute. I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [Presbyterian] is not subject to any terms different from or inconsistent with those stated in this Employee Agreement."

50.    Presbyterian uses Job Competency Assessment forms to evaluate the performance of its employees. The Job Competency Assessments received by Terri Elisberg for the calendar years 2000, 2001, 2002 and 2003 show that she was ranked in the very good or excellent categories in the skills for which she was evaluated.

51.    On December 11, 2003, Terri Elisberg submitted her resignation from employment at Presbyterian, stating, "I regret to inform you that after 26 years of employment with Presbyterian Healthcare Services I will be resigning from my Clinical Dietitian position at Presbyterian Kaseman Hospital effective January 1, 2004, 3 weeks from today. I would however, like to be considered for PRN status, whereby I could work a holiday or one day of a weekend occasionally if needed. I have enjoyed my years of service with Presbyterian Healthcare. This has been a most difficult decision for me."

52.    On October 7, 2003, prior to the time that Terri Elisberg submitted her resignation, Joan Hagen, who was a manager responsible for supervision of the clinical dietitians, sent a memorandum to the dietitians setting forth her requirement for attendance and paid time off policies and her requirement for scheduling work. Among other things, Ms. Hagen required that requests for paid time off be submitted to her by email on a form provided for that purpose.

53.    On the same date, October 7, 2003, Terri Elisberg sent an email message to Joan Hagen stating that she wanted to leave work early for the weekend and outlining

-12-

what she proposed to do to have other dietitians work in her absence. Ms. Hagen considered the statements by Terri Elisberg to be directly contrary to the policy on paid time off which she had outlined in her email message, and there was a dispute between Terri Elisberg and Joan Hagen over employees taking time off and making their own arrangements for coverage.

54.    The disagreement between Terri Elisberg and Joan Hagen over scheduling paid time off did not result in any disciplinary action toward Terri Elisberg. During the entire time of her employment at Presbyterian, no disciplinary or corrective actions were taken with respect to Terri Elisberg.

55.    At the time she submitted her resignation, the base pay for Terri Elisberg was $23.50 an hour. In the two calendar years prior to her resignation, Ms. Elisberg received compensation from Presbyterian of $47,664.68 for 2004 and $46,089.73 for 2003.

56.    In October 2003, prior to submitting her resignation from employment at Presbyterian, Terri Elisberg applied for a nutritionist position with the diabetes program at the Pueblo of Isleta. She was hired by the Pueblo of Isleta effective January 12, 2004, at an hourly rate of $24.84, which was a higher hourly rate than she had been receiving at Presbyterian.

57.    Terri Elisberg received gross compensation from her employment at Isleta Pueblo for the calendar year 2004 of $49,680.00, and for 2005 of $53,220.73, which was greater than the compensation she had been receiving at Presbyterian.

58.    Benefits available to Terri Elisberg through her employment at Isleta Pueblo include medical, dental and vision plans, life insurance, and a 401(k) plan. As of June 30, 2005, the value of Ms. Elisberg's retirement account for her employment at the Pueblo of

-13-

Isleta was $5,849.00. Projected monthly retirement income if she retired at age 55 was $1,197.00, and if she retired at age 65, $1,769.00.

59.    There is no evidence that the working conditions for Terri Elisberg prior to the time she submitted her resignation were so intolerable or that there existed such a hostile environment in her employment such that her voluntary resignation should be considered to be a constructive discharge.

60.    There is no evidence that discrimination on the basis of age, or on any other basis, provoked or was a cause of the voluntary resignation by Terri Elisberg from her employment at Presbyterian.

61.    The resignation by Terri Elisberg from her employment at Presbyterian did not involve any employment action by Presbyterian within the meaning of the *McDonnell Douglas* opinion.

62.    The evidence establishes that prior to submitting her resignation to Presbyterian, Terri Elisberg had applied for and accepted another job which provided her greater compensation and had comparable employment benefits.

63.    At no time has Terri Elisberg filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that she has been a victim of discrimination or retaliation in any way related to her employment at Presbyterian or her resignation from that employment.

64.    There is no evidence that Terri Elisberg's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with Presbyterian was in any way related to her decision to submit her resignation from

employment at Presbyterian or to any of the events or conditions in her employment prior to the time she submitted her resignation.

65.     Terri Elisberg has not sustained any damages as a result of her resignation from employment with Presbyterian and her acceptance of a new job at Isleta Pueblo.

Requested Findings as to Individual Claims of Mary A. Martinez

66.     Mary Martinez was hired by Presbyterian September 30, 1982, as a clinical dietitian, a position which she held until her resignation effective March 17, 2003.

67.     Mary Martinez signed Employment Agreements with Presbyterian April 3, 1993, and May 15, 1998, which Agreements provided, "I understand that my employment with [Presbyterian] is not for a fixed period of time, and that my employment may be terminated in circumstances where [Presbyterian] deems this appropriate. However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [Presbyterian] problem-solving procedure which is my sole and exclusive remedy for any dispute. I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [Presbyterian] is not subject to any terms different from or inconsistent with those stated in this Employee Agreement."

68.     On January 3, 2002, Mary Martinez was given a corrective action by her supervisors, David Foster and Mary Beth Easton, at the level of loss of good standing. The reasons for the corrective action were that it had been reported that Ms. Martinez had requested another employee to falsify training documents, that she had made misstatements to her supervisors about the work requirements of dietitians, that she had

-15-

signed purchase agreements without authority, and that she had authorized the use of expired cans of formula in the pediatric unit.

69.    There is no evidence that the corrective action at the loss of good standing level was taken because of the age of Ms. Martinez because of her entitlement to retirement benefits or for any other improper reason. The evidence establishes that the supervisors, David Foster and Mary Beth Easton, believed that the matters listed in the corrective action were true and that these matters warranted corrective action.

70.    In April 2002, the supervisors of Mary Martinez, Mary Beth Easton and Jerry Biggam, had meetings with her to discuss her absences from the hospital without informing the Service Center, about the labeling and dating of food which Ms. Martinez did not feel was necessary under State Health Department regulations, about an initiative for outpatient nutrition and support for regional hospitals. The supervisors expressed their concern that Ms. Martinez was unwilling to follow reasonable requests, to make needed changes, and by her pattern of divisive behavior, her criticism of Presbyterian leadership and a pattern of spreading inaccurate information.

71.    Further concerns about the performance and behavior of Mary Martinez were set forth in a memorandum dated December 21, 2002, written by David Foster, an Aramark manager. There is no evidence that the concerns of the managers supervising Mary Martinez were motivated by considerations of age, her entitlement to retirement benefits or by any other improper considerations. The evidence establishes that the concerns of the managers were prompted by a regard for patient safety and by a desire of the managers to insure strict compliance with the health and safety requirements which apply to hospitals.

-16-

72. In evaluating the job performance of Mary Martinez in the Job Competency Assessment for the year 2002, her manager David Foster stated, "Overall Mary has performed her duties as a Clinical Manager, and has been an advocate for the needs of the clinical staff and the organization. . . . Mary has also been resistant to comply with many of the request [sic] of her Director. Examples of this are resistance to calling the service center, challenging procedure changes in regards to HACCP, and in being less than 100% accurate in statements to senior leaders and her director."

73. In January 2003, it was reported that Mary Martinez had instructed a class of food service workers incorrectly on some questions for a JCAHO competency test and that she subsequently sought to have the answers of the workers on the test changed.

74. In February 2003, Mary Martinez became engaged in a dispute with her supervisors over travel to the regional hospitals. She objected to the denial of her request that she be provided with an SUV vehicle to make the trips. She also stated that she would have the directors of the regional hospitals approve her travel rather than the Administrative Director at the main hospital in Albuquerque. She then announced to other dietitians that she would no longer travel to the regional hospitals. The action of Mary Martinez stating that she would no longer travel to regional hospitals was disruptive and increased the workload for other dietitians and made the management of the dieticians more difficult.

75. The disputes which Mary Martinez had with her managers in January and February 2003, including the disputes over providing service to regional hospitals, did not result from any considerations by the managers of the age of Mary Martinez or the ages

of any other dietitians. The concerns expressed by the managers were legitimate concerns directly related to proper administration of Presbyterian and its regional hospitals.

76. In March 2003, Mary Martinez was informed that because of her conduct and her disputes with her managers she would be terminated. At her request, she was allowed to resign in lieu of termination. Her resignation was effective Mary 17, 2003.

77. At the time she submitted her resignation from employment, Mary Martinez discussed with the HR representative Betty Kurtz receiving additional compensation in exchange for signing a release of any claims against Presbyterian and its officers and agents. As a result of these discussions, it was agreed that Ms. Martinez would be paid an additional sum of $6,179.51, and that in exchange she would sign an Additional Consideration and Release Agreement. She accepted the additional compensation and signed the Agreement on March 20, 2003.

78. When Mary Martinez was provided with the Additional Consideration and Release Agreement, she was allowed time to read and review the Agreement. In addition, the Additional Consideration and Release Agreement informed Ms. Martinez that she had the right to revoke the Agreement by giving written notice to Presbyterian within seven days of signing the Agreement. Ms. Martinez signed the Additional Consideration and Release Agreement, accepted the sum of $6,179.51 provided under the Agreement, and did not exercise her right to revoke the Agreement.

79. The statement which Ms. Martinez made to the Court concerning signing the Additional Consideration and Release Agreement that, "At the time I signed the Agreement, I did not have any savings or financial reserves I could rely upon to withstand an extended period of unemployment," was not true. At the time she signed the

-18-

Agreement, Ms. Martinez had a 403(b) investment account with Presbyterian which had a balance of $17,000.00, which she could have withdrawn. Such a withdrawal would have been subject to income taxes and to an early withdrawal penalty, but these could have been avoided if the money were taken as a loan and repaid within sixty days.

80. In addition to the compensation which Mary Martinez was receiving from Presbyterian, her income tax returns reflect that she was also receiving $42,000.00 in each of the years 2003 and 2004 as alimony.

81. On the same day that Mary Martinez signed the Additional Consideration and Release Agreement, March 20, 2003, her application for employment with the University of New Mexico was approved; and she started work at the University of New Mexico in the position of a Senior Research Nutritionist as a regular full time employee effective March 31, 2003. Her initial salary was $39,957.00. This salary was increased to $47,199.96, then to $48,143.96 effective July 2004.

82. In addition to her salary as a Senior Research Nutritionist, Mary Martinez receives compensation for teaching classes at the University of New Mexico and at the Albuquerque Technical Vocational Institute, now CNM.

83. At the time she signed the Additional Consideration and Release Agreement, Mary Martinez had other funds and income available to her and had received approval for employment at the University of New Mexico. She was under no financial pressure to sign the Additional Consideration and Release Agreement in order to receive the additional funds.

84. Mary Martinez has received a Bachelor of Science degree from the University of California, Berkeley, and a Master of Science in Nutrition degree from the

University of New Mexico. She was fully capable of reading and understanding the meaning of the Additional Consideration and Release Agreement at the time it was presented to her.

85.     Based on her education and experience, Mary Martinez knew and understood, or reasonably should have known and understood, the meaning and the purpose of accepting additional compensation and signing a release of all claims against Presbyterian on March 20, 2003.

86.     The Additional Consideration and Release Agreement provides that if either party breaches the Agreement the other party may sue to enforce the release contained in the Agreement and may recover all costs and attorney fees incurred in enforcing the Agreement.

87.     At the time of the termination of her employment at Presbyterian, the base pay for Mary Martinez was $53,556.00. Her total compensation at Presbyterian for the two full years prior to the termination of her employment was $52,794.97 for 2002, and $50,746.87 for 2001.

88.     According to her federal income tax returns, Mary Martinez has wage and salary income for 2003 of $50,534.00, and for 2004 of $50,120.00.

89.     As a full time employee of the University of New Mexico, Mary Martinez is covered by the New Mexico Public Employees Retirement Act which, among other things, includes coverage under the group health insurance plan. Group insurance coverage available to employees of the University of New Mexico includes medical, dental and vision insurance coverage.

90.     There is no evidence that Mary Martinez was subject to discrimination on account of her age, or any other form of discrimination, during the term of her employment at Presbyterian or in connection with the corrective actions she received or the termination of that employment.

91.     The evidence establishes that Mary Martinez applied for employment with the University of New Mexico either prior to or at the time of her resignation from employment at Presbyterian.

92.     At no time has Mary Martinez filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that she has been a victim of discrimination or retaliation in any way related to her employment at Presbyterian or the termination of that employment.

93.     There is no evidence that Mary Martinez's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with Presbyterian was in any way related to any discipline or corrective action which she received as a Presbyterian employee, or to the termination of her employment, the submitting by her of her resignation from that employment or the offer of additional compensation in exchange for a release of claims and her acceptance of the additional compensation.

### Requested Findings as to Individual Claims of Patricia Troyanowski

94.     Patricia Troyanowski was hired by Presbyterian March 20, 1989, as a registered dietitian. She continued to be a registered dietitian until she submitted her resignation from employment effective June 1, 2003.

-21-

95. Patricia Troyanowski signed an Employment Agreement with Presbyterian April 14, 1998, which provided "I understand that my employment with [Presbyterian] is not for a fixed period of time, and that my employment may be terminated in circumstances where [Presbyterian] deems this appropriate. However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [Presbyterian] problem-solving procedure which is my sole and exclusive remedy for any dispute. I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [Presbyterian] is not subject to any terms different from or inconsistent with those stated in this Employee Agreement."

96. Presbyterian uses Job Competency Assessment forms to evaluate the performance of its employees. The Job Competency Assessments received by Patricia Troyanowski for the calendar years 1999, 2000, 2001 and 2002 show that she was ranked in the very good or excellent categories in the skills for which she was evaluated.

97. During the time that she was employed at Presbyterian Patricia Troyanowski did not receive any corrective actions or other forms of discipline.

98. On May 9, 2003, Patricia Troyanowski submitted her resignation from employment at Presbyterian stating, "David and Mary Beth, I am sending this second notice of resignation, it seems the first one did not go through on Presnet. This is to inform the management of the Food & Nutrition Services Department of PHS, that I will relinquish my position as clinical dietitian and regional representative, effective Sunday, June 1, 2003. Thank you for the opportunity to practice my profession for these past years."

99. Prior to resigning from her employment with Presbyterian, Patricia Troyanowski had objected to the manner in which the Aramark employees, David Foster

and Mary Beth Easton, had been managing the Food & Nutrition Department. Among her complaints were that they did not value dietitians in the workplace, that they demeaned the status of the dietitians, that they would not accept suggestions from the dietitians because they did not understand the dietary business, that they were secretive with the whole dietary department and with other departments as well, and that they were often angry and hostile.

100. According to the testimony of Patricia Troyanowski, the behavior of the managers which she found objectionable was directed toward all dietitians and to other departments at Presbyterian and was not directed specifically at her.

101. There was no evidence that the behavior of the managers about which Patricia Troyanowski complained was caused by or resulted from considerations of age or from any other improper or discriminatory considerations.

102. There is no evidence that the working conditions for Patricia Troyanowski prior to the time she submitted her resignation were so intolerable or that there existed such a hostile environment in the workplace such that her voluntary resignation should be considered a constructive discharge.

103. There is no evidence that discrimination on the basis of age, or on any other basis, provoked or was a cause of the voluntary resignation by Patricia Troyanowski from her employment at Presbyterian.

104. The resignation by Patricia Troyanowski from her employment at Presbyterian did not involve any employment action by Presbyterian within the meaning of the *McDonnell Douglas* opinion.

-23-

105. At the time that Patricia Troyanowski resigned from her employment at Presbyterian, her base pay was $22.09 an hour. During the last two full calendar years of her employment at Presbyterian, Patricia Troyanowski earned for 2002 the sum of $40,100.82, and for 2001 the sum of $38,449.16.

106. On May 9, 2003, the same date on which she submitted her resignation to Presbyterian, Patricia Troyanowski applied for employment with Specialty Hospital Trans, Inc. She accepted employment there at a salary of $24.50 an hour, receiving increases to $25.00 an hour on December 19, 2003, and to $25.75 an hour on May 21, 2004. She continued employment with Speciality Hospital Trans, Inc., until November 24, 2004, when she resigned voluntarily.

107. Following her resignation from Specialty Hospital Trans, Inc., on December 1, 2004, Patricia Troyanowski started work at Coram Healthcare at a rate of $26.00 per hour. She continues to be employed at Coram Healthcare.

108. Patricia Troyanowski received gross compensation from Coram Healthcare for the calendar year 2005, through December 16, 2005, of $52,000.00. Her income tax returns reflect that she has wages and salary for 2003 of $47,407.00, and for 2004 of $54,749.00. Since resigning from her employment at Presbyterian, Patricia Troyanowski has been earning more than she was paid at Presbyterian.

109. Employment benefits available to Patricia Troyanowski at Coram Healthcare include life insurance, dental, medical and vision plans,

110. At no time has Patricia Troyanowski filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that she has been a victim of discrimination.

-24-

111.    There is no evidence that Patricia Troyanowski's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with Presbyterian was in any way related to her decision to submit her resignation to Presbyterian or to any of the events or conditions in her employment prior to the time she submitted her resignation.

112.    Patricia Troyanowski has not sustained any damages as a result of her resignation from employment with Presbyterian and her acceptance of new jobs immediately following her resignation.

## REQUESTED CONCLUSIONS OF LAW

1.    The Court has jurisdiction over the parties and over the subject matter of this action.

2.    There is no evidence that Presbyterian has, in any manner, violated the Employee Retirement Income Security Act (ERISA). The evidence does not establish that any action taken by Presbyterian with respect to the Plaintiffs in this action was taken to limit or to deprive the Plaintiffs of any interest or benefit to which they are or would be entitled under the provisions of any pension or welfare plan, as those terms are defined in 29 USC 1002 and 29 CFR 2510.3-2 and 2510.3-1, offered by Presbyterian to its employees.

3.    Presbyterian has not breached its fiduciary duties established under ERISA or otherwise owed to any of the Plaintiffs under any pension or welfare plan.

4.    There is no evidence that Presbyterian has discriminated against any of the Plaintiffs or withheld or denied benefits to any of the Plaintiffs under any retirement or pension plan under which Plaintiffs were entitled to benefits.

5.     There is no evidence that Presbyterian has breached any express contract of employment with any of the Plaintiffs.

6.     There is no evidence that Presbyterian has breached any implied contract of employment or breached any workplace policy or practice with respect to treatment of any of the Plaintiffs.

7.     There is no evidence that Presbyterian has breached any implied contract of good faith and fair dealing with respect to its actions toward any of the Plaintiffs.

8.     There is no evidence to show that Presbyterian has made any misrepresentations to the Plaintiffs with respect to any of its policies or procedures or that Presbyterian has failed to treat the Plaintiffs fairly in the workplace as a reasonable employee would interpret that phrase.

9.     None of the Plaintiffs has invoked any of the provisions of the New Mexico Human Rights Act, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, or any other similar state or federal statute relating to the rights of employees.

10.    There is no evidence that Presbyterian discriminated against, retaliated against, or otherwise treated any of the Plaintiffs differently with respect to any terms and conditions of their employment at Presbyterian because of their age, gender, national origin, or any other protected status.

11.    There is no evidence of any civil conspiracy between Presbyterian and Aramark in violation of any state or federal statute including, without limitation, the New Mexico Human Rights Act, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or the Family Medical Leave Act.

12.     In taking corrective action for the discipline and ultimately the termination of the Plaintiff Frank Pacheco, there is no evidence that Presbyterian was motivated by considerations of age or that the age of Frank Pacheco and his entitlement to pension or welfare benefits in any way motivated or caused any of the corrective actions taken with respect to Frank Pacheco or the termination of employment of Frank Pacheco. The corrective actions which Frank Pacheco received and the termination of his employment with Presbyterian were caused by his improper actions in the workplace and had nothing to do with his age or with his entitlement to pension or welfare benefits.

13.     There is no evidence that Presbyterian discriminated against Plaintiff Terri Elisberg.

14.     The voluntary resignation by the Plaintiff Terri Elisberg from her employment with Presbyterian was in all respects voluntary and was in no respect the result of hostile conditions in the workplace as a reasonable employee would interpret that phrase. The voluntary resignation of the Plaintiff Terri Elisberg did not constitute a constructive discharge.

15.     The Plaintiff Terri Elisberg resigned from her employment with Presbyterian voluntarily in order to accept a better paying job for which she had applied prior to submitting her resignation. She was not subject to discrimination for reasons of age or gender, and Presbyterian took no action to cause or to bring about her voluntary resignation.

16.     There is no evidence that Plaintiff Mary Martinez was subjected to discrimination on account of her age or gender or was subject to any other mistreatment during her employment by Presbyterian.

-27-

17.     The Plaintiff Mary Martinez was given a corrective action in January 2002 because of her disputes with her managers, her refusal to follow their requirements and policies. The corrective action was not taken because of the age or gender of the Plaintiff Mary Martinez or for any other improper reason.

18.     When Mary Martinez was allowed to submit a resignation in lieu of termination, she entered into an agreement entitled Additional Consideration and Release Agreement with Presbyterian pursuant to which she released all claims against Presbyterian.

19.     The Plaintiff Mary Martinez entered into the Additional Consideration and Release Agreement with Presbyterian voluntarily and not as the result of any improper pressure or coercion on the part of Presbyterian. She was not subject to any financial pressure to sign the Agreement in order to receive additional compensation.

20.     The Additional Consideration and Release Agreement entered into by the Plaintiff Mary Martinez with Presbyterian complied with the provisions of the Older Workers Benefit Protection Act. The Plaintiff Mary Martinez had a sufficient opportunity to review the Agreement and to rescind it if she determined that it was in any manner unfair or unacceptable. Instead, she accepted the additional compensation and took no action to rescind the Agreement.

21.     In giving a corrective action to the Plaintiff Mary Martinez, and accepting her resignation, and in entering into the Additional Consideration and Release Agreement with her, Presbyterian was not motivated by considerations of her age or her entitlement to pension and welfare benefits; and the age of Mary Martinez and her entitlement to pension

-28-

and welfare benefits in no way caused or contributed to the corrective action which she received, her resignation, or the Additional Consideration and Release Agreement.

22.     The Plaintiff Patricia Troyanowski was not subject to conditions or treatment in the workplace which were hostile, humiliating or such as to cause her voluntary resignation from her employment at Presbyterian as to constitute a constructive discharge.

23.     Plaintiff Patricia Troyanowski acknowledged that the management style and the behavior of the managers to which she objected was applied to all dietitians and to other departments by Presbyterian. As such, the management style was not motivated or caused by considerations of her age or her entitlement to pension and welfare benefits.

24.     The resignation of Plaintiff Patricia Troyanowski from her employment at Presbyterian was, in all respects, voluntary. Patricia Troyanowski resigned from her employment at Presbyterian in order to take a better paying job and not because of any improper actions or failures to act on the part of Presbyterian.

25.     Presbyterian has not discriminated against any of the Plaintiffs on account of their age.

26.     No action was taken by Presbyterian with respect to any of these Plaintiffs, and no failure to act by Presbyterian with respect to these Plaintiffs was motivated or contributed by any consideration of their right to pension and welfare benefits.

27.     Presbyterian is entitled to a judgment dismissing with prejudice all of the claims which have been made against it by the Plaintiffs Frank Pacheco, Terri Elisberg, Mary Martinez and Patricia Troyanowski.

28.     It has been necessary for Presbyterian to defend itself in this action and to enforce the release contained in the Additional Consideration and Release Agreement

-29-

signed by Plaintiff Mary Martinez. Presbyterian is entitled to judgment against the Plaintiff
Mary Martinez under the terms of the Additional Consideration and Release Agreement for
the amount of its reasonable attorney fees incurred by her breach of that Agreement.

29.    There is no evidence that Presbyterian discharged, fired, suspended,
expelled, disciplined or discriminate against any Plaintiff for exercising his or her rights in
violate of 29 USC 1140.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____

Robert M. St. John
Julie P. Neerken
Attorneys for Presbyterian Healthcare Services, Inc.
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 768-7337
Facsimile:  (505) 768-7395

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be faxed a true and correct copy of the
foregoing Requested Findings of Fact and Conclusions of Law of Defendant Presbyterian
Healthcare Services, Inc., to the following counsel of record this 11h day of September,
2006.

Michael E. Mozes                          Agnes Padilla
Law Offices of Michael E. Mozes, P.C.     Butt, Thornton & Baehr
5732 Osuna, NE                            4101 Indian School, NE, #300
Albuquerque, NM 87109-2527                Albuquerque, NM 87110

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____

Robert M. St. John

-30-