IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SALLY GOMEZ, TERRI P. ELISBERG,
SHIRLEY GARCIA, LINDA GIVENS,
SCOTT COHERNOUR, DENISE HENDRIXSON,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, SALLY URIOSTE,
JOYCE WINN, JOSEPH RUIZ and DAVE PACHECO,

        Plaintiffs,

vs.                                      No. CIV 2005-461 JH/KBM

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,

        Defendants.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** Plaintiffs, by and through their counsel of record, Law Offices of

Michael E. Mozes, P.C. (Michael E. Mozes), and hereby submit their Proposed Findings of Fact

and Conclusions of Law in accordance with the pretrial instructions of the Court.

### FINDINGS OF FACT

1.     Plaintiff Terri Elisberg [hereinafter "Elisberg"]is a citizen of the United States

and a resident of the State of New Mexico.

2.     Plaintiff Mary Martinez [hereinafter "Martinez"], is a citizen of the United States

and a resident of the State of New Mexico.

3.     Plaintiff Frank Pacheco [hereinafter "Pacheco"] is a citizen of the United States

and a resident of the State of New Mexico.

4.     Plaintiff Trish Troyanowski [hereinafter "Troyanowski"] is a citizen of the United

States and a resident of the State of New Mexico.

5.      Defendant Presbyterian Healthcare Services, Inc. [hereinafter "PHS"] is a duly

licensed corporation under the laws of the State of New Mexico, located and conducting

business throughout the State of New Mexico.

6.      Defendant ARAMARK Management Services, L.P. [hereinafter "ARAMARK"]

is a duly licensed corporation authorized to conduct business in and throughout the State of New

Mexico.

7.      Elisberg began working for PHS as a dietitian in 1975.

8.      Martinez began working for PHS as a dietitian in 1982.

9.      Pacheco began working in PHS' Food Services Division in 1979.

10.     Troyanowksi began working for PHS as a dietitian in 1989.

11.     Elisberg, Martinez, and Troyanowski worked as clinical dietitians based in PHS'

principal hospitals located in Albuquerque, New Mexico at all times relevant to the allegations

of this action.

12.     In addition to their job duties pertinent to the PHS main hospital in Albuquerque,

New Mexico, Martinez and Troyanowski had duties and responsibilities related to providing

clinical dietitian services in PHS' regional hospitals located in Socorro, Tucumcari, and Ruidoso

during the period of time relevant to these actions.

13.     During all periods of time relevant to this action, Pacheco worked in the kitchen

as a Cook in PHS' main hospital located in Albuquerque, New Mexico.

14.     On August 29, 2000, PHS entered into an Integrated Support Services Agreement

("Agreement") with ServiceMaster Management Services, L.P., ("ServiceMaster") for the

2

purpose of the administration and management of PHS' support services at PHS' main hospital and Kaseman Hospital facilities in Albuquerque, New Mexico.

14.     The goals of the Agreement included consolidation, restructuring, and integration of the service departments at PHS' Albuquerque hospitals, with the aim of decreasing costs, improving service, and enhancing employee morale.

15.     ServiceMaster was to provide supervisory personnel for the purpose of implementing the Agreement's business plans and supervising and managing the support service.

16.     Under the Agreement, ServiceMaster was to perform all administrative responsibilities which relate to the employment of service employees by PHS.  In so administering and managing PHS' service employees, ServiceMaster employees were required to adhere to all applicable PHS policies and procedures.

17.     In addition, ServiceMaster had to provide and maintain under the Agreement, at its expense, all training materials used to train PHS service employees.  These materials remained the property of ServiceMaster at all times.

18.     ServiceMaster employees involved in the administration and management of PHS support services remained employees of ServiceMaster throughout the term of the Agreement, paid salaries exclusively through ServiceMaster.

19.     All PHS service employees remained PHS employees during the term of the Agreement, with salaries paid by PHS.

20.     The Agreement required ServiceMaster to procure all licenses and permits needed for the lawful rendering of the services provided.  ServiceMaster paid for any costs of fees associated with licenses and permits.

3

21.     The Agreement required ServiceMaster to furnish all coordinating management personnel required to perform the services promised under the Agreement.  One such manager was designated as a "coordinating manager" who would act as ServiceMaster's chief representative during the term of the Agreement.

22.     At all times relevant hereto, Bob Hudson acted as the "coordinating manager" for ServiceMaster and its successor, ARAMARK.

23.     ServiceMaster had authority under the Agreement to add supervisory, training and technical personnel, including service employees, for the purpose of efficiently performing duties under the Agreement.

24.     All personnel provided by ServiceMaster remained ServiceMaster employees, with insurance (including worker's compensation) provided by ServiceMaster.  Any worker's compensation claims for ServiceMaster employees were paid by ServiceMaster.

25.     PHS and ServiceMaster designated the employment relationship of ServiceMaster under the Agreement as an "independent contractor."

26.     All persons who were service employees of PHS on the date of the Agreement continued as PHS employees.  During the term of the Agreement, no PHS employee became a ServiceMaster employee and no ServiceMaster employee became a PHS employee.

27.     ServiceMaster was not regarded as a party to any collective bargaining agreement or agreements to which PHS was or became a party.

28.     ServiceMaster could make recommendations in connection with wage and wage-related matters, but ServiceMaster could not make any decisions with respect to wages, hours, or other working conditions for PHS service employees.

4

29.     PHS retained under the Agreement the sole responsibility to hire, discipline, and discharge its service employees.  PHS, under the Agreement, stated that it would handle such matters in accordance with its established policies and procedures and any collective bargaining agreements to which PHS is a party.

30.     PHS paid all wages and salaries of its service employees and any payroll and other taxes, as well as worker's compensation insurance.

31.     During the design phase of the Agreement, the parties prepared a business plan which included a financial plan, which, among other things, included projected savings for the first five years of the Agreement.

32.     The financial plan also included allowances for adjusting baseline amounts, program amounts, actual salary increases, and costs of fringe benefits to service employees.

33.     The Initial Term of the Agreement, which turned out to be the only effective term between PHS and ARAMARK, was five years.

34.     In early 2002, ARAMARK assumed all the duties, privileges, and responsibilities of ServiceMaster under the Agreement, without amendment, modification, or supplementation of the original terms of the Agreement.  This remained true throughout the term of the Agreement.

35.     Fringe benefits and corresponding increases related to those benefits affected the baseline amounts of the Agreement because of associated costs.

36.     PHS expected that ARAMARK would reduce costs by deleting positions and streamlining the operational expenses related to administration and management of support services.

37.   Bob Hudson considered PHS' valuation of the costs of fringe benefits in consideration of the Agreement's baseline amounts to be invalid.

38.   PHS terminated the Agreement at the end of the Initial Term because of financial reasons.

39.   Elisberg, Martinez, Pacheco, and Troyanowski all signed Employment Agreements as PHS employees.

40.   Among other things, the Employment Agreements provide the following: (1) a requirement that the employee familiarize himself with the policies and procedures of PHS; (2) a responsibility to keep informed of any policy and procedure changes; and (3) a notice to the employee that "employment may be terminated in circumstances where PHS deems this appropriate."

41.   The language stating that an employee may be terminated in circumstances where PHS deems such appropriate is ambiguous.

42.   Betty Kurtz ("Kurtz"), the principal Human Resources employee responsible for providing support and counsel to PHS and ARAMARK employees in support services, never disagreed with any disciplinary action recommended by ARAMARK managers.

43.   Policy 308, PHS' corrective action policy, states that corrective action is progressive in nature and includes a three-step counseling process–Summary of Counseling, Loss of Good Standing, and Dismissal–prior to discharge.  The step of dismissal is used only when "the previous disciplinary procedures fail to produce the expected results . . ."

44.   PHS service employees reasonably believed that PHS and ARAMARK managers and supervisors would act in accordance with the stated policies and procedures of PHS.

6

45.     PHS provided training to ARAMARK managers and PHS service employees with respect to the interpretation and enforcement of PHS policies and procedures.

46.     PHS communicated to both PHS and ARAMARK management employees the expectation that management would enforce PHS policies and procedures.

47.     PHS directly communicated to PHS service employees and ARAMARK managers the expectation that employees and managers would abide by the requirements and instructions set forth in PHS policies and procedures.  PHS required uniform and consistent adherence to policies and procedures at all employee levels.

48.     Violations of PHS policies and procedures could lead to disciplinary action against PHS employees, up to and including termination.

49.     Pacheco was terminated for alleged violations of PHS policies and procedures, specifically Policy 308, in April 2004.

50.     Martinez was forced to resign in lieu of termination for alleged violations of PHS policies and procedures in March 2003.

51.     PHS and ARAMARK subjected Elisberg to a disciplinary counseling session in October 2003 for alleged violations of PHS policies and procedures.

52.      Pacheco had not received any disciplinary action during more than 25 years of PHS employment prior to December 30, 2003.

53.     On December 30, 2003, Pacheco received disciplinary action in the form of a Summary of Counseling.  No PHS employee was present during the delivery of this disciplinary action and the evidence shows that no PHS employee approved this disciplinary action prior to it being given to Pacheco.

54.     Kurtz signed off on the Pacheco Summary of Counseling almost one month after it was delivered to Pacheco.  Kurtz marked the "Manager Review" section without knowing whether ARAMARK managers reviewed this information with Pacheco.

55.     With respect to the contents of the Summary of Counseling, Pacheco was falsely accused of violating PHS policies and procedures, as well as management instruction, with respect to clocking in early and working overtime.  Jutta Johnson, Pacheco's supervisor at the time, denies that Pacheco clocked in early or took early breaks.

56.     On February 6, 2004, Pacheco received another disciplinary action, a Loss of Good Standing.  The contents of the Loss of Good Standing related to allegations that raw fish had been placed on a food line at the cafeteria at Presbyterian Hospital on January 30, 2004.

57.     Pacheco was not responsible for monitoring food temperatures at the time of the January 30th incident.  In addition, Pacheco was addressing a serious safety concern in the kitchen at the time the fish was to be temped.

58.     The responsibility for the raw fish being placed on the tray line fell squarely on the shoulders of another PHS employee, who was neither counseled nor disciplined for the action ARAMARK management complained of.

59.     When Pacheco attempted to explain what had occurred to Mary Beth Easton and John Hughes, the ARAMARK managers who had previously given him the Summary of Counseling, they refused to either hear or consider his explanation.

60.     A Loss of Good Standing has the effect of not allowing an employee to receive salary increases and transfers to other positions, among other things.

61.     When Pacheco received the Loss of Good Standing from Easton and Hughes, no

8

PHS employee had been consulted prior thereto and no PHS employee was present at the disciplinary action meeting.

62.     The action of giving a Loss of Good Standing to an employee with 25 years of experience and no prior disciplinary action until a month prior by the same ARAMARK managers constitutes an unreasonable disciplinary action and violates the progressive nature of Policy 308.

63.     Kurtz did not sign the Pacheco Loss of Good Standing until February 6, 2004 and marked the Manager Reviewed section of the document without knowing whether Easton and Hughes reviewed the action items with Pacheco.

64.     Pacheco wrote a rebuttal to the Loss of Good Standing on February 5, 2004.  This rebuttal received no acknowledgment nor consideration from either PHS or ARAMARK managers.

65.     On April 15, 2004, Mary Beth Easton, an ARAMARK manager, terminated the employment of Pacheco.

66.     The dismissal action related to allegations that Pacheco had created a hostile work environment based on "foul language" and a confrontation with another kitchen employee by the name of Anthony Griego.

67.     The kitchen work environment was one where people raised their voices and talked loudly to each other because of the noise.  Pacheco did not raise his voice or speak harshly to employees any more than other employees spoke in that fashion.

68.     Johnson never counseled nor talked with Pacheco about the use of profanity or inappropriate language in the workplace prior to Pacheco being terminated on April 15, 2004.

69.     Johnson never heard Pacheco use profanity in the workplace.

70.     Liz Sandoval, a PHS supervisor who was present during the alleged confrontation between Pacheco and Griego, stated that it was Griego who threatened Pacheco physically and wanted to pick a fight with Pacheco.  Griego received no disciplinary action because of this incident.  Sandoval's statement is that Pacheco complied with her requests to stop the disagreement with Griego.

71.     There is no evidence that Pacheco created a hostile work environment for other employees and no PHS or ARAMARK employee ever complained to anyone that Pacheco had created a hostile work environment.

72.     Pacheco did not receive any opportunity to contest the disciplinary actions prior to his receipt of them.

73.     PHS violated the language of the ISS Agreement in permitting ARAMARK managers to discipline and dismiss Pacheco from his PHS employment.

74.     Pacheco reasonably expected PHS and ARAMARK management to abide by PHS policies and procedures.

75.     PHS and ARAMARK management and employees violated the terms of the ISS Agreement and PHS policies and procedures in disciplining and then dismissing Pacheco from his PHS employment.

76.     Pacheco reasonably believed that PHS and ARAMARK did not have appropriate reasons to dismiss him from employment.

77.     PHS Policy 314 sets forth the anti-harassment policy of PHS.  Pacheco's alleged misconduct in the April 15, 2004 dismissal action does not constitute a hostile work environment

under the definitions set forth in Policy 314.

78.     Martinez exercised supervisory responsibility over clinical dietitians at Presbyterian Hospital in Albuquerque, New Mexico during the period of time Mary Beth Easton and David Foster, ARAMARK managers, exercised supervisory authority over Martinez.

79.     Martinez had been an employee with PHS for over 20 years at the time she was forced to resign her employment or face involuntary termination.

80.     During the period of time Foster and Easton exercised supervisory duties over Martinez, Foster and Easton inappropriately bullied and harassed Martinez.  The form of this harassment included yelling at Martinez, subjecting Martinez to hours-long meetings where Martinez was unfairly criticized, unjustified, inappropriately changing Martinez' job duties and responsibilities, and removing duties and responsibilities from Martinez–all in violation of the Agreement and PHS policies and procedures.

81.     ARAMARK had no rights nor privileges under the Agreement to interfere with Martinez' job duties and responsibilities in the PHS regional hospitals.  The Agreement specifically restricted its scope to Presbyterian and Kaseman Hospitals located in Albuquerque, New Mexico.

82.     In December 2002, Martinez disputed in written form the performance assessment she received from Foster on December 19, 2002.  Under PHS policy and procedure, Martinez enjoyed the privilege of disputing performance assessments at her discretion.  When Foster became aware of the disputes raised by Martinez, he became furious with Martinez and berated and insulted her because Martinez had challenged the job assessment, stating, among other things, that Martinez was not a "team player."

11

83.     The job assessment Martinez received from Foster had much lower ratings than other job assessments Martinez had received over the years.

84.     Shortly thereafter, on January 3, 2002, Foster and Easton disciplined Martinez for a number of alleged job performance deficiencies.

85.     The January 3, 2003 disciplinary action took the form of a Loss of Good Standing

86.     Prior to the January 3, 2003 disciplinary action, Martinez had never received any disciplinary action as a PHS employee.

87.     The disciplinary action was issued by Foster and Easton, without any PHS employee approving the action.

88.     Kurtz was not present when Martinez received the Loss of Good Standing and no evidence confirms that Foster and Easton consulted with Kurtz prior to delivery of the Loss of Good Standing to Martinez.

89.     With respect to the contents of the disciplinary action, the allegation in the Loss of Good Standing related to Martinez falsifying training documents is false and contradicted by the person Martinez allegedly instructed to falsify documents, Jutta Johnson.

90.     The claim that Martinez reported to Easton that dietitians were on-call 24 hours a day and 7 days a week was simply a misunderstanding and did not justify the taking of a serious disciplinary action such as a Loss of Good Standing.  Martinez further clocked dietitians in and out while at educational activities in accordance with established PHS practice.  Indeed, even if true, Easton did not recommend disciplinary action when the issue first surfaced in November 2002.  This shows that the communication did not warrant disciplinary action under Policy 308.

91.     Martinez signed the Novartis purchasing agreement with the authority and

approval of Foster.  Again, Martinez had not been counseled about this prior to January 3, 2003 and this demonstrates that the action, even if true, did not merit disciplinary action.

92.     In its entirety, the January 3, 2003 Loss of Good Standing is based on past incidents which ARAMARK managers did not deem worthy of corrective action.  The inclusion of these incidents in the January 3, 2003 corrective action shows a malicious and manipulative animus on the part of these ARAMARK managers to affect the terms and conditions of Martinez' employment.

93.     The issue related to inappropriate use of expired formula has evidentiary support and should not have been included in a disciplinary action.

94.     There is no evidence that Foster or Easton spoke with Martinez about falsifying records, signing purchasing agreements without authorization, or authorizing the use of expired baby formula prior to issuing the January 3, 2003 corrective action.

95.     The corrective action is a retaliatory action taken by Foster and Easton because Martinez exercised her rights under PHS policy and procedure to contest and rebut the Foster job performance assessment.

96.     At the beginning of March 2003, Foster and Easton then administratively suspended Martinez from her job.  Foster and Easton did not explain to Martinez at the time the reasons for the suspension, any evidence of wrongdoing related to the suspension, or how long Martinez could expect to remain suspended.

97.     The suspension followed a conversation between Martinez, Foster, and Easton regarding coverage by clinical dietitians at the PHS regional hospitals.  Foster and Easton, in violation of the unambiguous terms of the ISS Agreement made decisions that affected the terms

and conditions of Martinez' PHS employment, improperly interfered with PHS duties in the regional hospitals, and acted in this fashion for the purpose of gaining an economic foothold and advantage in the PHS regional hospitals.

98.     PHS, by way of Kurtz's knowledge and subsequent inaction, tacitly approved these violations of the ISS Agreement.

99.     On March 17, 2003, signed a Corrective Action Form stating the reasons for Martinez' "resignation in lieu of dismissal."  The reasons stated in the document are: (1) Martinez spoke with clinical dietitians she supervised about the changes Easton and Foster wanted to impose with respect to dietitian coverage at the PHS regional hospitals after Easton had told Martinez not to discuss the matter with the dietitians and (2) the alleged inability of Martinez to comply with PHS policies and procedures and support other managers and supervisors.

100.    These alleged reasons for Martinez' dismissal are merely a pretext for Foster and Easton's plan to improperly remove Martinez from the workplace.  The reasons in the dismissal document do not justify the termination of a long-term employee with a spotless disciplinary record.

101.    With respect to the census Easton wanted Martinez to gather data on, ARAMARK had neither privilege nor authority to instruct or direct Martinez in those activities because ARAMARK's duties and responsibilities were confined to Presbyterian and Kaseman Hospitals.

102.    Kurtz permitted and condoned these violations of the ISS Agreement and PHS policies and procedures in violation of both.

14

103.    On March 20, 2003, Martinez met with Kurtz.  Martinez expressed to Kurtz that she desired to have a grievance hearing as set forth in Policy 311.  Kurtz denied this request from Martinez, although Policy 311 clearly allows an employee to have such a hearing when requested.

104.    Also at the March 20th hearing, Kurtz presented to Martinez for the first time a document entitled "Additional Consideration and Release."  Martinez had requested severance pay; however, there had been no discussions related to the necessity of signing a Release in order to receive the severance.

105.    When Martinez began to question Kurtz about the provisions of the Release, Kurtz responded that Martinez could return to work at PHS in 12 months if she signed the Release.  Martinez reasonably believed this statement from Kurtz was true prior to signing the Release.

106.    Martinez did not have sufficient time to deliberate whether she should sign the Release.  Kurtz insisted that Martinez immediately sign the Release in conjunction with the statement that Martinez could return to work at PHS in 12 months.

107.    Martinez did not have knowledge of the rights she was waiving under federal statute and New Mexico law at the time she executed Release.  Kurtz did not explain these statutes to Martinez and Martinez had no prior knowledge of the rights she enjoyed under these statutes and other claims inappropriately waived.

108.    Martinez did not take the Release to be reviewed by an attorney, although the Release explains that Martinez could do so, because Martinez believed Kurtz's statement that signing the Release would not affect future employment with PHS.  Kurtz's statement had the

15

effect of discouraging Martinez from seeking the advice of counsel.

109.    Martinez had no opportunity to negotiate any of the term of the Release she signed on March 20, 2003.

110.    On October 16, 2003, Elisberg received a verbal counseling from Easton and Joan Hagen, a PHS dietitian supervisor.

111.    The October 16th meeting became very adversarial, with Easton and Hagen accusing Elisberg of misusing PHS work time and leave.  Easton complained to Elisberg about Elisberg's use of vacation and advised Elisberg that leave time previously approved was being converted to unexcused absences.

112.    Elisberg had never received any form of disciplinary action during her 28-year career with PHS.

113.    Elisberg reasonably believed, on the basis of the removal of Martinez from the workplace and other involuntary terminations and resignations among the dietitians, that she was targeted as a senior dietitian to also be removed involuntarily from the workplace.

114.    Easton's instructions and demands to Elisberg with respect to use of vacation, scheduling, overtime, work hours, and the performance of other job-related duties violated the terms of the ISS Agreement.

115.    Elisberg involuntarily resigned her employment from PHS because she feared she would be dismissed from her PHS employment.

116.    Elisberg signed a Leaving Questionnaire when she left PHS.  The Leaving Questionnaire set forth the reasons Elisberg involuntarily resigned, including describing bad treatment from ARAMARK managers, PHS indifference, and the problems associated with

ARAMARK's administration and management of the clinical dietitians.

117.   PHS and ARAMARK targeted older, more senior employees for discipline and dismissal.  PHS and ARAMARK targeted more senior employees for removal from the workplace because of the expenses, including wages and benefits, associated with retaining such employees.

118.   Foster once remarked that he needed to know how many "older" dietitians still remained employed at PHS.

119.   Troyanowski had been a PHS employee for more than 14 years at the time she involuntarily resigned her PHS employment.

120.   Troyanowski had a clean disciplinary record and performed her job duties in at least a satisfactory fashion at the time she submitted her resignation in May 2003.

121.    Troyanowski principally worked with Martinez in PHS' Albuquerque and regional hospitals.

122.   ARAMARK managers, particularly Hudson, would yell at Troyanowski regarding work issues and make demands on Troyanowski's work schedule that violated the provisions of the ISS Agreement.

123.   Troyanowski reasonably feared, after Martinez lost her PHS employment, that PHS and ARAMARK had targeted Troyanowski for discipline and dismissal.

124.   ARAMARK managers forced Troyanowski to attend to the clinical dietary needs of the regional hospitals, even though Troyanowski did not want to travel alone to the regional hospitals and had asked for relief from this assignment because of health care needs related to her husband.  ARAMARK refused to consider relieving Troyanowski from the duties related to

17

the regional hospitals.

125.    Because of ARAMARK'S demeaning and punitive management style, among other things, Troyanowski was compelled to resign her employment with PHS.

126.    Troyanowski had communicated to Kurtz her concerns regarding ARAMARK's poor treatment of PHS employees.  Kurtz did nothing in response.

127.    Following the separation of Martinez and Troyanowski from PHS, the two women submitted a contract proposal for the provision of clinical dietary services to PHS' regional hospitals.

128.    PHS accepted the proposal and signed a consulting contract for the value of $10,800 with Martinez and Troyanowski.

129.    In September 2003, during the very first visits Martinez and Troyanowski made to the regional hospitals under the contract, ARAMARK management discovered that Martinez and Troyanowski provided consulting services to the regional hospitals.  ARAMARK management then prevailed upon PHS management to immediately cancel the contract.  Martinez and Troyanowski provided no further services under the contract and lost the benefit of the contract.

130.    ARAMARK interfered with Martinez' and Troyanowski's rights under the consulting contract.

131.    ARAMARK management knew that PHS employees were required to follow and abide by the policies and procedures established by PHS.

132.    ARAMARK management further understood that PHS expected PHS employees and ARAMARK management to enforce PHS policies and procedures.

133.    ARAMARK management understood and acknowledged that employees could be

18

subjected to disciplinary action, up to and including termination, for violations of PHS policies and procedures.

134.     ARAMARK management further understood the provisions of the ISS Agreement and acknowledged that it was required to abide by the terms and conditions of the Agreement.

135.     ARAMARK and PHS had an improper motive to remove older, more senior PHS employees from the workplace for the purposes of reducing costs and increasing savings under the Agreement.

136.     ARAMARK and PHS had an improper motive to accomplish the removal of older, more senior PHS employees by manipulating and misusing the provisions of PHS policies and procedures to discipline and separate Martinez and Pacheco from their PHS employment.

137.     Further, ARAMARK and PHS had an improper motive to force older, more senior employees, like Elisberg and Troyanowski, out of the workplace by threatening the use of disciplinary action, interfering in the performance of duties and responsibilities, violating PHS policies and procedures with respect to scheduling and use of leave, and creating a work environment that was hostile, intimidating, and threatening.

138.     ARAMARK enjoyed no privilege to act with these improper motives towards Elisberg, Troyanowski, Martinez, and Pacheco.

139.     ARAMARK also interfered through improper motives to deleteriously affect the employment of Elisberg, Martinez, Pacheco, and Troyanowski by taking adverse actions, both disciplinary and non-disciplinary, against these plaintiffs.

140.     ARAMARK took these adverse actions and interfered with Plaintiffs' employment with ill-will and the intent to harm the employment status of Plaintiffs.

141.    ARAMARK engaged in this misconduct because it desired to reduce costs associated with the administration and management of the ISS Agreement.

142.    ARAMARK further took these actions for the purpose of removing high-expense employees from the PHS workplace.  These high costs were, in part, associated with the costs of benefits to more senior and older PHS employees.

143.    The separation of more senior and older employees was accomplished by ARAMARK and PHS by the use of coercive methods and misapplication of PHS policies and procedures.  ARAMARK and PHS further accomplished the separation of senior and older employees by ignoring the requirements of the ISS Agreement.

144.     ARAMARK also interfered with these Plaintiffs rights to have the terms and conditions of their employment administered and managed only with PHS management approval, as provided for in the ISS Agreement.

145.    Furthermore, ARAMARK threatened Plaintiffs, intimidated Plaintiffs through raised voices and intimidating tactics, falsely stated claims and complaints against these Plaintiffs related to Plaintiffs' job performance and compliance with policies and procedures, and misrepresented to Plaintiffs causes and allegations for the taking of disciplinary action.  This conduct interfered with Plaintiffs' employment as PHS employees.

146.    PHS did not have the right to control the day-to-day administrative and management activities of ARAMARK supervisory employees under the ISS Agreement.

147.     ARAMARK acted as an independent contractor under the terms and provisions of the ISS Agreement.  In addition, the manner in which ARAMARK performed its duties and responsibilities under the Agreement demonstrates that ARAMARK in fact acted as an

20

independent contractor under the Agreement.

148.    ARAMARK was not privileged under the terms and provisions of the Agreement nor the work relationship with PHS to affect the terms and conditions of a PHS service employee's employment without prior approval of PHS management.

149.    Each and every of Plaintiffs was a PHS employee over 40 years of age and with over at least 14 years of PHS employment at the time of separation, resignation, or dismissal from PHS employment.

150.    PHS and ARAMARK considered the ages and lengths of tenure of work experience of Plaintiffs with PHS in deciding to either involuntarily terminate or constructively discharge Plaintiffs from their PHS employment.

151.    PHS further took into consideration the ages of Plaintiffs in determining to allow ARAMARK to force Plaintiffs out of the workplace, with the purpose of interfering with these Plaintiffs participation in PHS benefit programs, including those programs dedicated to health and welfare benefits and retirement benefits.

152.    At the time of their dismissal or constructive discharge from PHS employment, each and every Plaintiff was vested in PHS benefits plans, including, but not limited to, retirement benefits plans.

153.    At all times relevant to this action, Plaintiffs performed their job duties and responsibilities in at least a satisfactory level.

154.    At all times relevant to this action, Plaintiffs met the qualifications for the job descriptions applicable to the work they performed for PHS.

155.    The acts of PHS in participating in the dismissal or constructive discharge of

these Plaintiffs were taken for the purpose of interfering with Plaintiffs' entitlement to benefits, including retirement benefits.

156.   PHS did not administer its policies and procedures with respect to Elisberg, Martinez, Pacheco, and Troyanowski in good faith while ARAMARK administered and managed the Agreement.

## CONCLUSIONS OF LAW

### Jurisdiction

1.   This Court has personal jurisdiction over the parties to this action

2.   The Court has subject matter jurisdiction over the claims raised through this action through the Employee Retirement Income Security Act ("ERISA), 29 U.S.C. § 1101, *et seq.*

3.   This Court further has subject matter jurisdiction over this action because the ERISA claim permits the Court to exercise federal question jurisdiction, 28 U.S.C. § 1331.

4.   Both PHS and ARAMARK are employers withing the meaning of ERISA, 29 U.S.C. § 1140.

### Breach of Implied Contract of Employment

5.   An employment relationship calling only for performance of work and payment of wages is an "employment at will."  A person employed at will may be discharged at any time for any reason or for no reason at all, unless an exception to this rule applies.  An exception to this rule exists if the discharge, constructive or otherwise, of these Plaintiffs is in violation of an implied agreement or public policy.  NM UJI 13-2303 (modified).

6.   The policies and procedures of PHS altered the at-will relationship between PHS

and these Plaintiffs and required PHS to follow certain policies and procedures related to the terms and conditions of Plaintiffs' employment, including the implementation of disciplinary action.  The policies and procedures of PHS restricted PHS' power to terminate Plaintiffs and otherwise affect the terms and conditions of Plaintiff's employment.

      7.     In order for there to be an implied agreement, there must be a promise, representation, or conduct sufficiently specific to create a reasonable expectation in the minds of Plaintiffs that PHS would follow particular procedures in disciplining and discharging Plaintiffs.

      8.     The policies and procedures of PHS, including Policy 308, constitute sufficiently specific procedures to create in the minds of Plaintiffs reasonable expectations that PHS would abide by its policies and procedures.

      9.     To determine whether these specific policies and procedures modified the employment relationship requires a "totality of the circumstances" analysis, which would include evaluating the parties words and actions with respect to these policies and procedures.

      10.    At all relevant times PHS expected its managers to enforce its policies and procedures and communicated to all PHS employees that violations of policies and procedures may lead to disciplinary action, up to and including termination.

      11.    PHS prvodied training to all employees regarding the interpretation and content of PHS policies and procedures and specifically required all employees to keep abreast of any policy and procedure changes or modifications.

      12.    PHS created a work environment where employees understood that management's expectation was that all employees would abide by policies and procedures at all times.  This created a reasonable expectation in Plaintiffs that PHS would abide by and enforce

23

its policies and procedures.

13.     The ISS Agreement further established that ARAMARK managers and supervisors were required to conform their conduct to and enforce the policies and procedures of PHS.

14.     In addition, ARAMARK managers could only recommend disciplinary action against PHS service employees.  The ISS Agreement further required approval from PHS management prior to any alteration of the terms and conditions of employment affecting PHS employees.

15.     PHS permitted ARAMARK to violate PHS policies and procedures and the Agreement in effectuating the termination of Pacheco.

16.     Policy 308 sets forth a progressive correction action procedure.  PHS violated Policy 308's progressive disciplinary procedure by not providing coaching in attempting to improve any alleged work deficiencies noted in the Pacheco disciplinary actions.

17.     PHS further breached Policy 308 by not permitting Pacheco to participate in any informal counseling procedures.

18.     PHS also breached Policy 308 by initiating the formal disciplinary process without evidence that coaching would not produce desired results regarding Pacheco's performance.

19.     The Summary of Counseling given to Frank Pacheco in December 2003 does not meet the standards set forth in Policy 308.

20.     The Loss of Good Standing given to Pacheco in January 2004 does not meet the standards set forth in Policy 308.

24

21.     The Dismissal action given to Pacheco in April 2004 does not meet the standards set forth in Policy 308.

22.     PHS did not conduct a thorough investigation prior to dismissing Pacheco, in breach of the terms of Policy 308.

23.     PHS breached Policy 308 with respect to Mary Martinez by not following a course of progressive discipline prior to giving Martinez a Loss of Good Standing and Dismissal Action.

24.     PHS further breached Policy 308 by not permitting Martinez to participate in the informal counseling procedures set forth in the policy.

25.     PHS also breached Policy 308 with respect to Martinez by not providing Martinez any coaching prior to initiating the formal disciplinary action procedures.

26.     PHS breached Policy 308 by not giving Martinez a Summary of Counseling prior to issuing a Loss of Good Standing.

27.     The Loss of Good Standing issued to Martinez did not follow the standards set forth in Policy 308.

28.     The Dismissal action constitutes a breach of Policy 308 in that none of the performance actions complained of by PHS is a "serious" situation contemplated as meriting dismissal.

29.     PHS did not conduct a thorough investigation prior to dismissing Martinez from her PHS employment.

30.     PHS also breached Policy 311, the Problem Resolution Policy, in that PHS did not permit Martinez to have a grievance hearing on the dismissal action, although Policy 311

requires such a hearing when an employee makes such a request.  Further, PHS refused to

participate in either the informal or formal problem resolution process set forth in Policy 311.

31.     PHS breached Policy 308 with respect to Terri Elisberg in that PHS gave Elisberg

a verbal counseling in November 2003 that did not meet the standards set forth in Policy 308.

32.     There is no evidence that PHS ever provided Elisberg any coaching prior to

initiating the informal corrective action procedures of Policy 308.

33.     The allegations pertinent to the verbal counseling do not meet the standards for

counseling set forth in Policy 308.

34.     PHS further breached its policies and procedures by permitting ARAMARK to

create an intimidating and hostile work environment for Plaintiffs in violation of Policy 314.

35.     Policy 314, the anti-harassment policy of PHS, provides that any improper

conduct towards an individual because of status in a protected category is prohibited.  Further,

Policy 314 describes any threats against PHS employees constitutes harassment.

36.     PHS had knowledge of the hostile work environment and failed to do anything to

remedy the harassment complained of.

37.     PHS failed to conduct an appropriate investigation into the complaints of

harassment raised by Plaintiffs and took no appropriate action in response to the complaints of

harassment.

38.     These failures to act in accordance with Policy 314 constitutes a breach of that

policy.

39.     The policies and procedures of PHS, in conjunction with the duties and

responsibilities set forth in the ISS Agreement, constitute a legally enforceable implied contract

which PHS breached in the manner described above.

### Breach of the Implied Covenant of Good Faith and Fair Dealing

40.     Each party to a contract is required to perform its obligations under the contract in good faith.  NM UJI 13-832.

41.     It is a breach of contractual duty to act in bad faith.  Good faith requires that a party act honestly and in accordance with standards of fair dealing under the circumstances.

42.     PHS did not act in good faith in permitting, encouraging, and approving the breaches of policies and procedures set forth above.

43.     The reasons for which PHS approved the policy breaches described above are implausible and incredible.

44.     PHS refused to participate in good faith in the problem resolution process with Martinez.

45.     PHS did not investigate nor act to remedy the complaints of a hostile and intimidating work environment created by ARAMARK managers, specifically Hudson, Foster, and Easton.

46.     PHS is liable for breaching the covenant of good faith and fair dealing.

### Tortious Interference

47.     A contractual relationship existed between PHS and Plaintiffs through the policies and procedures PHS required Plaintiffs to abide by and the reasonable expectations Plaintiffs held that PHS would conform its conduct to the policies and procedures.

48.     ARAMARK knew of the contractual relationship between PHS and Plaintiffs established through the implementation and enforcement of PHS policies and procedures.

49.     ARAMARK had an improper motive to interfere with the contractual relationship between Plaintiffs and PHS in that ARAMARK desired to remove more costly older and senior employees from the workplace.

50.     ARAMARK demonstrated this improper motive by disciplining and discharging Plaintiffs (both constructively and actually) in violation of PHS policies and procedures.

51.     ARAMARK further demonstrated this improper motive by making decisions regarding the terms and conditions of Plaintiffs' PHS employment without consulting with or seeking the approval of PHS management–all in violation of the ISS Agreement.

52.     ARAMARK additionally demonstrated this improper motive by taking adverse employment actions against these Plaintiffs merely for financial and cost-savings reasons, unrelated to any legitimate business reasons.

53.     ARAMARK further demonstrated improper motive in interfering with these Plaintiffs contractual relations with PHS by deleting employees who were older and more senior.

54.     ARAMARK also demonstrated improper motive by drumming older and more senior employees out of the workplace for the sole purpose of reducing the costs of benefits and thereby reducing costs on the ISS Agreement.

55.     ARAMARK also used improper means to interfere with Plaintiffs' contract relationship with PHS.

56.     ARAMARK demonstrated improper means by

57.     ARAMARK intentionally and improperly interfered with Plaintiffs contractual

28

relations with PHS.

58.     ARAMARK used the improper means of interfering with Plaintiffs contract rights by misapplying PHS policies and procedures to discipline and dismiss Plaintiffs.

59.     ARAMARK further used improper means to interfere with Plaintiffs contract with PHS by threatening, intimidating, and relying upon falsehoods and inventions to inappropriately discipline and dismiss Plaintiffs.

60.     ARAMARK also used improper means by targeting older, more senior employees to accomplish cost savings under the ISS Agreement, in violation of the New Mexico Human Rights Act.

61.     ARAMARK enjoyed no privilege under the ISS Agreement or PHS policies and procedures to tortiously interfere with Plaintiffs contractual relationship with PHS.

62.     ARAMARK was also not privileged to make recommendations to PHS regarding the discipline and dismissal of Plaintiffs through improper motive and improper means.

## Civil Conspiracy

63.     A conspiracy existed between ARAMARK and PHS with respect to these Plaintiffs.

64.     The specific wrongful acts accomplished in furtherance of the conspiracy include the following: (1) a joint agreement between ARAMARK and PHS to rid the workplace of older, more senior employees for the purpose of cost cutbacks and savings associated with performance of the ISS Agreement; (2) joint agreement to accomplish this purpose through improper use and application of PHS' policies and procedures; (3) joint agreement to permit ARAMARK to violate the ISS Agreement by unilaterally disciplining and dismissing Pacheco, Martinez, and Elisberg and affect the terms and conditions of employment of all Plaintiffs; and (4) joint

30

agreement to invent and exaggerate workplace circumstances for the sole purpose of producing false allegations to accomplish ARAMARK's and PHS' purposes.

65.     As a result of the conspiracy between ARAMARK and PHS, Plaintiffs were damaged.

## NMHRA Wrongful Termination Claims

66.     Elisberg, Martinez, Pacheco, and Troyanowski are over 40 years of age.

67.     Elisberg and Troyanwoski at all times relevant hereto performed their job duties and responsibilities in at least a satisfactory fashion.

68.     The NMHRA, § 28-1-7(A) and (I), NMSA 1978, prohibits discrimination against an employee with respect to the terms and conditions of employment because of "age"

69.     The NMHRA constitutes a declaration by the legislature of the State of New Mexico with respect to public policy.

70.     All Plaintiffs dismissed and constructively discharged fall into a protected category of employees under the NMHRA.

71.     The age of Plaintiffs was a determining or motivating factor in PHS' decision to wrongfully terminate and constructively discharge these Plaintiffs.  PHS acted in this manner for the simple purpose of hiring employees at a lesser cost.

## Violations of ERISA

72.     At all times relevant hereto, PHS maintained in full force an effect benefit plans for Plaintiffs which included, but was not limited to, pension benefits.

73.     Plaintiffs were eligible participants in PHS benefit plans and had vested interests in the benefit plans provided.

74.     PHS served as the benefits plan administrator.

75.     It is considered wrongful interference under ERISA, 29 U.S.C. § 1140, for any fiduciary or employer to treat a plan participant adversely for the purposes of obstructing any rights to which a participant is entitled.  PHS engaged in such adverse treatment and wrongful interference by discriminating against Plaintiffs on the basis of age and seniority.

76.     PHS, through its wrongful interference with Plaintiffs' participation in these benefit plans, breached the terms of the pension/retirement plans under which Plaintiffs were entitled to benefits.

77.     PHS knew at all times that its unlawful conduct was in violation of the provisions of ERISA, specifically § 1140.

78.     PHS dismissed or constructively discharged Plaintiffs because it unlawfully sought to reduce the costs of benefits Plaintiffs would be entitled to in the future.

79.     The unlawful actions of PHS have resulted in severe reductions of retirement benefits to these Plaintiffs.

80.     The benefit considerations led PHS to the decision to remove Plaintiffs from the workplace.

81.     The unlawful actions and decisions of PHS were made with malice and reckless indifference to the federally-protected rights of Plaintiffs.

**Martinez Release**

82.     Under *Torrez v. Public Service Co.*, 908 F.2d 687, 689 (10th Cir. 1990), the Court finds that Martinez did not knowingly and voluntarily execute the Additional Consideration and release.

83.     The Additional Consideration and Release Agreement, with respect to the claims of Martinez, is, therefore, null and without effect.

### Damages

Having determined that PHS and ARAMARK are liable for the acts of its officers, agents, and employees for the reasons set forth above, the Court must now determine what relief, if any, is appropriate.

84.     Plaintiffs, individually, are entitled to damages in the form of back pay in the following amounts: (1) Pacheco _____; (2) Martinez _____.

85.     Plaintiffs, individually, are entitled to front pay damages in the following amounts: (1) Pacheco _____; (2) Martinez _____.

86.     Plaintiffs, individually, are entitled to front pay damages in the following amounts: (1) Pacheco _____; (2) Martinez _____.

87.     Plaintiffs, individually, are entitled to the loss of retirement benefits and other benefits in the following amounts: (1) Elisberg _____; (2) Martinez _____; (3) Pacheco _____; and (4) Troyanowski_____.

88.     The Court finds that Plaintiffs have appropriately mitigated their damages and are therefore entitled to the damages enumerated above.

89.     The Court awards Plaintiffs mental, emotional, and psychological distress damages, individually, in the following amounts: (1) Pacheco _____; (2) Martinez _____; (3) Elisberg _____; and Troyanowski_____.

90.     The Court awards Plaintiffs pre- and post-judgment interest.

33

**Attorney's Fees**

91.     The Court awards, pursuant to ERISA and Rule 1-054 of the New Mexico Rules

of Civil Procedure, Plaintiff's attorney's fees and costs in an amount to be determined at a

subsequent date.

Respectfully submitted,

LAW OFFICES OF MICHAEL E. MOZES, P.C.


Electronically filed on 09/11/06
MICHAEL E. MOZES
Attorney for Plaintiffs
5732 Osuna N.E.
Albuquerque, NM 87109
(505) 880-1200


**I HEREBY CERTIFY** that a copy of
the foregoing was sent via facsimile and
first class, regular mail to opposing counsel
of record on this 11th day of September, 2006.

Electronically filed on 09/11/06
MICHAEL E. MOZES