**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FILED

06 SEP 11 PM 3: 52

CLERK-ALBUQUERQUE

SALLY GOMEZ, TERRI P. ELISBERG,
SHIRLEY GARCIA, LINDA GIVENS,
SCOTT COHERNOUR, DENISE HENDRIXSON,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, SALLY URIOSTE,
JOYCE WINN, JOSEPH RUIZ and DAVE PACHECO,

       Plaintiffs,

vs.

                          No. CIV 2005-461 JH/KBM

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,

       Defendants.

## DEFENDANT ARAMARK MANAGEMENT SERVICES, L.P.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, ARAMARK Management Services, Limited Partnership ("ARAMARK"), submits the following requested findings of fact and conclusions of law:

### FINDINGS OF FACT

1.    Plaintiffs, at all material times, were employees in the Hospitality Services Division of Presbyterian Healthcare Services, Inc. ("PHS").

2.    All of the Plaintiffs understood and acknowledged that their employment with PHS was at-will employment. See Plaintiffs' Employment Agreements.

3.    On August 29, 2000, PHS contracted with Service Master for administration of the Hospitality Services Division. See Integrated Support Service Agreement.



4.     ServiceMaster was purchased by ARAMARK in October 2001.  Thereafter, ARAMARK became the administrator of the contract.  See Correspondence from ServiceMaster to PHS dated 10/04/01 and attachments.

5.     The contract was administered by ARAMARK through its management employees, David Foster, Bob Hudson, Mary Beth Easton, and John Hughes.

6.     PHS amended its Integrated Support Service Agreement with ServiceMaster on September 1, 2000 to change all references to ServiceMaster to ARAMARK/ServiceMaster effective April 7, 2003.  See Correspondence from ServiceMaster to PHS dated 10/04/01 and attachments.

7.     The Integrated Support Service Agreement was created as a result of a desire on the part of PHS to consolidate, restructure and integrate its service departments (including plant operations and maintenance, housekeeping, food service, linen distribution, bio-medical engineering, grounds, and support assistance) into a single Integrated Support Service in order to decrease costs, improve service and enhance employee morale.  See ISS Agreement.

8.     The    Integrated    Support    Service    Agreement    required ServiceMaster/ARAMARK to deliver Integrated Support Service using the Presbyterian Healthcare personnel employed on the date of the Agreement.  ServiceMaster/ARAMARK was to provide supervisory personnel to implement the business plan it developed and to supervise and manage the Integrated Support Service. See ISS Agreement.

9.     Under    the    Agreement,    ServiceMaster/ARAMARK    would    make recommendations in connection with wage and wage-related matters but ServiceMaster/

ARAMARK would not make any decisions with respect to wages, hours or other working conditions for its employees. See ISS Agreement.

10.   PHS retained sole responsibility to hire, discipline and discharge its service employees. PHS also retained the responsibility for paying all wages and salaries of its service employees and all payroll and other taxes, fees and other charges or insurance levied or required by a federal, state or local statute relating to the employment of its service employees. See ISS Agreement.

11.   Management had the authority and responsibility to follow a course of progressive discipline which may include coaching, written counseling, suspension and/or dismissal. See PHS Policy #308.

12.   PHS recognizes a progressive disciplinary process consisting of informal and formal counseling procedures which may be bypassed or accelerated based on the seriousness of the situation. See PHS Policy #308.

13.   Coaching may occur at any time and need not be documented in writing. Coaching is not considered part of the formal disciplinary action process and is intended to place the employee on notice that performance expectations are not being met. See PHS Policy #308.

14.   When an employee's work performance or behavior is not at a satisfactory level, a supervisor may meet with the employee and inform him of the problem and expectations necessary for correction. This is referred to as a summary of counseling. See PHS Policy #308.

15.   If the written counseling fails to produce expected results or other work performance problems occur a Loss of Good Standing should be initiated which will remain in effect for a 12-month period. See PHS Policy #308.

16.    An employee who is in Loss of Good Standing is not eligible for certain benefit programs including performance salary adjustments, gain share, tuition reimbursement, transfer/promotion, any Career Advancement Program, or personal or educational leave. See PHS Policy #308.

17.    If those disciplinary procedures fail to produce the expected results or other issues occur, notice of dismissal should be issued. See PHS Policy #308.

18.    When problem behavior is serious enough, use of disciplinary suspension or dismissal is appropriate. See PHS Policy #308.

19.    ARAMARK had no involvement with PHS benefits or benefit plans. It did not serve as the benefits plan administrator for PHS. ARAMARK had no influence over decisions made by PHS pertaining to benefits. ARAMARK was not made aware of which employees participated in any of its benefit plans. See testimony of Betty Kurtz or Karen Janway.

20.    There was more accountability under ARAMARK's management of employees at PHS. Changes made by ARAMARK and ARAMARK's management style was met with resistance by PHS employees. See testimony of Betty Kurtz, Mary Beth Easton, and David Foster.

## FRANK PACHECO

21.    PHS employed Frank Pacheco as a cook in its dietary department beginning in 1979. See PHS Benefit Calculation.

22.    Mr. Pacheco's employment was terminated by PHS effective April 15, 2004 for misconduct in the workplace including the use of foul language and abusive conduct toward

other PHS employees. See Corrective Action Memorandum 4/15/04 and supporting memos and statements.

23.   His termination followed a series of progressive discipline steps. See Corrective Action Memos and documentation dated 7/11/00, 3/30/03, 8/29/03, 12/15/03, 12/30/03, 1/30/04, 4/10/04, 4/14/04, 4/15/04.

24.   Prior to the signing of the Integrated Support Service Agreement between PHS and ServiceMaster/ARAMARK, on July 11, 2000, his supervisor, Linda Givens, spoke with Frank Pacheco about his responsibility as a lead employee and warned him not to contribute to rumors. She stated that Frank was not agreeable to her suggestions and had a difficult time recognizing and taking responsibility for his behavior. See memo by Linda Givens dated 7/11/00.

25.   On August 29, 2003, Frank Pacheco received a verbal Corrective Action from John Hughes and Mary Beth Easton for not consistently taking food temperatures during the months of June-August 2003. He was also given a verbal warning for complaints of harassment from others and was reminded that foul language is not tolerated in the workplace. See 8/29/03 Corrective Action Memorandum.

26.   On December 30, 2003, Frank Pacheco received a Corrective Action Memorandum and was placed in summary counseling regarding clocking issues, insubordination, overtime. It was believed that Mr. Pacheco was clocking in early and taking a break instead of beginning work. His clocking in prior to his scheduled shift was not approved by any manager. In addition, Mr. Pacheco had a loud verbal confrontation with a Food Service Zone Lead regarding discarding food. He was reminded at that time that he was expected to

practice safe food handling and storage techniques.   See 12/30/03 Corrective Action Memorandum.

27.   There had been previous discussions about responsibility for safe food handling practices at PHS and Mr. Pacheco understood that unsafe food handling practices would result in a Loss of Good Standing. On January 12, 2004 Mr. Pacheco received and signed a memo memorializing discussions at a meeting regarding responsibility for safe food handling practices. On January 13, 2004 he received and signed a memo regarding food replenishment and the necessity of taking food temperatures to assure foods have reached correct cooking/holding temperature. See 1204 and 1304, signed memos.

28.   On January 30, 2004, he received a Loss of Good Standing due to unsafe food handling practices, as a result of raw food being served by Mr. Pacheco on the cafeteria line and the receipt of a customer complaint regarding uncooked food.  See 1/30/04 Corrective Action Memorandum.

29.   Mr. Pacheco had previously been counseled about yelling in the workplace and using foul language in the workplace. He understood that foul language is not tolerated in the workplace, that employers should address employees who have used foul language, and that he could eventually be terminated for using foul language.   See Corrective Action Memorandums.

30.   On or about April 10, 2004, Mr. Pacheco was involved in a confrontation with two food service employees over work space.  Frank yelled at a fellow co-worker, Tony Griego, at work.  The employee indicated that he was tired of Frank Pacheco using foul language

in the workplace, and a verbal altercation took place. See 4/15/04 Corrective Action Memorandum and supporting documentation.

31.   As a result of that incident and his previous counseling/discipline, Mr. Pacheco was dismissed by PHS. See 4/15/04 Corrective Action Memorandum.

32.   Mr. Pacheco does not know of any policy or procedure that was violated with respect to his termination. Deposition of Frank Pacheco.

33.   He has no knowledge about the supervisor's investigation of the incidents which led to his termination and no information that Mary Beth Easton did not believe what she learned about the incident which led to his termination. Deposition of Frank Pacheco.

34.   Mr. Pacheco was fully vested in his pension plan with PHS. On May 1, 2004 he began receiving pension benefits of $523.16 per month. See PHS Benefits Calculation.

35.   Mr. Pacheco earned $32,083.97 with PHS in 2003. See PHS Benefits Calculation.

36.   Mr. Pacheco became employed by Santa Ana Star Casino on December 20, 2004, earning $9.50 per hour. On April 16, 2005 he began earning $9.75 per hour at the Casino. He worked there until May 20, 2005. See post-PHS earnings.

37.   He was eligible for medical, vision and dental insurance as well as life insurance, short term disability and long term disability, profit sharing and a 401(K) plan. He was eligible to take advantage of an Employee Assistance Program (EAP). See Santa Ana Star Casino NEO Participant Guide.

38.   On May 22, 2005, Mr. Pacheco became employed by Village Inn (VICORP) earning $9.75 per hour and is still employed with that company. He is eligible for medical,

dental, life, dependent life and personal accident insurance. He is also eligible for long term disability benefits. VICORP also offers a 401(k) plan for its employees. See VICORP check stubs and VICORP Restaurants, Inc. Benefits manual.

**TERRI ELISBERG**

39.    Terri Elisberg was employed as a dietician with PHS from September 20, 1975 until January 2, 2004. See PHS Benefits Calculation.

40.    Ms. Elisberg was not ever placed in a loss of good standing nor was she formally disciplined. On October 16, 2003 she was involved in a verbal coaching session with Mary Beth Easton, Joan Hagen and Betty Kurtz addressing the need to request days off prior to the posting of the monthly schedule. Testimony of Mary Beth Easton, Joan Hagen and Betty Kurtz.

41.    Ms. Elisberg received a Job Competency Assessment for the annual period 2000, which was completed by her supervisor, Mary Martinez. She believed that was a fair assessment of her job performance in the year 2000. See Job Competency Assessment for Annual Period 2000.

42.    Ms. Elisberg received Job Competency Assessments for annual periods 2001 and 2002 from Ms. Martinez. She has no quarrel or objection with any of the material that was filled in on the evaluations given on those assessments. She was ranked as excellent in all of her evaluations. See Job Competency Assessment for Annual Periods 2001 and 2002.

43.    Ms. Elisberg received a favorable Job Competency Assessment for the annual period 2003 from Joan Hagen. See Job Competency Assessment for Annual Period 2003.

44.    On or about December 11, 2003 Ms. Elisberg prepared, signed and delivered to Joan Hagen, Clinical Nutrition Manager for PHS, and Mary Beth Easton, Assistant Director of Food/Nutrition Services a notice of resignation from her job as Clinical Dietician. See December 11, 2003 Resignation.

45.    That resignation indicated that Ms. Elisberg enjoyed her years of service with PHS and that the decision to resign had been "most difficult" for her. See December 11, 2003 Resignation

46.    Ms. Elisberg's resignation was not requested by any officer, manager or supervisor at PHS or by anyone acting on behalf of PHS.  Testimony of Terri Elisberg.

47.    Ms. Elisberg's resignation was not the result of corrective action on the part of PHS.  Testimony of Mary Beth Easton and Joan Hagen.

48.    Mary Beth Easton believed Ms. Elisberg had a very dedicated view on nutrition care, had great interdisciplinary skills and was valued by Ms. Easton.  Testimony of Mary Beth Easton.

49.    When Ms. Elisberg resigned, she had already applied for another job and had been employed or given an employment offer with the Pueblo of Isleta.  See Personnel Action form dated 1/2/04.

50.    Ms. Elisberg is earning approximately $24.84 an hour with the Pueblo of Isleta and she is consequently not entitled to a lost wage claim.  She is eligible for health, dental and vision benefits and life insurance.   See Pueblo of Isleta Personnel Department Employee Action Notice.

51.   She is participating in the Pueblo of Isleta's employees' 401 (k) plan and trust.  See Pueblo of Isleta records.

52.   She does not contend that during her employment, policies and procedures at PHS were violated in regard to her employment.  Deposition of Terri Elisberg.

53.   She received no written warnings during her employment and was never written up. Deposition of Terri Elisberg.

54.   Ms. Elisberg did nothing prior to her resignation to deal with the issues she felt led to her resignation at Presbyterian. Deposition of Terri Elisberg.

55.   She has no information that ARAMARK employees conspired with PHS employees against her. She does not believe that ARAMARK or PHS employees had an improper motive to harm her. Deposition of Terri Elisberg.

56.   Ms. Elisberg earned $47,664.68 at PHS in 2003 and was fully vested in her pension plan with PHS.  See PHS Benefits Calculations.

**PATRICIA TROYANOWSKI**

57.   Patricia Troyanowski was employed as a dietician with PHS from March 27, 1989 to June 1, 2003.  See PHS Benefits Calculations.

58.   On or about May 9, 2003 Patricia Troyanowski resigned her employment with PHS via an E-mail communication to David Foster and Mary Beth Easton.  She resigned effective June 1, 2003 and thanked them for the opportunity to practice her profession "for these past years". Nowhere in that communication does Ms. Troyanowski mention that she was forced to relinquish her position.   See 5/9/03 E-mail from Richard Troyanowski to David Foster regarding resignation.

59. Ms. Troyanowski did not complain to ARAMARK about her working conditions. See deposition testimony of Patricia Troyanowski.

60. Her resignation was not requested by any officer, manager or supervisor at PHS or by anyone acting on behalf of PHS. See Resignation of Troyanowski.

61. Her resignation was not the result of any corrective or disciplinary or other similar action on the part of PHS or ARAMARK. Testimony of Patricia Troyanowski, Mary Beth Easton and David Foster

62. Ms. Troyanowski received a positive Job Competency Assessment for the annual period 2000 from Mary Martinez, her supervisor. See Job Competency Assessment for Annual Period 2000.

63. She also received a positive Job Competency Assessment for the annual period 2001. She has no knowledge that anyone ever objected to the evaluation of her work as reflected in the Job Competency Assessment. See Job Competency Assessment for Annual Period 2001.

64. She also received a positive Job Competency Assessment for the annual period 2002 by Ms. Martinez. She is not aware of anyone criticizing or objecting to the high evaluation of "excellent" as her competence level. See Job Competency Assessment for Annual Period 2002.

65. Mary Beth Easton believes that Ms. Troyanowski was a resource for other dieticians and was thought of as a great educator for the patients to whom she provided education. Deposition testimony of Mary Beth Easton.

66.     Ms. Troyanowski was earning $21.44 per hour (approximately $40.000 annually) when she left PHS. PHS approved a pay increase to $21.44 / hour which would have become effective May 25, 2003. She was fully vested in PHS' Pension Plan. See PHS Benefits Calculation documentation.

67.     Ms. Troyanowski has had several jobs since leaving PHS and has earned more money at those jobs than she earned at PHS. She is not entitled to a lost wage claim. See Post-PHS documentation from THI of NM, Specialty Hospital Trans, Inc. and CORAM Healthcare.

68.     In 2003, Ms. Troyanowski earned $47,407.00 in wages and earnings. In 2004, Ms. Troyanowski earned $54,794. She continues to earn comparable wages. See Ms. Troyanowski's tax returns.

69.     She is eligible for health, vision and dental benefits as well as life insurance benefits with her new employer. See CORAM Employee Benefits Summary.

70.     Ms. Troyanowski is eligible to participate in a 401 (k) plan with her new employer but has opted not to participate. See CORAM Employee Benefits Summary.

**MARY MARTINEZ**

71.     Ms. Martinez was the Chief Clinical Dietician at PHS. She was employed with PHS from September 1982 to March 17, 2003. See PHS Benefits Calculation documentation.

72.     Ms. Martinez resigned her employment with PHS in March 2003, in lieu of termination. See Personnel Action form dated 3/17/03 and Corrective Action Form dated 3/17/03.

73.    At the time of her resignation from employment with PHS, Mary Martinez requested and PHS agreed to pay additional consideration to Ms. Martinez of $6,179.51, which amount was over and above all other compensation, expenses, benefits and allowances to which she was entitled upon her resignation from employment.    See Additional Consideration and Release Agreement.

74.    In consideration for the payment of additional compensation of $6,179.51 to Mary Martinez, she executed and delivered to PHS an Additional Consideration and Release Agreement on March 20, 2003. See Additional Consideration and Release Agreement.

75.    Ms. Martinez was not otherwise entitled to the consideration given. See Additional Consideration and Release Agreement.

76.    By entering into the Additional Consideration and Release Agreement, Ms. Martinez waived all rights or claims and released and forever discharged PHS, its officers, directors, assigns and all entities in privity with them, from any and all claims and causes of action of every kind, nature or description which she has, known or unknown, related to or arising from her employment with or cessation of employment from PHS, and any other event occurring up to the date of the Release. See Additional Consideration and Release Agreement.

77.    By signing the Additional Consideration and Release Agreement, she acknowledged that she had the opportunity to and carefully read all the terms and conditions in the Agreement and understood the Agreement to be a release of all claims that she had arising out of her employment by PHS or the cessation of employment. See Additional Consideration and Release Agreement.

78.   The release specifically includes claims asserted under the New Mexico Human Rights Act, the ADEA and ERISA. See Additional Consideration and Release Agreement.

79.   Ms. Martinez acknowledged that she had been advised to review the Agreement with an attorney and then she signed it voluntarily.  Deposition testimony of Mary Martinez.

80.   At the time she signed the Additional Consideration and Release Agreement, Ms. Martinez had available to her for withdrawal $17,204 in PHS' 403(b) plan and $2,840 in PHS' 401(a) plan. See PHS Benefits documentation.

81.   During the years 2003 and 2004, Ms. Martinez received $42,000 per year in alimony payments. See Mary Martinez tax returns.

82.   Ms. Martinez had seven days after signing the Release to revoke the waiver/release of rights or claims under the ADEA.  The Agreement clearly advises her to consult with an attorney regarding execution of the Release. See Additional Consideration and Release Agreement.

83.   Ms. Martinez has a Bachelor degree from the University of California Berkeley in food nutrition and dietetics which she obtained in 1975.  She worked with NASA in the Department of Public Health and at Berkeley's research facility doing research on cholesterol, weightlessness and the loss of calcium from the bones of astronauts and on wine and digestibility. See Mary Martinez Resume.

84.   She received a Master of Science in Nutrition from the University of New Mexico in 1992.  She took a year of business classes at the Anderson School of Business.  She

took exercise science courses, statistics, advanced classes in some biological fields and public health. See Mary Martinez Resume.

85.   She has worked as a Corporate Dietitian, Consultant Dietitian, Clinical Dietitian and Clinical Nutrition Manager in entities such as La Vida Llena, Charter Behavioral Systems, Coram Healthcare, San Francisco City College, and Presbyterian Hospital, where she managed 14 Clinical Dieticians, directed Clinical Nutrition Services for six hospitals, managed clinical nutrition services for state wide homecare services and outpatient clinics and provide continuing education programs for nurses dietitians and physicians.   She has also been an educator for wellness nutrition, community nutrition and continuing education. See Mary Martinez Resume.

86.   She has been an instructor of clinical and introductory nutrition classes at the University of New Mexico School of Medicine and T-VI (now CNM). See Mary Martinez Resume.

87.   She has served as President and Legislative Network Coordinator of NM Dietetic Association, Board Member of Presbyterian Homecare and Board Member of St. Pius X High School. See Mary Martinez Resume.

88.   On   January 3, 2002,   Ms. Martinez   received   a   Corrective   Action Memorandum, which placed her in a loss of good standing for her work performance and professional conduct. This resulted from several incidents.   One incident involved Mary Martinez instructing a PHS employee to falsify training documents. The other had to do with misrepresentations by Ms. Martinez regarding requirements of Dietitians on call status and clocking out for clinical education.   The issue of Ms. Martinez lacking the authority to sign

purchasing agreements was also addressed. Finally, the Corrective Action Memorandum addressed an incident in which Ms. Martinez approved the use of expired formula. It is strictly forbidden to dispense expired formula/enteral product to patients under any circumstances. See Corrective Action Memorandum 1/3/02 and supporting documentation.

89.    On February 27, 2003 Mary Beth Easton and David Foster met with Mary Martinez to discuss Ms. Martinez's travel to and activities at the regional hospitals. Mary Beth Easton directed Ms. Martinez to gather data regarding each Regional Hospital she and Patricia Troyanowski support including daily census, number of patients for which she is asked to provide nutrition assessment and planning, number of outpatients seen; and other activities. Ms. Easton informed Ms. Martinez that she believed Ms. Martinez's role at the Regional Hospitals would change and told her she needed the data in order to make a determination regarding needs. Finally Ms. Easton specifically asked Ms. Martinez not to involve others with the project and not to go to the Hospitals of anyone else regarding possible plans, outcomes, or scenarios. Time and data was needed to make recommendations regarding the best nutritional care for each of the Regional Hospitals. See Corrective Action Form dated 3/17/03 and supporting documentation.

90.    Ms. Easton was advised that Ms. Martinez made an announcement on March 5, 2003 at lunch that she would not be traveling to the Regionals after 90 days and that Trish Troyanowski didn't want to travel to the Regionals any more and that a full time registered dietitian would have to travel alone to the Regionals. By going to the clinical nutrition staff, Ms. Martinez had ignored Ms. Easton's express order not to involve anyone else. She was suspended as a result. See Corrective Action Form dated 3/17/03 and supporting documentation.

91.   Ms. Martinez resigned in lieu of dismissal on or about March 17, 2003. See Corrective Action Form dated 3/17/03 and supporting documentation.

92.   Ms. Martinez consistently showed an inability to model support for directives given to her by her immediate managers, policies and procedures of PHS and to provide accurate information which affects others in the Management Team or to those who reported directly to her. See Corrective Action Form dated 3/17/03 and supporting documentation and other disciplinary action taken against Ms. Martinez.

93.   Ms. Martinez earned approximately $52,794.97 at PHS, the year prior to her resignation. She was fully vested in PHS' Pension Plan. See PHS Benefits Calculations documentation.

94.   Ms. Martinez became re-employed by UNM by March 31, 2003, as a Senior Research Nutritionist earning $48,142.96 with subsequent increases. See UNM Health Sciences Center offer letter.

95.   In 2003, Ms. Martinez earned $50,534 in wages. See Mary Martinez tax returns.

96.   In 2004, Ms. Martinez had earnings of $50,120. See Mary Martinez tax returns.

97.   In 2005, Ms. Martinez earned about $47,000 at UNM. Ms. Martinez is eligible for health and dental insurance through her employer. She has earned on average $8,000-11,000 per year teaching at T-VI. See Deposition testimony of Mary Martinez.

98.   Ms. Martinez is earning more now than she did at PHS and has no future lost wages. In addition, on April 13, 2006, T-VI Community College confirmed that Ms.

Martinez had been hired as a full-time instructor in the discipline of nutrition for a two-semester work load. Her base salary there for the 2006-2007 academic year would be $39,168.00. See 4/13/06 T-VI Community College letter to Mary Martinez regarding 2006-2007 academic year.

### CONCLUSIONS OF LAW

1.      There was no employment relationship between Plaintiffs and ARAMARK and, therefore, Counts I, II, III, IV, V, and VII do not state a claim for relief against ARAMARK.

2.      The plaintiff had no reasonable expectation that the terms of the personnel policy constituted an implied contract.

3.      Each of these plaintiffs signed and acknowledged an agreement which expressly provided that the handbook did not constitute a contract and therefore they had no reasonable expectation that the handbook constituted an implied contract.

4.      There was contract between Plaintiffs and PHS that was breached. However, even if any contract was breached, the evidence fails to demonstrate that ARAMARK played any role in inducing any breach.

5.      The acts of ARAMARK regarding the employment of the Plaintiffs were done with justification or privilege.

6.      ARAMARK did not act either with an improper motive or by use of improper means.

7.      The Plaintiffs' subjective belief regarding decisions about their employment is insufficient to create a genuine issue of material fact.

8.      ARAMARK was, by contract, PHS's administrator for the Hospitality Services Department. ARAMARK acted as the agent of PHS.

9.    Agents cannot conspire with their corporate principal.

10.   There was, therefore, no conspiracy between PHS and ARAMARK.

11.   In the alternative, because there is no evidence that PHS and ARAMARK engaged in any scheme involving either an unlawful purpose or using unlawful means, the conspiracy claim fails. Plaintiffs' mere allegations and subjective belief is insufficient to establish a conspiracy.

12.   Civil conspiracy is achieving an unlawful purpose or using an unlawful means to achieve a lawful goal.

13.   The existence of a conspiracy must be shown either by direct, specific evidence or by circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred.

14.   The absence of evidence of an unlawful purpose or use of unlawful means defeats a civil conspiracy claim.

15.   ARAMARK's motive for recommendation of the corrective actions taken was not based on hatred or ill will toward Ms. Martinez or to discriminate against her because of her race, age, sex, religion or national origin.

16.   ARAMARK did not use improper means such as violence, threats, intimidation, or deceit, misrepresentation, bribery, unfounded litigation, defamation or disparaging falsehoods in making its recommendations regarding corrective actions.

17.   PHS and ARAMARK are in Privity of Contract, by virtue of the ISS Agreement.

18.   The release language contained in the Additional Consideration and Release Agreement signed by Mary Martinez is clear and specific.

19.   Mary Martinez waived all rights or claims and released and forever discharged PHS, and ARAMARK, from any and all claims and causes of action of every kind, related to or arising from her employment with or cessation of employment from PHS.

20.   Plaintiffs have failed to establish a cause of action of conspiracy between PHS and ARAMARK.

21.   Plaintiffs have failed to establish that ARAMARK tortiously interfered with their contractual relations with PHS.

22.   Plaintiffs have failed to establish that their damages are attributable to ARAMARK.

Respectfully Submitted,

BUTT THORNTON & BAEHR PC


Agnes Fuentevilla Padilla
Michael P. Clemens
Attorney for Defendant ARAMARK
P.O. Box 3170
Albuquerque NM  87190-3170
Telephone: (505) 884-0777

I hereby certify that a true copy of the
foregoing pleading was mailed to all
counsel of record on this 11th day
of September, 2006:

Michael E. Mozes, Esq.
Attorney for Plaintiffs
5732 Osuna Road NE
Albuquerque, NM  87109

Robert M. St. John, Esq.
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Attorneys for Defendant
    Presbyterian Healthcare Services, Inc.
P.O. Box 1888
Albuquerque, NM  87103

Agnes Fuentevilla Padilla
Michael P. Clemens