IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TERRI P. ELISBERG, SCOTT COHERNOUR,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, JOSEPH RUIZ, and
DAVE PACHECO,

        Plaintiffs,

vs.
                                         No. 05-CV-461 JCH/KBM

PRESBYTERIAN HEALTHCARE SERVICES,
INC., and ARAMARK MANAGEMENT
SERVICES, L.P.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Presbyterian Healthcare Services, Inc.'s ("Presbyterian") Motion for Summary Judgment as to Claims of Plaintiff Patricia Troyanowski, filed November 4, 2005 **[Doc. No. 54]**, Defendant ARAMARK Management Services, L.P.'s ("ARAMARK") Motion for Summary Judgment as to Claims of Plaintiff Patricia Troyanowski, filed November 21, 2005 **[Doc. No. 65]**, Defendant Presbyterian's Motion for Summary Judgment as to Claims of Plaintiff Terri P. Elisberg, filed November 4, 2005 **[Doc. No. 58]**, and Defendant ARAMARK's Motion for Summary Judgment as to Claims of Plaintiff Terri P. Elisberg, filed November 21, 2005 **[Doc. No. 64]**. On August 10, 2006, the Court entered a Memorandum Opinion and Order deferring its ruling on Defendants' Motions for Summary Judgment on Plaintiffs' constructive discharge and Employee Retirement Income Security Act

(ERISA) claims to allow the parties to submit supplemental briefing.[1]  On August 24, 2006, Plaintiffs Troyanowski and Elisberg ("Plaintiffs") filed their Supplemental Brief in Response to Defendants' Motions for Summary Judgment,[2] and on September 5, 2006, Defendant Presbyterian filed its Reply to Plaintiffs' Supplemental Brief in Response to Defendants' Motions for Summary Judgment.  The Court having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the motions are not well taken and will be denied.

## BACKGROUND[3]

I.    Plaintiff Troyanowski.

Plaintiff Troyanowski resigned from her twelve-year employment with Presbyterian on May 9, 2003, because she felt as though Defendants were forcing her to resign.  Plaintiff Troyanowski was not verbally asked to resign but was encouraged to leave by a variety of factors, including Defendant ARAMARK's management style and behavior.  ARAMARK's management style and behavior was "punitive."  Plaintiff stated, "[I]f I made a comment to [one of my

---

[1] In that Memorandum Opinion and Order, the Court also denied Defendants Presbyterian's and ARAMARK's motions for summary judgment to the extent they sought summary judgment on Plaintiffs' Troyanowski's and Elisberg's NMHRA age discrimination claims on the ground that Plaintiffs were required to submit evidence of differential treatment, denied Defendants' motions for summary judgment to the extent they sought summary judgment on Plaintiff Ruiz's civil conspiracy claim based upon FMLA retaliation, and granted Defendants' motions for summary judgment to the extent they sought summary judgment on Plaintiff Ruiz's discriminatory demotion claim under the NMHRA, ADA, or Title VII.  This Memorandum Opinion and Order will not address the claims already decided in the August 10, 2006, Order, and will only address Defendants' motions for summary judgment on Plaintiffs Troyanowski's and Elisberg's constructive discharge and Employee Retirement Income Security Act (ERISA) claims.

[2] Plaintiff Joseph Ruiz joined Plaintiffs Troyanowski and Elisberg in filing the Supplemental Brief in Response to Defendants' Motions for Summary Judgment.  Since that time, however, Plaintiff Ruiz has entered into a settlement agreement with Defendants.  Defendants' motions for summary judgment on Plaintiff Ruiz's claims therefore are moot.

[3] The facts set forth herein are construed in the light most favorable to Plaintiffs.

2

supervisors] and it wasn't in line with what they believed or the way that they dealt with issues, they would shut it down, and they would say, 'No, you know, we're not doing it that way,' and . . . sometimes as a result they would take responsibilities away." "[T]hey would basically take away or do whatever it was that they felt was necessary to continue their behavior." In addition, the "Aramark managers were often very angry and would show their anger." "[T]hey were hostile[] . . . they were punitive if you did not exactly follow everything that they said, or if you even questioned their decisions or . . . if there was any questioning at all." Defendants also created a hostile atmosphere in Plaintiff's meetings with ARAMARK's on-site lead manager Bob Hudson and ARAMARK manager Mary Beth Easton.

Defendant ARAMARK's management style also was secretive. "When positions were changed, they, you know, didn't announce it or make it known to anyone." "It just seemed that nobody knew what was going on . . . who the managers were . . . [and] how they were directing the policy and procedures." In addition, ARAMARK's management style and behavior was "divisive. It seemed that they would come between people." ARAMARK's management style also was demeaning. ARAMARK made demeaning comments regarding Plaintiff's value as a dietitian and failed to empower Plaintiff to do her job. For example, ARAMARK manager Mary Beth Easton made comments like, "I really don't even know why dietitians need to be in the hospital," or she would question the dietitians' ability to do certain tasks that they already had been doing. ARAMARK supervisor David Foster also refused to "acknowledge the hard work of the [Presbyterian] staff," and instead "promoted all of [Easton's] work."

Plaintiff Troyanowski also felt compelled to leave for other reasons, including lead ARAMARK supervisor Bob Hudson's "yell[ing]" at her on three occasions. The subject of this "informal discipline," as Plaintiff characterizes it, involved the regional hospitals. On one

3

occasion, Hudson verbally abused Plaintiff after she asked Hudson to obtain a four-wheel-drive vehicle for her to use during a storm for business travel to a regional hospital.  When Plaintiff discovered that no four-wheel-drive vehicle had been ordered, Plaintiff telephoned Hudson to inquire about the omission, and Hudson indicated that he was not allowed to rent a four-wheel-drive vehicle.  Hudson informed ARAMARK manager Mary Beth Easton that Plaintiff had been rude to him and that he did not want her to challenge his decisions again.  On another occasion, after Plaintiff returned from her trip to the regional hospital, Hudson requested that Plaintiff report to his office.  There, Hudson "went into a tirade and became very red in the face while telling [plaintiff she] had overstepped her] bounds in talking to the directors of the regional facilities" despite the fact that "[this was something [plaintiff] did as usual practice."

Plaintiff Troyanowski also felt forced to resign because Defendant ARAMARK "substantially interfered with [her] position responsibilities."  ARAMARK supervisor David Foster imposed upon Plaintiff additional duties, removed any supervisory responsibilities, and relegated Plaintiff to performing more menial tasks.  When Plaintiff opposed her demotion to non-supervisory duties, she was subjected to rude and angry outbursts from her supervisors.  When Plaintiff informed her supervisors that she could not physically perform the additional duties imposed up her and that she disagreed with the removal of her supervisory responsibilities, Plaintiff was told that she had no choice because there were no other jobs for her.  For example, when Plaintiff Troyanowski discussed with Foster her new duty of traveling alone to regional hospitals and indicated that she did not wish to travel to rural areas alone, Foster said "if [she] did not do the regional position, that he didn't know if there would be enough work for [her] at Presbyterian to do."

In addition to resigning because of her work environment and the interference with her job

responsibilities, Plaintiff also resigned because "ARAMARK supervisors made frequent inferences that demotion or termination were imminent thereby leaving [Plaintiff] no other options than to resign."

Plaintiff Troyanowski informally reported her concerns regarding how Presbyterian employees were being treated, including how they were either being let go or resigning, to Betty Kurtz, Presbyterian's human resources manager. Plaintiff also expressed to Kurtz that she was in an uncomfortable work environment, that she had no one to speak to about the environment, and that she feared reprisal. In addition, Plaintiff filled out an employee survey in which she expressed the same concerns that she had relayed to Kurtz. Neither Kurtz nor anyone else responded to or followed up with Plaintiff regarding her concerns. The employee survey results were reported as positive despite the fact that Plaintiff had reported negative comments.

II.     Plaintiff Elisberg.

Plaintiff Elisberg resigned from her position as a Clinical Dietitian at Presbyterian on December 11, 2003, after 28 years of employment. Plaintiff gave her resignation to her immediate supervisor Joan Hagen, informed Hagen of her plans to start a new job at the Pueblo of Isleta, and told Hagen that she "hadn't been planning or wanting to leave, yet felt that [she] was being pushed out of [her] job, ever since [her] verbal counseling a couple of months earlier." Hagen did not respond to Plaintiff's feelings of being compelled to leave, but rather acted happy for Plaintiff that she had a new job.

Plaintiff felt she had no recourse except to resign because of, among other things, ARAMARK's mistreatment of her. "Working under management who did not support [her] or appreciate [her] efforts and did nothing but find fault and correct most of what [she had] been doing . . . made the workplace intolerable for [her]. . . . Being expected to do an unreasonable

5

amount of work . . . within [her] allotted hours made [her] job miserable and stressful." Plaintiff Elisberg also was unhappy with the "unfair and ruthless" decisions of ARAMARK manager Mary Beth Easton and with the lack of support from ARAMARK management. When Easton began working at Presbyterian, the environment changed. "When passing [Easton] in the hall, she was not very friendly and acted like [Elisberg] was too far beneath her to acknowledge her." Plaintiff Elisberg also noted that Easton took actions regarding menus without consulting Elisberg or any other dietitian. In addition, Plaintiff noted that Betty Kurtz, the Presbyterian human resources manager, failed to represent Plaintiff and instead supported ARAMARK manager Easton. Plaintiff also believed that Presbyterian did not care about her as an employee. Plaintiff Elisberg would have remained employed with Presbyterian were it not for the mistreatment she believed she had received from ARAMARK management.

Plaintiff Elisberg also felt forced to resign because, on October 16, 2003, she was verbally counseled, *i.e.*, disciplined, for the first time in her 28-year career. According to Plaintiff, "[t]he disciplinary action meeting was the primary reason [she] decided . . . to leave, along with how Aramark was treating [her], other dietitians and [her] previous managers. . . . The verbal counseling session with [her immediate supervisor] Joan Hagen, [ARAMARK manager] Mary Beth Easton and [Presbyterian human resources manager] Betty Kurtz was the 'wake up' call for [her] to believe that they were going after [her] to find fault and . . . make up issues." During the disciplinary meeting, for example, Easton invented a "new procedure" which transformed Plaintiff's previously approved leave into unexcused absences. With her number of leave days changed into unexcused absences, Plaintiff faced a real threat of termination. At the meeting, Easton also accused Plaintiff of coercing another employee into working for her. The tone of the disciplinary meeting was hostile and threatening.

6

In addition, Plaintiff Elisberg felt compelled to resign because she believed that ARAMARK wanted to replace her with a less experienced and less costly employee. Plaintiff's previous managers warned her that Defendants might begin to treat her unfairly, make accusations against her, and disrespect and intimidate her. Plaintiff Elisberg "was the next highest paid employee who had been there the longest of all the dietitians and it would [have] benefit[ted] P[resbyterian] and Aramark to get rid of [her] and replace [her] with a lower paid dietitian." Having witnessed how other senior employees had been terminated or forced to resign their employment through Presbyterian's progressive disciplinary action policy, Plaintiff Elisberg decided that it was in her best interest to resign prior to being terminated.

Finally, Plaintiff Elisberg believed she had no choice but to resign because ARAMARK manager Mary Beth Easton significantly reduced her job responsibilities and removed her managerial duties, thereby effectuating a de facto demotion of Plaintiff.

III.     Additional Facts.

Presbyterian human resources manager Betty Kurtz always agreed with and approved any disciplinary action taken by Plaintiffs' supervisors. Kurtz, despite knowing that there were serious personnel problems in the division where Plaintiffs worked, did not take action to remedy or improve the workplace environment.

ARAMARK supervisor David Foster indicated during a meeting that he wanted to know how many "old" dietitians were left. During that same meeting, Plaintiff's Elisberg's immediate supervisor Joan Hagen responded that there were "one or two" left.

According to Plaintiff Troyanowski, ARAMARK manager Mary Beth Easton indicated that she "felt that dietitians who were just graduated from the university would be able to fill [Plaintiff's and the other dietitians] positions quite easily and would need very little training."

7

**STANDARD**

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

Defendant Presbyterian moves for summary judgment on Plaintiffs Troyanowski's and Elisberg's wrongful termination and ERISA claims. Defendant ARAMARK moves for summary judgment on Plaintiffs' civil conspiracy and tortious interference with contractual relations claims to the extent those claims implicate Plaintiffs' wrongful termination and ERISA claims. Specifically, Defendants maintain that Plaintiffs cannot demonstrate that Defendants violated their rights under ERISA. In addition, Defendants argue that Plaintiffs cannot set forth evidence sufficient to demonstrate that Plaintiffs were constructively discharged. In its Reply to Plaintiffs Troyanowski and Elisberg's Supplemental Brief in Response to Defendants' Motions for Summary Judgement, Defendant Presbyterian also asks the Court to amend and modify its August 10, 2006, Memorandum Opinion and Order denying Presbyterian summary judgment in its favor on Plaintiffs' New Mexico Human Rights Act claims, citing grounds not raised in Defendant's opening brief but argued for the first time in its Reply to Plaintiffs' Supplemental Brief. The Court will address each of these arguments in turn.

I.     <u>Constructive Discharge</u>.

A "plaintiff who advances [a hostile-environment constructive discharge claim] must show working conditions so intolerable that a reasonable person would have felt compelled to resign."

9

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Derr v. Golf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986) (an employee must allege facts sufficient to find that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign); *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) ("Essentially, a plaintiff must show that she had no other choice but to quit.") (citations and internal quotations omitted). "The bar is quite high" for proving constructive discharge. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002). The fact of discrimination alone is not sufficient to result in a constructive discharge. *See, e.g.*, *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982) (citations omitted); *id.* ("Although scarcely uniform, . . . case law does indicate a general reluctance to predicate a finding of constructive discharge upon the fact of discrimination.") (citation and quotation marks omitted). "[A] finding that [a plaintiff-employee] was constructively discharged must be justified by the existence of certain 'aggravating factors.'"[4] *Id.* at 173 (citation omitted); *see also James v. Sears Roebuck Co.*, 21 F.3d 989, 992-93 (10th Cir. 1994) ("A constructive discharge claim must allege 'aggravating factors' outside the purview of a discrimination or retaliation claim."). Each case must be reviewed on its individual merits. *Irving*, 689 F.2d at 173.

Plaintiff Troyanowski maintains that she felt compelled to resign because (1) she did not

---

[4] In *Suders*, for example, the Supreme Court concluded that the plaintiff was constructively discharged where her three supervisors engaged in a continuous barrage of sexual harassment towards her that did not end until she resigned (*e.g.*, discussing people having sexual relationships with animals, saying young girls should be given instruction in how to gratify men, making obscene gestures to plaintiff five to ten times a day by grabbing genitals and shouting vulgar comments, and engaging in other lewd and suggestive body actions towards plaintiff), informed plaintiff she had failed several computer skills exams she had taken, and devised a plan to arrest plaintiff for theft when she found and removed her completed exams that her supervisors had not forwarded for grading. *Id.* at 135-36.

like Defendant ARAMARK's management style and behavior, which was punitive and hostile (in that ARAMARK would "shut down" Plaintiff's comments or suggestions and take away responsibilities to ensure that ARAMARK management could continue to act as it wanted), secretive (in that information about new positions and managers was not disclosed), divisive (in that ARAMARK management would try to come between people), and demeaning (in that ARAMARK management would imply that dietitians were unimportant and would not recognize the contributions of Presbyterian staff), (2) she was yelled at by lead ARAMARK manager Bob Hudson on three occasions for work-related issues (*e.g.*, while telling Plaintiff he was not allowed to rent a four-wheel-drive vehicle for her, and while "telling [plaintiff she] had overstepped [her] bounds in talking to the directors of the regional facilities"), (3) "ARAMARK supervisors made frequent inferences that demotion or termination were imminent thereby leaving [Plaintiff] no other options than to resign," (4) Defendants failed to respond to her informal complaint to Presbyterian human resources manager Betty Kurtz and her negative questionnaire responses on an employee survey, (5) ARAMARK imposed additional tasks on Plaintiff, such as driving to regional hospitals alone, (6) ARAMARK manager David Foster informed Plaintiff that if she did not drive to regional hospitals alone, he did not "know if there would be enough work for [her] at Presbyterian," and (7) ARAMARK removed Plaintiff's supervisory responsibilities, relegated Plaintiff to performing more menial tasks.

Although Defendants' new management style might be unpleasant, and although a reasonable person would not appreciate being yelled at by his or her supervisor on three occasions for perceived work-related problems, or having management ignore two informal complaints about management treatment of employees, these facts alone are not sufficient to establish

11

constructive discharge.[5]  In addition, although Plaintiff Troyanowski maintains that her supervisors made "inferences that demotion or termination were imminent," she has not provided the Court with any specific examples of threats of demotion or termination.  Vague and general claims of threatened adverse action are insufficient to rise to the level of constructive discharge.[6]  Likewise, asking an employee to drive unaccompanied by a co-worker to rural hospitals, or informing an employee that there might not be enough work for her if she does not agree to drive to regional hospitals likewise is insufficient to establish constructive discharge.[7]  "Absent extraordinary conditions, 'complaining employees are expected to remain on the job while seeking redress.'"  *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (citation omitted).

The fact that Plaintiff Troyanowski maintains that Defendants de facto demoted her by removing her supervisory responsibilities, however, raises a material factual question whether Plaintiff was constructively discharged.  Although generally a failure to promote, unlawful transfer, unequal pay, and casual and intermittent slurs, in and of themselves, are not sufficient to result in a constructive discharge, *Irving*, 689 F.2d at 172, the Tenth Circuit stated in *James* that

---

[5] *See, e.g.*, *Darnell v. Target Stores*, 16 F.3d 174, 179 (7th Cir. 1994) (a showing that a job was difficult and required an employee to work long hours and perform unpleasant tasks for an insufferable supervisor is not proof of constructive discharge); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (constructive discharge cannot generally be established simply through evidence that an employee felt that the quality of his or her work was unfairly criticized or that the employee's working conditions were difficult or unpleasant).

[6] *Compare Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (telling plaintiff he would be fired following probation, "no matter what he did to improve his allegedly deficient performance" sufficient alone to support a finding of constructive discharge); *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) (finding constructive discharge where employer held over plaintiff "like a sword of Damocles a threat of immediate termination").

[7] *Cf. Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (assignment to a fallow sales territory not intolerable).

12

"[a] perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge." 21 F.3d at 993 (citation omitted). The Tenth Circuit has further explained that although "a perceived demotion or reassignment to a job with lower status or lower pay may . . . constitute aggravating factors that would justify [a] finding of constructive discharge," a "'reassignment is not a demotion unless the employee can show that [she] receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than [her] previous assignment.'" *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1229 (10th Cir. 2001) (internal citations omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).[8] Although Plaintiff Troyanowski provides no evidence that the de facto demotion included a decrease in salary or title, she does allege, and for purposes of this motion Defendants concede, that Defendants "imposed upon Troyanowski duties that removed any supervisory responsibilities and relegated her to performing more menial tasks." Because the facts construed in Plaintiff's favor indicate that Defendants de facto demoted to her to a position with less responsibility and in which she was required to utilize a lesser degree of skill, the Court denies Defendant Presbyterian summary judgment on Plaintiff Troyanowski's constructive discharge claim, and denies Defendant ARAMARK summary judgment on Plaintiff Troyanowski's civil

---

[8] *Compare Pena v. Brattleboro Retreat*, 702 F.2d 322, 325-26 (2d Cir. 1983) (no intolerable working environment where employer reassigned Pena to a different position that would leave her with a title but no authority because the evidence showed that she was encouraged to remain with the home and she was faced with no loss of pay or change in title); *Doscherholmen v. Walters*, 575 F. Supp. 1552, 1553 (D. Minn.) (no constructive discharge where the plaintiff, a 68-year-old physician in the intermediate care ward of a veteran's hospital, was reassigned to examination and pension evaluation work in the outpatient clinic because although the plaintiff considered the transfer tantamount to being "put out to pasture," the evidence showed that his compensation and opportunity for teaching and research were to remain the same), *aff'd*, 754 F.2d 377 (8th Cir. 1977).

13

conspiracy and tortious interference with contractual relations claims to the extent those claims are based upon constructive discharge.

The Court likewise denies Defendants' motions for summary judgment on Plaintiff Elisberg's constructive discharge claims. The facts as alleged by Plaintiff Elisberg demonstrate that Plaintiff felt compelled to resign because of (1) Defendants' mistreatment of her (*e.g.*, their failure to support or appreciate her, ARAMARK's finding of fault with and criticizing Plaintiff, ARAMARK's unreasonable expectations with respect to workload during allotted hours, ARAMARK manager Mary Beth Easton's "unfair and ruthless" decisions and superior attitude, and Presbyterian human resources manager Betty Kurtz's refusal to support Plaintiff), (2) Defendants' verbal counseling (discipline) of Plaintiff (including their unfair decision to invent a "new procedure" which transformed Plaintiff's previously approved leave into unexcused absences, thereby causing Plaintiff to face a real threat of termination), (3) Plaintiff's belief that ARAMARK wanted to replace her with a less experienced and less costly employee, and that ARAMARK was engaging in a pattern of replacing senior employees, and (4) ARAMARK manager Mary Beth Easton's decision to significantly reduce Plaintiff's job responsibilities and remove her managerial duties, thereby effectuating a de facto demotion of Plaintiff.

Although a reasonable person would not enjoy being unappreciated or unsupported, and a reasonable person would not enjoy being expected to do an unreasonable amount of work, a reasonable person would not feel that these conditions were so intolerable as to force her to resign. *Cf. Harriston*, 992 F.2d at 705 (lack of supervisor support not intolerable); *Stetson*, 995 F.2d at 360 (difficult or unpleasant working conditions not intolerable). The fact that Defendants gave Plaintiff one unfair disciplinary report, that Defendants converted Plaintiff's excused absences into unexcused absence presenting a real threat of termination (when Defendants never

14

directly made such a threat), or that an employee believed her employer wanted to replace her with a less experienced employee, likewise would not compel a reasonable person to resign. *Cf. Grube*, 257 F.3d at 728 (absent extraordinary circumstances, employees expected to remain on job while seeking redress); *id.* (employees who resign without giving their employers a reasonable chance to resolve problems have not been constructively discharged). However, the fact that Plaintiff Elisberg presented (undisputed) evidence that ARAMARK "significantly reduced [her] job responsibilities and removed [her] managerial duties, thereby effectuating a de facto demotion" of Plaintiff, raises a factual question whether she was constructively discharged. *Cf. Bennett*, 258 F.3d at 1229. Accordingly, the Court denies Defendant Presbyterian summary judgment on Plaintiff Elisberg's constructive discharge claim and Defendant ARAMARK summary judgment on Plaintiff Elisberg's civil conspiracy and tortious interference with contractual relations claims to the extent those claims are based upon constructive discharge.

II.     ERISA.

An employee may rely upon direct or indirect proof that an employment action "was motivated by an intent to interfere with employee benefits protected by ERISA." *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993) (citation omitted); *see also Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998). The employee is not required to show that the employer's sole motivation was to interfere with employee benefits; she need only show that it was a motivating factor. *See id.* Defendants move for summary judgment on the ground that Plaintiffs cannot establish conduct manifesting a specific intent to interfere with Plaintiffs' attainment of benefits.

The Court already has held that Plaintiffs have raised a genuine issue of material fact with respect to whether Defendants' actions were improperly motivated. *See* Mem. Op. & Order,

15

dated Aug. 10, 2006, deciding ARAMARK's Mot. for Summ. J. [Doc. No. 117]. The Court based its conclusion on (1) the fact that Bob Hudson, ARAMARK's on-site lead manager, testified that the Integrated Support Service Agreement was terminated because of financial reasons, that Presbyterian expected ARAMARK to streamline costs by deleting positions, and that fringe benefits affected the baseline amounts of the Agreement because of the associated costs and (2) the fact that Defendants terminated and/or encouraged older employees to resign from their Presbyterian employment. In addition, Plaintiffs presented evidence that ARAMARK supervisor David Foster asked during a company meeting how many "old" dietitians were left, and that supervisor Joan Hagen responded that there were "one or two" left. Plaintiffs also presented evidence that ARAMARK manager Mary Beth Easton stated that she "felt that dietitians who were just graduated from the university would be able to fill [Plaintiff's and the other dietitians] positions quite easily and would need very little training," and that Plaintiff Elisberg and her supervisors believed that Defendants were treating older employees badly and encouraging them to resign in order to effectuate cost savings. This evidence is sufficient to raise a material factual question whether Defendants had a specific intent to interfere with Plaintiffs' attainment of benefits. Accordingly, the Court denies Defendant Presbyterian's motion for summary judgment on Plaintiffs' ERISA claims and Defendant ARAMARK's motion for summary judgment on Plaintiffs' civil conspiracy and tortious interference with contractual relations claims to the extent those claims are based upon an ERISA violation.

III.   Plaintiffs' NMHRA Claims.

In its Reply to Plaintiffs' Supplemental Brief in Response to Defendants' Motions for Summary Judgment, Defendant Presbyterian asks the Court to "amend and modify its Memorandum Opinion and Order previously entered . . . to grant summary judgment in favor of

16

Presbyterian and against the claims of the Plaintiffs Troyanowski and Elisberg" with respect to "any claims of age discrimination or claims asserted by them under the NMHRA."  Defendant Presbyterian did not file a proper motion for reconsideration but rather seeks affirmative relief in its supplemental reply in support of its motion for summary judgment.  Accordingly, the Court denies Defendant Presbyterian's request.

The Court also denies Presbyterian's request to reconsider because the arguments raised by Presbyterian in support of its request for modification were raised for the first time in its supplemental reply.  For example, Defendant Presbyterian for the first time maintains that the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), burden shifting standard is "wholly inapplicable" to Plaintiffs Troyanowski's and Elisberg's age discrimination claims, and that the Court erred in relying upon this standard in deciding the motions for summary judgment on Plaintiffs' NMHRA discrimination claims.  Defendant Presbyterian also argues for the first time that "Plaintiffs have not brought claims under the New Mexico Human Rights Act," that the complaint only alleges that the "Act constitutes a declaration of public policy," and that Plaintiffs "do not claim that they are bringing an action under the provisions of the Act . . . or any federal civil rights act dealing with discrimination on account of age."  In its opening memoranda seeking summary judgment on Plaintiffs' NMHRA claims, however, Defendant Presbyterian argued only that Plaintiffs were required to present evidence that Defendants treated Plaintiffs differently from other similarly-situated employees under the Tenth Circuit case *English v. Colorado Department of Corrections*, 248 F.3d 1002 (10th Cir. 2001),and that it was entitled to judgment in its favor because Plaintiffs failed to make any such allegations.[9]  The Court explained that under *English*,

---

[9] The Court notes that *English*, the case cited by Defendants in support of their argument that Plaintiffs must demonstrate pretext by presenting evidence of differential treatment, employed

17

the "evidence that a plaintiff can put forward to overcome a defendant's legitimate, nondiscriminatory reason for an adverse employment action can take a variety of forms," *id.* at 1009 (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)); *id.* at 1009-12, and that it need not be limited to evidence that a plaintiff in a protected class was treated differently from a similarly situated, non-protected employee, *id.* (explaining that a plaintiff can establish pretext by presenting evidence of differential treatment, but noting that a plaintiff can also establish pretext by presenting evidence that the tendered reason for the employment decision was not the genuine motivating reason but rather a sham reason). Accordingly, the Court concluded that even if it had found that Plaintiffs had not presented evidence of dissimilar treatment, Defendants would not be entitled to judgement as a matter of law by virtue of this failure alone. The Court therefore denied Defendants' motions. In their opening memoranda, Defendants did not argue that, and the Court did not consider whether, the *McDonnell Douglas* burden shifting standard is inapplicable to Plaintiffs' claims. The Court also did not consider whether Plaintiffs actually brought claims under the NMHRA or any other civil rights act. Because Defendant raises these arguments for the first time in its reply to Plaintiffs' supplemental briefing, the Court declines to consider the arguments.

Defendants also argue for the first time in their Reply to Plaintiffs' Supplemental Brief that Plaintiffs have failed to allege that they have invoked the grievance procedure set forth in the NMHRA or pursued an appeal to obtain a trial de novo in the district court.[10] Although the Court

---

the *McDonnell Douglas* burden-shifting standard that Defendants now maintain is inapplicable to this case. The Court further notes that establishing pretext is part of the *McDonnell Douglas* framework.

[10] In one sentence in its opening memoranda Defendant Presbyterian argued that it was entitled to judgment in its favor on the NMHRA claims because "there is no allegation that

18

declines to consider this argument brought for the first time in Presbyterian's Reply to Plaintiffs' Supplemental Brief, the Court notes that a plaintiff bringing a NMHRA discrimination claim must establish as a matter of law that he or she has complied with the statutory prerequisites for bringing suit, including the requirement that a plaintiff exhaust his or her administrative remedies.

## CONCLUSION

For the reasons stated above, **IT THEREFORE IS ORDERED** that Defendant Presbyterian's Motion for Summary Judgment as to Claims of Plaintiff Patricia Troyanowski **[Doc. No. 54]**, Defendant ARAMARK's Motion for Summary Judgment as to Claims of Plaintiff Patricia Troyanowski **[Doc. No. 65]**, Defendant Presbyterian's Motion for Summary Judgment as to Claims of Plaintiff Terri P. Elisberg **[Doc. No. 58]**, and Defendant ARAMARK's Motion for Summary Judgment as to Claims of Plaintiff Terri P. Elisberg **[Doc. No. 64]** shall be **DENIED** as follows:

(1) Defendants' motions for summary judgment on Plaintiffs Troyanowski's and Elisberg's constructive discharge claims are **DENIED**;

(2) Defendants Presbyterian's and ARAMARK's motions for summary judgment on Plaintiffs Troyanowski's and Elisberg's ERISA claims are **DENIED**; and

(3) Defendant Presbyterian's request for the Court to amend and modify its August 10, 2006, Memorandum Opinion and Order denying Defendant Presbyterian's motion for summary judgment on Plaintiffs' NMHRA claims is **DENIED**.

---

[Plaintiffs have] complied with the statutory prerequisite to maintain a claim for age discrimination." This allegation, however, was not sufficiently specific to put the Court or Plaintiffs on notice that Defendant was moving for summary judgment on the ground that Plaintiffs had failed to exhaust their administrative remedies. This conclusion is supported by the fact that Plaintiffs did not respond to the argument and the fact that Defendant did not raise the argument again in its reply brief.

Dated this 13th day of September 2006.

                                                 _____
                                                 JUDITH C. HERRERA
                                                 UNITED STATES DISTRICT JUDGE