**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

TERRI P. ELISBERG, MARY MARTINEZ,
FRANK PACHECO, and
PATRICIA TROYANOWSKI,

        Plaintiffs,

vs.                            No. CIV 2005-461 JH/KBM

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,

        Defendants.

## SUPPLEMENTAL REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT PRESBYTERIAN HEALTHCARE SERVICES, INC.

Defendant Presbyterian Healthcare Services, Inc. (PHS), requests the Court to make the following findings of fact and conclusions of law following the trial of this action.[1]

### REQUESTED FINDINGS OF FACT

1.      PHS is a nonprofit corporation organized under the laws of the State of New Mexico with its principal office in Albuquerque, Bernalillo County, New Mexico. It operates the Presbyterian Hospital and the Presbyterian Kaseman Hospital in Albuquerque, and regional hospitals, clinics and urgent care centers within the State of New Mexico. Tr. 1368-69.

2.      PHS management determined that a number of service areas including housekeeping, maintenance and dietary needed improvement in the quality of services and

---

[1]These Supplemental Requested Findings of Fact and Conclusions of Law are submitted pursuant to the direction of the Court made at the conclusion of the trial (Tr. 1511) as a supplement to and not in replacement of the Requested Findings of Fact and Conclusions of Law of Defendant Presbyterian Healthcare Services, Inc., filed September 11, 2006 (Doc. 168).

in efficiency.  There was a desire to provide career opportunities for service workers and reduce turnover.  Tr. 254, 1362-64.

3.       On August 29, 2000, PHS entered into an agreement entitled Integrated Support Service Agreement (ISS Agreement, Stip. Ex. 1) with ServiceMaster Management Services Limited Partnership (ServiceMaster) to consolidate, restructure and integrate various technical service and customer service functions, including plant operations and maintenance, housekeeping and food service.  Stip. Ex. 1, p. 1.  ServiceMaster was acquired by Aramark Management Services, L.P. (Aramark), in October or November 2002.  Tr. 332.  As used herein, the term "Aramark" refers to both ServiceMaster and Aramark.

4.       Under the terms of the ISS Agreement, Aramark furnished management personnel to carry out the purposes of the ISS Agreement, but all responsibility to hire, discipline and discharge service employees was retained by PHS.  Aramark consulted and worked in cooperation with the PHS Human Resources Department (HR) with respect to such matters as the coaching, corrective discipline of employees and discharge from employment of employees.  Stip. Ex. 1, Tr. 1094, 1334,1406.  Robert Hudson (Hudson), who was the Aramark director of ISS, was instructed that there were problems with the managerial processes in place. Tr. 340.  While Aramark provided services under the ISS Agreement, Aramark personnel insisted on strict compliance with PHS policies on the part of all employees.  Tr. 465.

5.       The Presbyterian regional hospitals operate under the policies of PHS and Aramark managers who had authority over the dietitians who were managed out of the

main hospital including authority over their services being provided to the regional hospitals. Tr. 1373.

6.      Plaintiff Frank Pacheco (Pacheco) was employed as a cook at PHS. Tr. 581-82.  Plaintiff Mary Martinez (Martinez) was a clinical dietitian. Tr. 819.  Plaintiff Terri Elisberg (Elisberg) was a clinical dietitian.  Tr. 470.  Plaintiff Patricia Troyanowski (Troyanowski) was a clinical dietitian.  Tr. 704.  From time to time hereafter, these four former PHS employees will be collectively referred to as "Plaintiffs."

7.      All of the Plaintiffs were employees of PHS working in  Food and Nutrition Services which fell within the scope of the ISS Agreement for which management personnel employed by Aramark had management and supervisory responsibility.  Stip. Ex. 1; Tr. 337.  Among the Aramark managers who had supervisory responsibility over the Plaintiffs were Hudson, David Foster (Foster), Mary Beth Easton (Easton) and Jerry Biggam (Biggam).

8.      When PHS entered into the ISS Agreement, PHS did not direct any PHS employee or anyone at Aramark to reduce PHS's workforce , and did not have any intention of reducing the workforce or terminating any group or class of PHS employees. Tr. 1363-64.  One of the principal purposes for entering into the ISS Agreement was to reduce the level of employee turnover.  Stip. Ex. 3, p. 19; Tr. 387, 1363-64.  During the period that the ISS Agreement was in effect, the employee turnover was reduced.  Tr. 388. Further, it was difficult to hire seasoned dietitians, and there would have been no benefit to PHS in replacing older dietitians.   In fact, PHS valued and honored long term employees. Tr. 272.

-3-

9.      Plaintiffs entered into Employment Agreements which, among other provisions, specify that employment with PHS is not for a fixed period of time and may be terminated in circumstances where PHS deems termination to be appropriate.  Stip. Exs. 138-148.  The Employment Agreements provided in part,

> I understand that my employment with [PHS] is not for a fixed period of time, and that my employment may be terminated in circumstances where [PHS] deems this appropriate.  However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [PHS] problem-solving procedure which is my sole and exclusive remedy for any dispute.  I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [PHS] is not subject to any terms different from or inconsistent with those stated in this Employee Agreement.

10.     The PHS Employment Agreements provide that the policies and procedures contained in the PHS Employee Handbook do not constitute a part of the Employment Agreement which PHS has with its employees.  Stip. Exs. 138-148.

11.     The Aramark employees who were engaged to perform duties pursuant to the ISS Agreement were in all respects qualified by education and training to work as managers overseeing the work of service employees in healthcare facilities such as those of PHS. Tr. 1088-90, 1326-27.

12.     The ISS Agreement was entered into by PHS and Aramark for the purpose of improving the quality of the work for which the departments covered by the Agreement were responsible.  PHS and Aramark did not enter the ISS Agreement for any unlawful or improper purpose, and the ISS Agreement did not operate to effect any unlawful or improper purpose.  Specifically, PHS and Aramark did not enter into the ISS Agreement for the purpose of terminating or adversely affecting the employment of older and/or long service employees; and in carrying out its management duties under the ISS Agreement,

-4-

Aramark did not act to terminate or adversely affect the terms of employment of employees because they were older and/or had longer service. Tr. 387-88, 1363-64.

13.    There is no evidence of any conspiracy between PHS and Aramark to deprive any of the Plaintiffs of rights or benefits associated with their employment by PHS or to deprive them of their employment with PHS. There were no wrongful acts committed pursuant to the alleged conspiracy. Plaintiffs suffered no damages as a result of the alleged wrongful acts of PHS and Aramark.

14.    Considerations of age, length of service or benefits had nothing to do with the termination or the resignation in lieu of termination of Pacheco or Martinez, or the voluntary resignations of Elisberg and Troyanowski. Tr. 1139, 1176-77, 1206.

15.    There was no intention and no practice of Aramark or PHS to get rid of employees for the purpose of affecting health, retirement or other benefit plans made available by PHS to its employees. There is no evidence that the termination of Pacheco, the resignation in lieu of termination of Martinez, or the voluntary resignations of Elisberg and Troyanowski had any effect on the cost to PHS of any of its benefit plans. Tr. 387-88, 1139, 1176-77, 1206.

16.    There is no evidence that any action was taken against any Plaintiff which breached any agreement or of any right to which these employees was entitled under the retirement or other benefit plans provided by PHS to its employees. *See* Tr. 640-658.

17.    Changes have been made to the PHS benefit plans. PHS is not under any contractual or other obligation to continue indefinitely in the future its present retirement plans and other benefit plans. PHS has the right to modify or to terminate its present

retirement plans and any other benefit plans which it presently maintains. Stip. Ex. 16, p. 17 ("PHS may make changes in the Plan from time to time.").

18.     None of the policies or procedures of PHS was violated in the supervision, management or discipline of any of the Plaintiffs. Among these policies is a progressive discipline policy. Stip. Ex. 8, Stip. Ex. 9 at 3.9.

19.     Investigations under the progressive discipline policy need not be reduced to writing. Tr. 251, 1094.

20.     A manager is held to a higher standard under the progressive discipline policy than is a staff employee. Tr. 143-44, 1211-12, 1347.

21.     In the case of serious employee infractions, such as food safety issues, which can particularly jeopardize immune-compromised patients' health, PHS may dispense with steps in the coaching and progressive discipline policy. Tr. 1098-99, Def. Ex. N. Safe handling of food at hospitals is important to patient health and in order to comply with requirements of the Center on Medicare and Medicaid Services and County Health Department and City of Albuquerque rules. Tr. 1098-1102, 1104.

22.     Aramark instructed PHS employees on food safety. Tr. 1108, Def. Ex. N. PHS COO Mark Reifsteck instructed Aramark employees to be certain PHS food service facilities were not shut down because of unsafe food handling practices. Tr. 1109, 1110.

23.     There is no evidence that PHS or Aramark violated any of the procedures relating to coaching and discipline contained in the PHS Employee Handbook or in the other policies of PHS in carrying out the coaching and discipline of employees,.

24.     The Court has previously ruled by its Memorandum Opinion and Order entered August 10, 2006, that Plaintiffs have not raised any evidence demonstrating that

the employee handbook constitutes a contract and that Plaintiffs' breach of an express contract claim based upon violation of the handbook policies therefore must fail. Doc. 148, p. 3.

25.     There is no evidence that PHS has violated any implied contract of employment or any covenant of good faith and fair dealing which may exist between PHS and the Plaintiffs.

26.     Plaintiffs did not include a claim for negligent misrepresentation in the Pretrial Order.

27.     PHS made no negligent misrepresentations to Plaintiffs.   There is no evidence that Plaintiffs relied on any representation or negligent misrepresentation of PHS.

28.     The PHS Travel and Business Expense Policy (the "Travel Policy") defines allowable travel expenses for PHS employees.  Stip. Ex. 11, p. 8.   The policy provides that employees will be reimbursed only for the least expensive travel option. Personal vehicles are to be used for in state travel unless there is a need for a larger vehicle to hold additional passengers or material; the cost of renting a vehicle would be less than mileage reimbursement; or the personal vehicle is not deemed reliable.  Mid-sized or larger cars may be rented only when there are three or more passengers. If an employee chooses to upgrade the vehicle to a larger and/or more luxurious model, the employee must personally pay for the upgrade.  Employees traveling to regional hospitals were subject to this policy. Stip. Ex. 11, Tr. 399-400.

29.     Easton discussed with dietitians additional certifications and specialties available to dietitians but did not say a dietitian just out of school could replace experienced

dietitians.  She testified that the best opportunity for patient care is to have registered dietitians who are experienced.  Tr. 1202-03.

Requested Findings as to Individual Claims of Pacheco

30.      Pacheco was hired by PHS in 1979, and worked as a cook and lead cook at PHS until his termination in April of 2004. Tr. 581.

31.      On July 11, 2000, Linda Givens (Givens), the director who was at that time responsible for the food service area in which Pacheco worked, had a meeting with him during which Givens pointed out to him that he was a lead employee and was not to contribute to rumors, that he must be careful how he stated his opinions to fellow employees.  It had been reported to her that Pacheco was spreading rumors that she, Linda Givens, was doing a bad job.  During this meeting,  Pacheco was extremely defensive and continuously interrupted. Tr. 96-7, 600-01; Def. Ex. K.

32.      Givens was a PHS employee, not an Aramark employee, and was one of the former PHS employees who joined this action as a Plaintiff at the time it was filed.  The incident did not form the basis for a corrective action or other discipline.  Tr. 92, 96.

33.      On April 18, 2001, Pacheco was given a notice that his job as lead cook was eliminated and that he was given the position of cook.  There was no loss of pay or of benefits.  This change was made as a part of reorganization.  The change had no effect on his job duties. Tr. 643, Def. Ex. L.

34.      On March 30, 2003, Pacheco became engaged in a dispute with two fellow employees in the food service area, Beth Tapia (Tapia) who was a weekend supervisor and Judy Martinez, over the insistence by Pacheco that Judy Martinez cut onions and peppers to be held for the morning cook.  Pacheco and Judy Martinez were yelling at each

-8-

other, and Pacheco insisted that Tapia call their supervisor, Jutta Johnson, at home. Both Tapia and Judy Martinez wrote memoranda about the incident. Tr. 1111-1114, Def. Ex. M.

35.     On August 29, 2003, Easton and the executive chef, John Hughes, gave Pacheco a verbal warning for Pacheco's failure to complete work assignments. He was warned that he had failed to take food temperatures on the tray line on a number of days during June, July and August 2003, a failure that compromised patient safety. He was also given notice that several employees had made complaints of harassment and coercion from him. He was warned that it was a serious offense to harass co-workers in the workplace and that foul language would not be tolerated in the workplace. During the meeting, Easton also discussed a log of days in which the temperature of food was not properly taken which showed dates for which Pacheco was responsible for taking food temperatures. He received a corrective action memorandum, a verbal counseling, for these deficiencies. Tr. 644-646, 1116-20. Stip. Ex. 58.

36.     Pacheco acknowledged it was his responsibility to take the temperatures of food on the tray line and, except for one holiday, did not dispute that the temperatures were not taken or not entered on the logs for the days shown. Tr. 644.

37.     On December 30, 2003, Pacheco received a corrective action memorandum, a summary of council, from Easton and John Hughes for clocking issues and for insubordination. Stip. Ex. 60. They provided Pacheco a copy of his time card report from 12/07/03 to 12/20/03, which showed that eleven of the twelve days indicated significant unapproved overtime. They advised him that it had been reported to them that he would clock in early then immediately go on break in the cafeteria. They also spoke to him about a loud verbal confrontation with another employee, Glenda Pesina, the Food Service Zone

Lead, who was discarding food from the walk in cooler because the food was not properly dated or properly stored (violations of food safety standards).  Tr. 646-48, 1123-26.

38.     Pacheco admitted that he had not obtained approval for the overtime and admitted interfering with the employee who was throwing out the undated food. Tr. 646-48.

39.     There is no evidence that Pacheco made a written response or requested a review of the summary of council corrective action.

40.     On January 12 and 13, 2004, Pacheco, along with other food service employees, signed memoranda setting forth their responsibilities for sanitation and cleanliness in the work area and for safe food handling practices.  The January 12 memorandum  provided that unsafe food handling practices will result in a loss of good standing.  Def. Exs. N, O; Tr. 440, 650-51.

41.     On January 30, 2004, a customer in the cafeteria approached Foster, an Aramark manager, with two plates of fish which had not been cooked thoroughly.  Easton investigated  the  incident.    Tr.  1194-95.    Pacheco  received  a  corrective  action memorandum, loss of good standing, from Easton, Hughes, and Jutta Johnson, a food service supervisor, concerning the undercooked fish served in the cafeteria.  He was placed on loss of good standing for 12 months.  They pointed out that he and other employees had been instructed about the temperature of food items and responsibility for safe food handling practices.  Tr. 652-53, 1194; Stip. Ex. 61.

42.      Pacheco  was  responsible  for  detecting  improperly  cooked  food  on January 30, 2004. Tr. 652-54, 1126-27. Pacheco admitted it was his responsibility to see the cafeteria food was properly cooked.  Tr. 653.

43.     Under the terms of policy 308, after a loss of good standing corrective action is received, another corrective action during the period of the loss of good standing will result in dismissal. Stip. Ex. 8.

44.     Pacheco informed his supervisors that he wanted to write a rebuttal to the corrective action resulting in loss of good standing.  The rebuttal did not deny that it was his responsibility to ensure that food safety practices were followed on the cafeteria line the day of the incident.  No change in the corrective action was made as a result of the rebuttal. Tr. 654; Stip. Ex. 62.

45.     Pacheco's use of foul language was offensive to other employees working in proximity to him.  Tr. 1114, 1482-86; Def. Ex. P.  On April 9, 2004, Judi Rieckenberger, a diet aide, wrote a memo complaining about Pacheco cursing in the workplace and telling new employees how bad people are all around the workplace. Def. Ex. P.

46.     On April 15, 2004, Pacheco received a final corrective action, a memorandum of dismissal, for causing a hostile work environment.  The memorandum concerned a confrontation with two food service employees over work space on April 10, 2004.  Stip. Ex. 64.  Angela Ramirez, at whom Pacheco had yelled, wrote an account of the incident. Def. Ex. Q.  Easton investigated the incident and obtained statements.  Tr. 656-57, 1129-37.  Easton gave the other employee involved in the incident a corrective action. Tr. 1195.  The corrective action memorandum noted that Pacheco had previously been counseled for inappropriate language and summarized the three previous corrective actions, verbal warning, summary of council and loss of good standing.  Stip. Ex. 64.

47.    Pacheco requested a grievance hearing, which PHS scheduled in accordance with its progressive discipline policy, but after PHS had set up the hearing, Pacheco cancelled it. Tr. 660.

48.    Pacheco admitted that each of the disciplinary steps leading to the dismissal and the progressive discipline policies of PHS were correctly followed. Tr. 657-58.

49.    The verbal counseling of Pacheco and the corrective action loss of good standing both concerned violations of safe food handling practices. Stip. Ex. 58, 61. The summary of council corrective action involved actions of Pacheco interfering with an employee who was complying with safe food handling practices. Stip. Ex. 60.

50.    The verbal counseling of Pacheco and the corrective actions summary of council and dismissal all involved offensive language in the workplace and confrontations with other employees. Stip. Exs. 58, 60, 64.

51.    Easton believed that the matters brought up at each stage in the progressive disciplinary process were true and that these matters warranted the corrective actions taken. Easton did not subject Pacheco to discipline because of his age, long service or benefits. Tr. 1139.

52.    There is no evidence that the discipline of Pacheco and his dismissal from employment at PHS were in any way related to his age, gender, race or national origin or any similar factor.

53.    There is no evidence that Pacheco's eligibility for retirement benefits or his right to receive any other benefits available as a result of his employment with PHS was in any way related to either his discipline or his dismissal from employment at PHS.

-12-

54.     At no time has Pacheco filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that he has been a victim of discrimination or retaliation. Tr. 638-39 .

55.     At the time of the termination of his employment at PHS, Pacheco's base pay as a cook was $12.37 an hour.  The compensation which  Pacheco received from PHS for the two full calendar years prior to his termination was $32,083.97 for 2003 and $29,418.57 for 2002.  Stip. Exs. 57, 69.

56.     At the time of the termination of his employment with PHS, Pacheco was vested in the PHS defined benefit retirement plan.  Since his retirement commencing May 4, 2004, Pacheco has been receiving a monthly benefit payment from the PHS retirement plan of $523.16.   Stip. Ex. 71.

57.     In December 2004  Pacheco applied for a job as a cook at Santa Ana Star Casino.  The casino hired him and he started working there December 20, 2004, at $9.50 and hour, which was increased to $9.75 an hour effective April 16, 2005.  He resigned his employment at Santa Ana Star Casino May 20, 2005, to accept employment at Village Inn as a cook where he is now receiving $10.25 an hour. Tr. 636-38.

58.     Benefits  offered  by  the  Santa  Ana  Star  Casino  included  medical, prescription, vision and dental coverage, life insurance, a profit sharing and a 401(k) plan, and paid time off.  Employee benefits offered by Vicorp Restaurants, Inc., which operates the Village Inn, include a 401(k) plan, medical, dental, life, dependent life, personal accident and long term disability coverage, flexible spending accounts, a short term salary continuation plan and a long term disability income protection plan.  Stip. Ex. 72.

59.     No evidence was offered at trial to show a comparison of the benefits available to Pacheco from the Santa Ana Star Casino and from Vicorp Restaurants, Inc., with the benefits which had been available to him at PHS to show whether Pacheco suffered a loss of benefits or, if he did suffer a loss of benefits, to show how any such loss would be offset by the retirement benefits which Pacheco receives from PHS.

60.     Pacheco offered no evidence at trial to support a claim for emotional distress damages.

61.     No competent evidence was offered at trial to support a claim by Pacheco for punitive damages.

<u>Requested Findings as to Individual Claims of Mary A. Martinez</u>

62.     Martinez was hired by PHS September 30, 1982, as a clinical dietitian and was a manager.  Tr. 819, 939.

63.     Martinez did not file any charges with the EEOC or Human Rights Commission regarding any discrimination.  Tr. 937-38.

64.     From 1982 through 1999, Martinez was not a full-time employee at PHS. She worked either part time or on a PRN, on-call basis, during this period.  She did not begin working at PHS as a full time employee until 1999.  Tr. 938-40; Stip. Ex. 101.

65.     In her 2001 Job Competency Assessment (Stip. Ex. 77) Martinez was coached to be positive, accurate in her statements, and more flexible.  She never read her assessment after the meeting at which Foster presented the assessment to her.  Tr. 943, 1414-17.

66.     PHS management decided how to provide dietitian services at the regional hospitals.  Tr. 954, 1371-72.

-14-

67.     Martinez made serious misrepresentations about dietitians being on-call at all times, which would have required additional compensation if true. If such statements had been correct, it would have meant that the pay for dietitians was not correct. Tr. 203, 1149-50, 1343. Martinez now denies making that statement. Tr. 1011.

68.     Martinez failed to correctly instruct her subordinates with respect to clocking out and clocking in under educational time when they attended educational programs, making tracking for hours worked and educational expenditures for budgetary purposes impossible. Tr. 1148-49, 1343-44. She signed a purchase agreement, which she was not authorized to sign. Tr. 1150-51. When Aramark managers attempted to coach her on the performance deficiencies and caution her that rules that applied to other managers also applied to her; she was argumentative and unreceptive. Def. Ex. C; Tr. 1219-25.

69.     In April 2002, Foster met with Martinez to discuss her absences from the main PHS hospital without informing the Service Center, about the labeling and dating of food which Martinez did not feel was necessary, and about an initiative for outpatient nutrition and support for regional hospitals. He expressed his concern that Martinez was unwilling to follow reasonable requests and to make needed changes as well his concern about her pattern of divisive behavior, criticism of PHS leadership and spreading inaccurate information. Def. Exs. A, B; Tr. 1411-13, 1421-26.

70.     There is no evidence that Foster's concerns about Martinez were motivated by considerations of age or long service, her entitlement to retirement benefits or by any other improper considerations. The evidence establishes that the concerns of the managers were prompted by a regard for patient safety, compliance with PHS policies, and by a desire to ensure strict compliance with the health and safety requirements which the

-15-

Centers for Medicare and Medicaid (CMS) and Joint Committee on the Accreditation of Healthcare Organizations (JCAHO) apply to hospitals. Use of expired baby formula would violate the conditions of participation in Medicaid and could result in withholding of Medicaid funds. Tr. 1159-60, 1210-11, 1335-37.

71.     In evaluating the job performance of Martinez in the Job Competency Assessment (JCA) for the year 2002, her manager Foster stated, "Overall Mary has performed her duties as a Clinical Manager, and has been an advocate for the needs of the clinical staff and the organization. . . . Mary has also been resistant to comply with many of the request [sic] of her Director. Examples of this are resistance to calling the service center, challenging procedure changes in regards to HACCP, and in being less than 100% accurate in statements to senior leaders and her director." Stip. Ex. 78. The comments in this and all other JCAs for Martinez were consistent with the PHS goals and procedures for coaching and progressive discipline of employees. Foster used job competency assessments to improve performance. Tr. 1427-33.

72.     In January 2003, Jerry Biggam, a manager, and Jutta Johnson reported that Martinez had instructed a class of food service workers incorrectly on some questions for a JCAHO competency test and that she subsequently sought to have the answers of the workers on the test changed. Tr. 1208, 1260-61, 1340-01; Stip. Ex. 88, Tr. 431-433.

73.     Martinez's managers were informed that she had informed a Food and Nutrition Service worker that baby formula that had expired could nonetheless be fed to a baby, a direct violation of PHS policy and basic nutrition principles. Tr. 1152-53, 1345-46.

74.     On January 3, 2003, Martinez was given a corrective action by her supervisors, Foster and Easton, at the level of loss of good standing.  The reasons for the corrective action were that the reports that Ms. Martinez requested another employee to falsify training documents, that she had made misstatements to her supervisors about the work requirements of dietitians, that she had signed a purchase agreement without authority, and that she had authorized the use of expired cans of formula in the pediatric unit.  Tr. 153, 203, 1146-55; Stip. Ex. 84.

75.     At the time of the corrective action in January 2003, Easton attempted to coach Martinez to improve the situation.  Stip. Exs. 83, 86; Tr. 1155-60, 1215-18.

76.     The evidence establishes that the supervisors, Foster and Easton, reasonably believed that the matters listed in the loss of good standing level corrective action were true and that these matters warranted the corrective actions taken.  Salary level and benefits were not considered.  Tr. 1177.  There is no evidence that the action was taken because of the age of Martinez, because of her entitlement to retirement benefits or for any other improper reason.

77.     The Travel Policy (Stip. Ex. 11) was binding on Martinez as a PHS employee.  Tr. 1015-16.  Martinez and Troyanowski protested complying with the PHS Travel Policy.  Tr. 1161.

78.     In February 2003, Martinez became engaged in a dispute with her supervisors over travel to the regional hospitals.  She objected to the denial of her request that she be provided with an SUV vehicle to make the trips.   In violation of the Travel Policy and the ISS Agreement, Martinez also stated that she would have the directors of

the regional hospitals approve her travel rather than the Administrative Director at the main hospital in Albuquerque.  Tr. 399-400, 1162-63, 1393-95; Stip. Ex. 90.

79.    Easton and Foster met with Martinez on February 27, 2003 concerning Aramark's plan for a 90 day data collection and analysis effort to measure the utilization of dietitians' time in traveling to the PHS regional hospitals.  Tr. 1164.   To forestall confusion and stress, Easton specifically instructed Martinez not to mention the effort to the other dietitians.  Stip. Ex. 90.

80.    Despite this direct instruction, Martinez immediately thereafter announced to other dietitians that she would no longer travel to the regional hospitals, resulting in confusion and stress to the other dietitians.  Tr. 1165-66, 1399; Stip. Exs. 91, 93.  The action of Martinez disregarding an explicit directive was insubordinate and disruptive and made the management of the dietitians more difficult.

81.    The disputes which Martinez had with her managers in January and February 2003, including the disputes over providing service to regional hospitals, did not result from any considerations by the managers of the age, term of service or benefits of Martinez or the ages, term of service or benefits of any other dietitians. Tr. 1176-77, 1403. The concerns expressed by the managers were legitimate concerns directly related to proper administration of PHS and its regional hospitals.

82.    On March 10, 2003, Martinez was suspended during an investigation of her performance deficiencies.   As a consequence of the conclusions reached after investigation, on March 17, 2003, Martinez was informed that because of her conduct and her repeated failures to follow directives and policies, her employment was terminated.  Tr. 1172; Stip. Ex. 93.

-18-

83.     At her request, Martinez was allowed to resign in lieu of termination. Her resignation was effective March 17, 2003.  Tr. 889-90, 1229-30.

84.     At the time she submitted her resignation from employment, Martinez requested additional compensation.  Tr. 890.  Human Resources representative Betty Kurtz (Kurtz) agreed to discuss with her superiors the possibility of paying Martinez additional compensation.  Tr. 211-12.

85.     Subsequently, additional compensation was offered in exchange for Martinez's written release of any claims against PHS and its officers and agents.  Tr. 213-14.  As a result of these discussions, it was agreed that Ms. Martinez would be paid an additional sum of $6,179.51, less necessary deductions, and that in exchange she would sign an Additional Consideration and Release Agreement (Release).  She accepted the additional compensation and signed the Release on March 20, 2003.  Stip. Ex. 95.

86.     Based on her education and experience, Martinez knew and understood, or reasonably should have known and understood, the meaning and the purpose of accepting additional compensation and signing a release of all claims against PHS on March 20, 2003.  Tr. 818-23, 962-63.

87.     Kurtz's practice when offering such additional consideration for a release is to review the release paragraph by paragraph, emphasizing in particular employees' rights to 21 days to consider the release and seven days to revoke the release, if signed.  When Martinez was provided with the Additional Consideration and Release Agreement, she was allowed time to read and review the Release.  Tr. 213-14, 267-68, 1501-02.

88.     The Release in clear, unambiguous language informed Martinez that she had the right to revoke the Release by giving written notice to PHS within seven days of

signing the Release. Stip. Ex. 95, p. 2, ¶ 4. Kurtz recalled conversations telling Martinez she could take the document to an attorney. Tr. 214.

89.     The Release clearly states that by accepting the money paid in settlement, Martinez was waiving all rights or claims against PHS and was releasing PHS and all entities in privity with PHS. Stip. Ex. 95, ¶ 3.

90.     Martinez signed the Release, accepted the sum of $6,179.51, less required deductions, under the Release and did not exercise her right to revoke the Release. She negotiated the check the same day that she picked it up, April 4, 2003, more than seven days after she signed the Release. Def. Ex. X.

91.     Martinez is not a credible witness. Her supervisors did not believe she could be trusted. Tr. 1148, 1409-12. The affidavit which Martinez provided to the Court (Def. Ex. J) concerning signing the Release states "At the time I signed the Agreement, I did not have any savings or financial reserves I could rely upon to withstand an extended period of unemployment." This was not true. At the time she signed the Release, Martinez had a 403(b) investment account and a matching contribution account with PHS which she could have withdrawn. Stip. Ex. 108. Under a Marital Settlement Agreement for her divorce, she had numerous accounts from which she could withdraw funds. In addition, she had gold coins and other valuable and liquid assets. Tr. 1031-32. She was also receiving $3,500 a month in alimony. Tr. 972-73; Stip. Exs. 112, 113, 114.

92.     Martinez testified that she was not paid during her suspension period, Tr. 966-67. However, it was established at trial that she was paid in full, including the period of suspension and, through an error by PHS, was paid for an additional 80 hours. Tr. 1502-05; Def. Exs. V, W, Y and Z.

93.    The evidence establishes that Martinez applied for employment with the University of New Mexico either prior to or at the time of her resignation from employment at PHS. Stip. Ex. 103; Tr. 971. On the same day that Martinez signed the Release, March 20, 2003, her application for employment with the University of New Mexico was approved, and she started work at the University of New Mexico in the position of a Senior Research Nutritionist as a regular full time employee effective March 31, 2003.  Stip. Ex. 103; Tr. 926-27, 971-72.

94.    In addition to her salary as a Senior Research Nutritionist, Martinez receives compensation for teaching classes at the University of New Mexico and at the Albuquerque Technical Vocational Institute, now CNM.  Tr. 931-33, 974, 981-82; Stip. Ex. 11.

95.    Martinez was under no financial pressure to sign the Release in order to receive the additional funds, and in fact signed that form voluntarily and did not revoke it.

96.    Martinez was not forced to sign the Release in order for the "dismissal" designation to be changed to a "resignation in lieu of termination" designation.  During her meeting on March 17, 2003, with Kurtz, Martinez asked Kurtz to change the dismissal to a resignation in lieu of termination. Tr. 888-89; Stip. Ex. 93. Kurtz agreed, and the change was made on the corrective action memorandum on that day and initialed by both Kurtz and Martinez. *Id.* The Release was signed three days later. Stip. Ex. 95. Martinez's ability to resign in lieu of termination was not contingent upon signing the Release.

97.    Martinez has received a Bachelor of Science degree from the University of California, Berkeley, and a Master of Science in Nutrition degree from the University of New Mexico. She took classes at the Anderson School of Business. She teaches at a

college level.   Tr. 962-63; Stip. Ex. 109.   Martinez is fully capable of reading and understanding the meaning of the Additional Consideration and Release Agreement.

98.     The Release provides that if either party breaches the Release, the other party may sue to enforce the release and wavier provisions Release and may recover all costs and attorney fees incurred in enforcing the Release.   Stip. Ex. 95, ¶ 6.

99.     At the time of the termination of her employment at PHS, the base pay for Martinez was $53,556.00.  Her total compensation at PHS for the two full years prior to the termination of her employment was $52,794.97 for 2002, and $50,746.87 for 2001.  Stip. Exs. 80, 101.

100.    As a full time employee of the University of New Mexico, Martinez is covered by the New Mexico Public Employees Retirement Act which, among other things, includes retirement benefits for both her UNM and TVI (now CNM) employment, as well coverage under the group health insurance plan, including retiree health coverage.  Tr. 928.  Group insurance coverage available to employees of the University of New Mexico includes medical, dental and vision insurance coverage.  Ms. Martinez earns in excess of $48,000 per year for working and teaching at UNM.  Tr. 976-77.

101.    No evidence was offered at trial to show a comparison of the benefits being received by Martinez as an employee of the University of New Mexico and at TVI with those which she was receiving at PHS.  There is no evidence that Martinez has suffered any loss of benefits.

102.    No competent evidence was offered at trial to support a claim by Martinez for emotional distress damages.

103.   No competent evidence was offered at trial to support a claim by Martinez for punitive damages.

104.   There is no evidence that Martinez was subject to discrimination on account of her age or term of service, or was subject to any other form of discrimination, during the term of her employment at PHS or in connection with the coaching and corrective actions she received or the termination of that employment.

105.   At no time has Martinez filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission or any other governmental agency claiming that she has been a victim of discrimination or retaliation in any way related to her employment at PHS or the termination of that employment. Tr. 938.

106.   There is no evidence that Martinez's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with PHS was in any way related to any coaching, discipline or corrective action which she received as a PHS employee, to the proposed dismissal of Martinez by PHS, to the resignation in lieu of termination of her employment or to the offer of additional compensation in exchange for a release of claims and her acceptance of the additional compensation.

### Requested Findings as to Individual Claims of Terri P. Elisberg

107.   Elisberg was hired by PHS 1975, as a clinical dietitian, a position which she held until her resignation effective January 1, 2004. Tr. 470.

108.   The Job Competency Assessments received by Elisberg for the calendar years 2000, 2001, 2002 and 2003 show that she was ranked in the very good or excellent categories in the skills for which she was evaluated. Stip. Exs. 21, 22, 23, 24.

109.    On December 11, 2003, Elisberg submitted her resignation from employment at PHS, stating, "I regret to inform you that after 26 years of employment with PHS Healthcare Services I will be resigning from my Clinical Dietitian position at PHS Kaseman Hospital effective January 1, 2004, 3 weeks from today.  I would however, like to be considered for PRN status, whereby I could work a holiday or one day of a weekend occasionally if needed.  I have enjoyed my years of service with PHS Healthcare. This has been a most difficult decision for me." Stip. Ex. 31.

110.    The disagreement between Elisberg and Joan Hagen over scheduling and paid time off did not result in any disciplinary action toward Elisberg.  During the entire time of her employment at PHS, other than one verbal counseling in October of 2003, no disciplinary or corrective actions were taken with respect to Elisberg.  Tr. 509.

111.    At the time she submitted her resignation, Elisberg already had another job. Tr. 517.  Her pay was $0.50/hour higher in the new position than what she had been receiving at PHS. Tr. 522.

112.    Elisberg stated that her reasons for resigning were that she did not like Aramark, how they were treating employees, she was unhappy about the resignation in lieu of termination of Martinez, and she did not feel supported by PHS.  Tr. 543-49.

113.    There is no evidence that the working conditions for Elisberg prior to the time she submitted her resignation were so intolerable or that there existed such a hostile environment in her employment that her voluntary resignation should be considered to be a constructive discharge.

114.    There is no evidence that discrimination on the basis of age, or on any other basis, provoked or was a cause of the voluntary resignation by Elisberg from her employment at PHS

115.    There is no evidence that Elisberg's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with PHS was in any way related to her decision to submit her resignation from employment at PHS or to any of the events or conditions in her employment prior to the time she submitted her resignation.

### Requested Findings as to Individual Claims of Patricia Troyanowski

116.    Troyanowski was hired by PHS in 1989, as a clinical dietitian. Tr. 704.  She continued to be a registered dietitian until she submitted her resignation from employment effective June 1, 2003. Stip. Ex. 121.

117.    During the time that she was employed at PHS, Troyanowski did not receive any corrective actions or other forms of discipline.  Tr. 296.

118.    Troyanowski had numerous objections concerning her employment at PHS. She objected that she would not be invited to meetings with outside representatives, objected to the use of Aramark education material, objected to the way the travel policy was enforced, objected to the change in outpatient education, objected to the change in arrangements for travel to regional hospitals, objected to comments of Easton, objected to a test or a procedure dealing with total parenteral nutrition, and objected to a change in handling reports at the regional hospitals.  Tr. 712-728, 766, 770-76.

119.    The numerous objections of Troyanowski do not in the aggregate constitute working conditions that were so intolerable or evidence such a hostile environment in the workplace that her voluntary resignation was a constructive discharge.

120.    On May 9, 2003, Troyanowski submitted her resignation from employment at PHS stating, "David and Mary Beth, I am sending this second notice of resignation, it seems the first one did not go through on Presnet. This is to inform the management of the Food & Nutrition Services Department of PHS, that I will relinquish my position as clinical dietitian and regional representative, effective Sunday, June 1, 2003. Thank you for the opportunity to practice my profession for these past years." Stip. Ex. 121.

121.    There is no evidence that discrimination on the basis of age or seniority, or on any other basis, provoked or was a cause of the voluntary resignation by Troyanowski from her employment at PHS. There is no evidence that the behavior of the managers about which Troyanowski complained was caused by or resulted from considerations of age or seniority or from any other improper or discriminatory considerations.

122.    Approximately three weeks prior to the date on which she submitted her resignation to PHS, Troyanowski applied for employment with Specialty Hospital Trans, Inc. Tr. 801-4. She accepted employment there at a salary of approximately $3/hour in excess of her compensation at PHS. She resigned from PHS when she received notice that she had been hired by Specialty Hospitals. Tr. 805. Since resigning from her employment at PHS, Troyanowski has been earning more than she was paid at PHS. Tr. 805-807.

123.    There is no evidence that Troyanowski's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with PHS

-26-

was in any way related to her decision to submit her resignation to PHS or to any of the events or conditions in her employment prior to the time she submitted her resignation.

## REQUESTED CONCLUSIONS OF LAW

1.      The Court has jurisdiction over the parties and over the subject matter of this action.

2.      "Generally, in order to set aside or avoid a written settlement [agreement], there must be evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake, and such evidence must be clear and convincing." *Quintana v. Motel 6, Inc.,* 102 N.M. 229, 230, 693 P.2d 597, 598 (Ct. App. 1984). "[T]he policy of [New Mexico] is to favor amicable settlement of claims without litigation when the agreements are fairly secured, are without fraud, misrepresentation or overreaching, and when they are supported by consideration." *Ratzlaff v. Seven Bar Flying Serv., Inc.,* 98 N.M. 159,163, 646 P.2d 586 (Ct. App. 1982).

3.      A release should be "sufficiently clear and unambiguous that it would inform the person signing it of its meaning." *Berlangieri v. Running Elk Corp.,* 2003-NMSC-024, ¶ 29, 134 N.M. 341, 76 P.3d 1098.  Legal terms will not void a release, but "should not be relied upon exclusively to convey the meaning of the release to the person signing it."  Id., ¶ 31. "Generally, a party who executes and enters into a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act of the contracting party." *Smith v. Price's Creameries*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982).

4.      *Torrez v. Pub. Serv. Co. of New Mexico, Inc.*, 908 F.2d 687 (10th Cir. 1990) held that, in deciding whether to enforce a release, courts should consider the following factors to determine whether a release was made knowingly and voluntarily: (1) clarity and specificity of the release; (2) employee's education and business experience; (3) amount of time the employee had for deliberation before signing; (4) whether employee knew or should have known his rights upon execution; (5) whether employee was encouraged to consult with an attorney; (6) whether employee had an opportunity to negotiate terms; and (7) whether the consideration given exceeded benefits to which he was already entitled. *Id.* at 689-90.

5.      Considering the totality of the circumstances, the fact that an employee did not have the opportunity to negotiate terms of a release does not invalidate the release. *Barslow v. America Online, Inc.*, No. CIV. 03-1445 (D.N.M. Jan. 31, 2005), slip op. at 3-4.

6.      The document entitled "Additional Consideration and Release Agreement" (Release) executed by Martinez is clear and unambiguous.

7.      Failure to read a release is not a reason to invalidate a release. *Gibson v. Wal-Mart Stores Inc.,* 181 F.3d 1163 (10th Cir. 1999). "Each party to a contract has a duty to read the document in its entirety and is charged with knowledge of the document." *Gardner-Zemke Co. v. State*, 109 N.M. 729, 734, 790 P.2d 1010, 1015 (1990). Failure to read and familiarize oneself with the contents of terms of an agreement, "when information was readily available, clearly indicates a lack of reasonable diligence." *Roscoe v. U.S. Life Title Ins. Co.,* 105 N.M. 589, 591, 734 P.2d 1272, 1274 (1987), *overruled on other grounds by Ruiz v. Garcia,* 115 N.M. 269, 850 P.2d 972 (1993).

-28-

8.   Martinez was not coerced into signing the Release.

9.   There was no evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake in connection with the execution of the Release.

10.   Considering the totality of the circumstances, Martinez's execution of the Release was knowing and voluntary; and the Release is enforceable in its entirety.

11.   PHS fully complied with the terms of the Release. Martinez breached the terms of the Release when she filed and pursued this lawsuit.

12.   It has been necessary for PHS to defend itself in this action and to enforce the Release signed by Martinez. PHS is entitled to judgment against Martinez under the terms of Release for the amount it paid Martinez for executing the Release and for its reasonable attorney fees incurred by her breach of that Release.

13.   Section 510 of Employee Retirement Income Security Act ERISA, codified at 29 U.S.C. § 1140, protects employees from "adverse action for exercising any right under a plan or ERISA and ... interference with the attainment of any right under a plan or ERISA." *Garratt v. Walker*, 164 F.3d 1249, 1251 n. 1 (10th Cir. 1998) (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990)). "Section 510 proscribes changes in employment status based upon benefit motivations." *Id.* at 1255.

14.   The three prong burden shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to ERISA cases when there is no direct evidence of a violation of ERISA. *Winkel v. Kennecott Holdings Corp.,* Nos. 99-4114, 99-4124, slip op. at 20-24 (10th Cir. Jan. 10, 2001). *See also Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 296 (7th Cir. 1998); *Gitlitz v. Compagnie Nationale Air France*, 129

F. 3d 554, 558 (11th Cir. 1997) (cited with approval in *Garratt v. Walker*, 164 F.3d 1249, 1256 n. 1 (10th Cir. 1998)); *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3rd Cir. 1987) (cited with approval in *Garratt*, 164 F.3d at 1256).

15.     Under this analysis, an employee may establish a *prima facie* case of discrimination by showing that the employee (1) was a member of a protected class, (2) was qualified for the job position, and (3) suffered an adverse employment action under circumstances that demonstrate that (4) the employer took the action with the specific intent to interfere with the employee's ERISA rights. If an employee satisfies the first prong of *McDonnell Douglas*, the employer is required to articulate a legitimate nondiscriminatory reason for the adverse action.  The employer's burden at this point is one of production, not persuasion. Finally, if the employer puts forth nondiscriminatory reasons for its actions, then the employee must show the proffered reasons are pretextual. *See* cases cited in support of Requested Conclusion 14 *supra*.

16.     PHS did not discipline Pacheco or Martinez or terminate the employment of either of them with the specific intent to interference with Pacheco's or Martinez's attainment of rights under ERISA.

17.      PHS articulated legitimate, nondiscriminatory reasons for disciplining Pacheco and Martinez and for terminating their employment.  These reasons were not pretextual.

18.     "[S]tatements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination." *EEOC v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996) (citations omitted).

19.     In making decisions about intent and pretext, the factfinder is not to second guess the employment decisions without evidence of impermissible motive.  *Simms v. Oklahoma ex rel. Dep't Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir. 1999); *Selenke v. Med. Imaging of Colo.,* 248 F.3d 1249, 1261 (10th Cir. 2001); *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1209 (10th Cir. 1999), *overruled in part on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

20.     PHS did not, in any manner, violate ERISA.  It did not take any action with respect to the Martinez or Pacheco in order to limit or to deprive either of them of any interest or benefit to which they are or would be entitled under the provisions of any pension or welfare plan or any other benefit plan offered by PHS to its employees; PHS has not discriminated against Pacheco or Martinez or withheld or denied benefits to either of them under any retirement or pension plan or other benefit plan under which either of them was entitled to benefits.

21.     PHS has not breached its fiduciary duties established under ERISA or otherwise owed to Pacheco or Martinez under any benefit plan.

22.     PHS did not breach any express contract of employment with Pacheco or Martinez.

23.     The one-page Employment Agreements that Pacheco and Martinez signed were clear and unambiguous.

24.     The only reasonable expectations that Martinez and Pacheco could have formed after executing the Employments Agreements were that PHS could discipline and terminate an employee as it deemed appropriate, and in making these decisions, it was not obligated to follow any particular procedure or policy or practice.

25.    In disciplining and terminating Martinez and Pacheco, PHS did not violate its policies and procedures.  Pacheco and Martinez were afforded all of applicable steps of the progressive discipline system.

26.    PHS's policies and practices did not require PHS to make a written report of an investigation or require complaints to be in writing or to show reports or statements to an employee before he or she was disciplined.  Nothing in any PHS policy requires that an employee know the names of those who complained about his or her behavior prior to discipline.

27.    Pacheco and Martinez have failed to show that any PHS policy or procedure or practice was breached.  PHS did not breach any implied contract of employment or breach any workplace policy or practice with respect to treatment of Martinez or Pacheco.

28.    PHS did not breach any implied covenant of good faith and fair dealing relative to Martinez's and Pacheco's.

29.    By failing to mention the negligent misrepresentation claim in the Pretrial Order, Pacheco and Martinez have abandoned or are deemed to have abandoned this claim.

30.    Neither Martinez nor Pacheco has invoked any of the provisions of the New Mexico Human Rights Act, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, or any other similar state or federal statute relating to the rights of employees.

31.    The New Mexico Human Rights Act (HRA), NMSA 1978, §§ 28-1-1 to -15 (1969), as amended, provides that an employer may not "discharge ... any person otherwise qualified because of ... age."  § 28-1-7(A) (2004).

32.　New Mexico does not recognize a tort for age discrimination outside of the context and requirements of the HRA. *Gormley v. Coca-Cola Enters.*, 2004-NMCA-021,¶ 8, 135 N.M. 128, 85 P. 3d 252, *affirmed on other grounds,* 2005-NMSC-003, 137 N.M. 192, 109 P. 3d 280.

33.　PHS was not motivated by Pacheco's or Martinez's age in terminating the employment of either of them.

34.　PHS is entitled to a judgment dismissing with prejudice all of the claims which have been made against it by the Plaintiffs Frank Pacheco, Terri Elisberg, Mary Martinez and Patricia Troyanowski.

35.　To establish a wrongful discharge claim, also called a retaliatory discharge claim, an employee must show that he or she was terminated because the employee performed an action that public policy authorizes (*e.g.,* criticizing employer's misuse of public funds, serving as a juror, voting, seeking relief under the HRA) or refused to perform an action that public policy condemns (refusing to commit perjury or engage in price fixing or sign a false statement). *Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp.,* 105 N.M. 19, 738 P.2d 513 (1987); *Vigil v. Arzola,* 102 N.M. 682, 688-89, 699 P.2d 613, 619-20 (Ct. App. 1983), *reversed on other grounds,* 101 N.M. 687, 687 P.2d 1038 (1984) and *overruled on other grounds by Chavez v. Manville Prods. Corp.,* 108 N.M. 643, 777 P.2d 371 (1989; *Shovelin v. Central N.M. Elec. Co-op,* Inc., 115 N.M. 293, 850 P.2d 996 (1993); *Gandy v. Wal-Mart Stores, Inc.,* 117 N.M. 441, 872 P.2d 859 (1994); *Zacardi v. Zale Corp.,* 856 F.2d 1473 (10th Cir. 1988); UJI 13-2302-2310 NMRA.

36.     PHS did not discriminate against, retaliate against, or otherwise treat Martinez or Pacheco or any other PHS employee differently with respect to any terms and conditions of their employment at PHS because of their age, gender, national origin, or any other protected status.

37.     A civil conspiracy by itself is not actionable and does not provide an independent basis for liability. *Bauer v. Coll. of Santa* Fe, 2003-NMCA-121, ¶ 16, 134 N.M. 439, 78 P.3d 76. "Without an actionable civil case against one of the conspirators, ... an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense." *Ettenson v. Burke*, 2001-NMCA-003, ¶ 12, 130 N.M. 67, 17 P.3d 440.   To state a conspiracy claim, a plaintiff must prove an "independent, unlawful act that causes harm." *Id.* (citing *Las Luminarias v. Isengard*, 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct. App. 1978)).

38.     Neither PHS nor Aramark committed an unlawful act that caused Pacheco or Martinez harm.

39.     PHS and Aramark did not conspire to defeat any of Martinez's or Pacheco's rights, including those contained in the state or federal statutes listed in their complaint, including, without limitation, the New Mexico Human Rights Act, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or the Family Medical Leave Act.

40.     Neither Martinez nor Pacheco suffered any damages as a result of any action that PHS took or failed to take.

41.     Equitable remedies are the exclusive remedies under ERISA. *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 268 (1993) (internal quotation marks & citation omitted).

"[M]onetary compensation for economic or other harm" is unavailable under ERISA. *Moffett v. Haliburton Energy Servs. Inc.,* 291 F. 3d 1227, 1234 (10th Cir. 2002); *see also Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 210 (2002). Back pay is not an equitable remedy and may not be recovered in an ERISA action. *Millsap v. McDonnell Douglas Corp.,* 368 F.3d 1246, 1248, 1260 (10th Cir. 2004).

42.     Under ERISA, the district court has the discretion to award attorney's fees and costs of the action to either party. *Deboard v. Sunshine Mining and Ref. Co.,* 208 F.3d 1228, 1244 (10th Cir. 2000); 29 U.S.C. §1132(g)(1). The Tenth Circuit has set out the following nonexclusive five factors to consider it making the decision whether to award fees and costs to either party: the degree of bad faith or culpability of the opposing party; the ability of the opposing party to satisfy an award of fees; whether the award would deter others from acting under similar conditions; whether the party seeking fees sought to benefit all participants and beneficiaries of a plan or to resolve significant legal question regarding ERISA; and the relative merit of the parties' positions. *Gordon v. United States Steel Corp.,* 724 F.2d 106, 109 (10th Cir. 1983).

43.     ERISA does not authorize an award for punitive damages or emotional distress. *Conovor v. Aetna US Health Care, Inc.* 320 F.3d 1076, 1080 (10th Cir. 2003); *Zimmerman v. Sloss Equip., Inc.,* 72 F.3d 822, 827-29 (10th Cir. 1995); *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 888 n. 2 (10th Cir. 1988).

44.     Punitive damages may be recovered in New Mexico "when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with wanton disregard for the plaintiff's rights." *Romero v. Mervyn's,* 109 N.M. 249, 255, 784 P.2d 992,

998 (1989) (internal quotation marks & citation omitted); *Green Tree Acceptance, Inc. v. Layton*, 108 N.M. 171, 769 P.2d 84 (1989). In a contract case, "there must be evidence of an 'evil motive' or 'culpable mental state'" to justify a punitive damage award. *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 211, 880 P.2d 300, 308 (1994), *limited on other grounds by Sloan v. State Farm Mut. Auto. Ins. Co.*, 2004-NMSC-004, 135 N.M. 106, 85 P.3d 230.

45.    "[D]amages for emotional distress are not recoverable in an action for breach of an employment contract, whether express or implied, in the absence of a showing that parties contemplated such damages at the time the contract was made." *Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp.*, 106 N.M. 19, 20, 738 P.2d 513, 514 (1987); *Bourgeous,* 117 N.M. at 440, 872 P.2d at 858.

46.    Emotional distress damages are not allowable in a breach of the covenant of good faith and fair dealing claim. *Bourgeous*, 117 N.M. at 440, 872 P.2d at 858.

47.    In New Mexico, "absent statutory or other authority, litigants are responsible for their own attorney's fees." *Montoya v. Villa Linda Mall,* 110 N.M. 128, 129, 793 P.2d 258, 259 (1990). There is no statute allowing attorney's fees for the breach of an implied contract or covenant of good faith and fair dealing or conspiracy claim.

48.    Neither Pacheco nor Martinez is entitled to compensatory, back pay, emotional distress, or punitive damages against PHS or entitled to any ERISA award. Neither is entitled to judgment awarding them attorneys' fees or costs.

49.    Evidence of humiliating demotions, extreme cuts in pay, transfers resulting in unbearable working conditions, systematic threats of being fired and pressure to resign

might satisfy the high bar for proving constructive discharge. *Gormley*, 2005-NMSC-003, ¶¶ 11-12. Changes in duties, demotions and 10% pay reduction, intimidating behavior and denial of request to transfer do not constitute constructive discharge. *Id.* ¶ 13. Criticism of an employee's job performance, loss of a guaranteed 55-hour work week, reduction in pay, and loss of assignment to lighter duties do not rise to the level of constructive discharge. *Id.*

50.     The resignations by the Elisberg and Troyanowski from their employment with PHS were in all respects voluntary and not the result of hostile conditions in the workplace.

51.     Neither Troyanowski nor Elisberg was constructively discharged.

52.     PHS did not discharge, fire, suspend, expel, discipline or discriminate against any PHS employee for exercising his or her ERISA rights.

53.     PHS is entitled to a judgment dismissing with prejudice all of the claims which have been made against it by the Plaintiffs Frank Pacheco, Terri Elisberg, Mary Martinez and Patricia Troyanowski.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____
        Robert M. St. John
        Julie P. Neerken
Attorneys for Presbyterian Healthcare Services, Inc.
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 768-7337
Facsimile:  (505) 768-7395

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be mailed and mailed a true and correct copy of the foregoing Supplemental Requested Findings of Fact and Conclusions of Law of Defendant Presbyterian Healthcare Services, Inc., to the following counsel of record this 27th day of October, 2006.

Michael E. Mozes
Law Offices of Michael E. Mozes, P.C.
5732 Osuna, NE
Albuquerque, NM 87109-2527

Agnes Padilla
Butt, Thornton & Baehr
4101 Indian School, NE, #300
Albuquerque, NM 87110

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____
    Robert M. St. John