**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

FILED

06 OCT 27  PM 4: 09

CLERK-ALBUQUERQUE

**SALLY GOMEZ, TERRI P. ELISBERG,
SHIRLEY GARCIA, LINDA GIVENS,
SCOTT COHERNOUR, DENISE HENDRIXSON,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, SALLY URIOSTE,
JOYCE WINN, JOSEPH RUIZ and DAVE PACHECO,**

**Plaintiffs,**

**vs.**                                                   **No. CIV 2005-461 JH/KBM**

**PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,**

**Defendants.**

**PLAINTIFFS' REVISED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

  **COMES NOW** Plaintiffs Mary Martinez [hereinafter "Martinez"] and Frank Pacheco

[hereinafter "Pacheco"], by and through their counsel of record, Law Offices of Michael E.

Mozes, P.C. (Michael E. Mozes), and hereby submit their Revised Findings of Fact and

Conclusions of Law in accordance with the instruction of the Court.

**REVISED PROPOSED FINDINGS OF FACT**

**GENERAL FACTUAL FINDINGS**

Background Information on Martinez and Pacheco

  1.  Martinez was, during the period of time relevant to the claims in this action,

employed by Presbyterian Healthcare Services [hereinafter "PHS"] as PHS' chief clinical

dietitian. Trial Transcript [hereinafter "TT"], pp. 823 and 834; Stip. Exhs. 76-77.

  2.  During all times relevant to this action, Martinez worked as a full-time employee,

eligible for health and welfare benefits under various plans maintained by PHS. Stip. Exhs. 94

206

and 101.

3.      Martinez' duties and responsibilities as PHS' chief clinical dietitian included duties to PHS' Main and Kaseman Hospitals and further extended to the regional hospitals in the PHS system.  TT, p. 823; Stip. Exhs. 19 and 89.

4.      Approximately once a month and more often when needed, Martinez traveled to the PHS regional hospitals located in Tucumcari, Socorro, and Ruidoso, New Mexico.  TT, p. 1039.

5.      When at the regional hospitals, Martinez provided management services and dietary services for the patients located at these hospitals.  TT, p. 823.

6.      The chief clinical dietitian at PHS, as part of his or her job duties, supervised dietitians throughout the PHS system.  TT, p. 823; Stip. Exh. 19.  The job duties and responsibilities also included making schedules for the dietitians, assigning job duties to dietitians, and ensuring that dietitian services were being adequately provided.  TT, p. 823 and 886; Stip. Exh. 19.

7.      During the period from December 2000 to January 2001, David Foster ("Foster"), first a ServiceMaster employee and then an ARAMARK manager, directly supervised Martinez. TT, p. 824; Stip. Exhs. 77-78.

8.      At the end of 2002, Mary Beth Easton ("Easton"), an ARAMARK manager, became Martinez' supervisor.  TT, pp. 824-825 and 871.

9.      At the time of Martinez' forced resignation in March 2003, Easton directly supervised Martinez.  TT, p. 825.

10.     Martinez was 50 years of age when she was forced to resign.  TT, p. 819.

2

11.     Pacheco was 59 years of age when he was terminated from his job. TT, p. 581; Stip. Exh. 68.

12.     PHS hired Pacheco in 1979 as a cook in the kitchen at PHS' main hospital kitchen. TT, pp. 581 and 587; Stip. Exh. 69.

13.     Pacheco remained a cook throughout the entire term of his PHS employment. TT, p. 581; Stip. Exh. 56.

14.     Pacheco worked as a full-time employee throughout his entire PHS employment and often worked overtime. Stip. Exh. 69.

15.     As a full-time employee, Pacheco qualified for and received health and welfare benefits offered by PHS. Stip. Exh. 70.

16.     John Hughes, an ARAMARK manager, directly supervised Pacheco during late 2003 and 2004. TT, p. 591; Stip. Exhs. 56 (2003 JCA), 60, and 61. Hughes directly supervised Pacheco at the time Easton terminated Pacheco. TT, p. 428.

PHS Policies and Procedures

17.     PHS employees, both managerial and staff, were absolutely required to abide by the provisions, terms, and conditions of PHS' policies and procedures. TT, pp. 130-131.

18.     PHS managers were trained, instructed, and expected to implement and enforce PHS policies and procedures. TT, pp. 130-31.

19.     PHS required uniform and consistent adherence to its policies and procedures at all employee levels. TT, p. 131.

20.     Violations of PHS policies and procedures could lead to disciplinary action against employees, up to and including termination. TT, pp. 587-88, 822. PHS disciplined its employees in accordance with established policies and procedures. TT, p. 137.

21.    PHS expected and required ARAMARK managers and employees to follow, implement, and enforce PHS policies and procedures in the same manner PHS expected its own employees to follow, implement, and enforce these policies.  TT, p. 163, 348; Stip. Exh. 1, §§ 1.3 and 3.1(e).

22.    Policy 308, PHS' corrective action policy, constitutes a definite, specific, and explicit representation to employees and managers of PHS and ARAMARK of disciplinary policy at PHS.  Stip. Exh. 8.

23.    Policy 308 applied to Martinez and Pacheco.  TT, p. 137.

24.    Policy 308 imposed upon PHS and ARAMARK management the responsibility to follow a course of progressive discipline in issuing corrective action to employees.  TT, p. 139; Stip. Exh. 8.

25.    Policy 308 represents a progressive disciplinary action process involving informal and formal counseling procedures, which may be bypassed or accelerated depending on the seriousness of the circumstances.  TT, p. 139; Stip. Exh. 8, p. 1.

26.    Coaching, a part of the informal process, is not considered part of the formal disciplinary action policy and is intended to place the employee on notice that performance expectations are not being met.  Stip. Exh. 8, p. 2.

27.    The formal process is to be engaged only after the informal coaching process fails to produce expected results.  TT, p. 139; Stip. Exh. 8, p. 2.

28.    A Loss of Good Standing under Policy 308 requires the submission of additional documentation to support the corrective action.  Stip. Exh. 8, p. 2.

29.    Policy 308's Immediate Suspension and/or Dismissal section provides for suspension of an employee for the purpose of allowing the department director/administrator, in

4

consultation with the Human Resource Manager, to conduct a thorough investigation.  Stip. Exh. 8, p. 4.

30.     The suspension of an employee under these circumstances is without pay.  Stip. Exh. 8, p. 4.

31.     During all periods of time relevant to the claims of Martinez and Pacheco, Betty Kurtz ("Kurtz") acted as the PHS Human Resources Manager assigned to the Hospitality Services Division.  TT, p. 163.

32.     Employees should be advised of their right to rebut a supervisor's evaluation or corrective action.  Stip. Exh. 8, p. 5.  The rebuttal should be sent to Human Resources ("HR") and a copy must be provided to the manager.  TT, p. 142; Stip. Exh. 8, p. 5.  According to PHS policy, an employee could write a rebuttal, regarding either a performance evaluation or corrective action, without fear of retaliation.  TT, pp. 170 and171.

33.     An employee could also access the Problem Resolution Process (PHS' grievance procedure) if such a request was made.  *Id.*  Policy 308 does not require a written request to access the Problem resolution Process.  *Id.*; Stip. Exh. 9, p. 3.9.

34.     An employee should be provided a grievance hearing if they so request during any step of the formal process.  TT, p. 140.  Neither the Handbook nor Policy 308 requires such a request to be in writing.  TT, p. 171, Stip. Exh. 8, p. 5; Stip. Exh., p. 3.9.

35.     Policy 308 is rehabilitative in nature and its purpose is to correct employee behavior.  TT, pp. 142-43.

36.     The Causes for Corrective Action are the only causes listed in Policy 308 for taking corrective action short of immediate suspension and dismissal.  TT, p. 155; Stip. Exh. 8, p. 6.

37.     Under Causes for Immediate Suspension and Dismissal, Policy 308 requires "Gross Insubordination" for dismissal of an employee. Stip. Exh. 8, p. 7.

38.     The PHS corrective action forms include management review items which managers are to communicate to employees when issuing corrective action. TT, p. 175; Stip. Exh. 8, p. 8.

39.     Policy 314, PHS' Harassment/Threats of Violence Policy, applied to both Martinez and Pacheco. Stip. Exh. 10.

40.     Policy 314 defines non-sexual harassment as "any pattern of conduct which holds a person up to ridicule and substantially interferes with work performance, creates an intimidating, hostile or offensive work environment, or would cause a reasonable person to suffer severe emotional distress." Stip. Exh. 10, p. 3. Policy 314 includes discriminatory conduct and threats of violence in its explanation of non-sexual harassment. *Id.*

41.     Any claim of non-sexual harassment must be referred to the department director or HR. *Id.* The policy further provides for the investigation of all such complaints. *Id.*

42.     Policy 903, PHS' Travel and Business Expenses policy, provides for a process by which an employee could make travel arrangements in accordance with a "least expensive itinerary" and a more expensive "desired itinerary." Stip. Exh. 11, pp. 3(f) and 4(g).

43.     Final signature authority for approval of a "desired itinerary" is restricted to those who were identified as having such authority in the policy. Stip. Exh. 11, p. 4(l) and 22 (Exh. B).

44.     No ARAMARK manager had signature authority as a final signer for an employee's "desired itinerary." TT, p. 380; Stip. Exh. 11, p. 22 (Exh. B).

45.     Martinez, Pacheco, Scott Cohernour, Joyce Winn, Sally Urisote, Sally Gomez,

6

and Denise Hendrixson were all long-term PHS employees who were employed with PHS while ARAMARK administered the Agreement. TT, pp. 226-229. None of these employees received any disciplinary action while ServiceMaster administered the Agreement for over a year. TT, pp. 173-74.

46.     A complaint submitted to PHS HR must be in writing before it will be investigated. TT, p. 149.

47.     Kurtz' signature on any corrective action taken by any ARAMARK manager against a PHS employee indicates her approval of the action. TT, p. 200. In addition, Kurtz' initials on the corrective actions indicates that she knew the facts and circumstances related to the corrective action. TT, p. 201.

Integrated Support Service Agreement

48.     On August 29, 2000, PHS entered into an Integrated Support Service Agreement ("Agreement") with ServiceMaster Management Services, L.P. ("ServiceMaster") for the purposes of administering and managing PHS' support services departments at the PHS' main, Kaseman, and Northside Hospitals. Stip. Exh. 1, p. 1; Stip. Exh. 3, final page.

49.     The scope of the Agreement did not extend to the regional hospitals in the PHS system, except for the provision of biomedical engineering services through the Premier contract. TT, pp. 337-39, 1382; Stip. Exh. 3, pp. 7 and 23.

50.     The goals of the Agreement included consolidation, restructuring, and integration of the service departments at PHS' Albuquerque Hospitals. Stip. Exh. 1, p. 1; Stip. Exh. 3, p. 7.

51.     The Agreement set forth the aims of decreasing costs, improving service, and enhancing employee morale. TT, p. 339; Stip. Exh. 1, p. 1.

52.    The Business Plan associated with the Agreement provided for decreasing costs through labor savings. Stip. Exh. 3, Proforma (page following p. 73). These labor savings included savings associated with fringe benefits. *Id.* Further, these labor savings constituted approximately 50% of the predicted savings over the term of the Agreement in the Hospitality Services Department. *Id.*

53.    The only cost centers considered in formulating the financial baselines for the administration of the Agreement were PHS hospitals located in Albuquerque. Stip. Exh. 3, final page.

54.    In October 2001, ARAMARK assumed all the duties and responsibilities of ServiceMaster under the Agreement. Stip. Exhs. 2, 4, and 5.

55.    ARAMARK was to perform all administrative responsibilities related to the employment of PHS service employees under the Agreement. Stip. Exh. 1, § 1.3.

56.    All ARAMARK employees provided to perform the duties and responsibilities of the Agreement remained ARAMARK employees throughout the term of the Agreement. Stip. Exh. 1, § 3.1(c). ARAMARK paid the wages and salaries of its employees and any charges associated with worker's compensation benefits. *Id.*

57.    ARAMARK performed its duties and responsibilities under the Agreement as an "independent contractor." Stip. Exh. 1, § 3.1(e)

58.    PHS employees remained PHS employees while the Agreement was in effect. Stip. Exh. 1, § 3.2(a).

59.    ARAMARK was not regarded as a party to any collective bargaining agreement between PHS and its employees during the term of the Agreement. Stip. Exh. 1, § 3.2(b).

60.     ARAMARK could make no decisions regarding the wages, hours, or other working conditions of PHS employees. Stip. Exh. 1, § 3.2(b).  ARAMARK could only make recommendations regarding wage and wage-related matters. *Id.*

61.     Under the terms of the Agreement PHS maintained the "sole responsibility" for the hire, discipline, and discharge of its employees. TT, pp. 362;Stip. Exh. 1, § 3.2(c).  Hudson understood this phrase to mean that terminations of PHS employees had to be done by PHS HR. TT, p. 362.

62.     PHS promised in the Agreement to handle matters relating to the hiring, firing, and disciplining of PHS employees in accordance with its policies and procedures. *Id.*

63.     PHS was required under the Agreement to provide ARAMARK, upon request, certificates of insurance on its employees. Stip. Exh. 1, § 3.2(e).

64.     ARAMARK and PHS mutually determined which vendors would be used to provide supplies for the Hospitality Services Division. Stip. Exh. 1, § 4.1.

65.     The Agreement provided for mutual indemnification in the event that a liability claim was made against either ARAMARK or PHS during the term of the Agreement. Stip. Exh. 1, § 7.1.

66.     ARAMARK could negotiate vendor contracts for the provisions of supplies and services under the Agreement without the participation of PHS. TT, p. 366.

67.     The PHS manager charged with overseeing and negotiating the Agreement did not have any conversations with Bob Hudson ("Hudson"), the ARAMARK coordinating manager under the Agreement, about ARAMARK'S performance under the Agreement. TT, p. 1378.

68.     ARAMARK acted independently with respect to the day-to-day administration of

its duties and responsibilities under the Agreement. TT, p. 344.

69.     Kurtz did not know that PHS had the "sole responsibility" to hire, discipline, and discharge PHS service employees under the Agreement. TT, p. 134.

70.     Kurtz did not terminate the employment of Martinez and Pacheco. TT, p. 135.

71.     Kurtz' understanding of the phrase "sole responsibility" is that Kurtz would have the responsibility for making the recommendation and carrying out the terminations of Martinez and Pacheco. TT, p. 136.

72.     Kurtz did not make the recommendation and carry out the terminations of Pacheco and Martinez. TT, p. 136.

Administration of Regional Hospitals

73.     For years after the Agreement was in place, Martinez and Patricia Troyanowski ("Troyanowski") traveled to the regional hospitals to provide dietitian services. TT, pp. 381-82, 405, 720.

74.     When making travel arrangements to visit the regionals, Martinez and Troyanowski handled those arrangements through the regional hospitals themselves. TT, p. 874.

75.     Regional administrators are responsible for the daily operations of their respective regional hospitals. TT, p. 1387.

76.     The practice at PHS was to allocate any costs to the regional hospitals when PHS was providing services to them, such as dietitian services. TT, p. 1389.

77.     For a long period of time and until the end of 2002, the regional administrators paid for the rental car expenses associated with Martinez' and Troyanowski's visits to the regional hospitals. TT, p. 874.

10

78.    ARAMARK did not have any management duties or provide management services to the regional hospitals. TT, pp. 378 and .

79.    No PHS employee ever indicated to Martinez or Troyanowski that ARAMARK had authority to supervise their activities in the regional hospitals. TT. p. 721.

80.    The regional administrators approved for years the use of an SUV rental vehicle by Martinez and Troyanowski when the weather was bad or the forecast predicted bad weather. TT, p. 873 and 875.

81.    The regional administrators feared that ARAMARK'S involvement in the regional hospitals would lead to increased costs for those hospitals. TT, p. 950.

82.    Hudson took over the travel arrangements for Martinez and Troyanowski to the regional hospitals at the end of 2002. TT, p. 379 and 873.

83.    Martinez and Troyanowski worked under the direction of the regional administrators when they performed duties in the regional hospitals. TT, p. 720.

84.    The exhibits in this case set forth ARAMARK'S responsibilities and duties at main Presbyterian Hospital, Kaseman, Northside, and some Albuquerque clinics. Stip. Exh. 1, p. 1; Stip. Exh. 3, *passim.* No document nor exhibit sets forth any responsibilities or duties ARAMARK enjoyed with respect to the provision of dietitian services in the regional hospitals.

85.    Martinez and Troyanowski entered into an independent contractor agreement with PHS on August 28, 2003 for the provision of dietitian services to the regional hospitals. Stip. Exh. 96.

86.    PHS neither consulted with nor requested the approval of ARAMARK with respect to the provision of dietitian services to the regional hospitals by Martinez and

Troyanowski in September 2003. TT, pp. 1476-77; Stip. Exh. 96, pp. 4, 5, and 6. ARAMARK was not a party to this service contract. *Id.*

87.　The dietitians who worked in the regional hospitals, including Martinez, submitted and discussed the reports of their activities in the regional hospitals with the regional administrators of these hospitals, not ARAMARK management located in main Presbyterian. TT, p. 775.

88.　Foster hired Easton to take over the job duties of Martinez. TT, p. 1385; Stip. Exh. 78, p.3, (Bullet #4).

89.　Reifsteck did not know how dietitians' travel to the regional hospitals was paid for, did not know that the regional administrators paid for the travel, did not discuss with ARAMARK any duties ARAMARK had in the regionals, and did not know whether ServiceMaster directly supervised any of the dietitians' activities in the regional hospitals. TT, pp. 1379-1381.

90.　The scope of the Business Plan associated with the Agreement only involved PHS Main and Kaseman Hospitals. TT, p. 1382. The only PHS cost centers subject to ARAMARK'S management were located in Albuquerque. TT, p. 1383.

Invalidity of Martinez March 20, 2003 Release

91.　Martinez signed an Additional Release and Consideration Agreement ("Release") on March 20, 2003. Stip. Exh. 95.

92.　Martinez received the Release for the first time when she went to see Kurtz on March 20, 2003. TT, p. 896.

93.　During the meeting with Kurtz, the only provision of the Release that Kurtz

explained to Martinez was the provision related to eligibility for COBRA insurance. TT, p. 899.

94.     During the meeting. Kurtz explained to Martinez that Martinez was a good employee and that she could be rehired in 12 months if Martinez signed the Release. TT. p. 897, 906.

95.     Martinez did not read through the Release at the March 20th meeting. TT. 898. Martinez was still unsettled by the fact that PHS had forced her out of her job. *Id.*

96.     Kurtz did not advise Martinez that Martinez could seek legal counsel prior to signing the document. TT, p. 899.

97.     Kurtz did not tell Martinez that Martinez could take the Release home to review it. TT, p. 899.

98.     Martinez has no familiarity with any of the federal statutes set forth in the Release's waiver clause. TT, p. 905.

99.     Kurtz repeatedly told Martinez during the March 20th meeting that Martinez could be rehired by PHS in 12 months. TT, pp. 897 and 906.

100.    Martinez did not have sufficient time to thoroughly review the Release prior to signing it. TT, p. 896.

101.    Martinez did not sufficiently review the Release or seek advice of counsel because of Kurtz' repeated assertion that if Martinez signed the Release she could be rehired in 12 months. TT, pp. 897 and 906.

102.    Martinez did not have any opportunity to negotiate any of the terms of the Release. TT, p. 229.

103.    No one ever explained to Martinez that the Release pertained to any potential

13

claims Martinez may have against ARAMARK or related in any fashion to ARAMARK. TT, p. 1040.

Breach of Implied Contract of Employment–Mary Martinez

104.    Martinez signed the Employment Agreements she received when her managers told her to sign them and turn them back in. TT, p. 821; Stip. Exhs 141 and 142.

105.    Martinez did not receive any explanation regarding the Employment Agreements. TT, p. 821.

106.    Martinez understood the Employment Agreements to mean that if she acted contrary or inappropriately with respect to PHS' policies and procedures, she could be terminated. TT, p. 822. *See also* TT, p. 474-75, 707-08.

107.    Prior to January 3, 2003, Martinez had not received any corrective action during her PHS employment. TT, p. 822.

108.    Foster and Easton could have given disciplinary action to Martinez without Kurtz' review of the corrective action or reviewing the documents supporting the action. TT, p. 204.

109.    Martinez had no coachings with Foster prior to December 19, 2002 about her being inconsistent with the directions Foster gave her. TT, p. 832.

110.    On December 19, 2002, Martinez received her 2002 Job Competency Assessment (JCA). Stip. Exh. 78. David Foster ("Foster") prepared the 2002 JCA for Martinez. TT, p. 830.

111.    Martinez wrote a written rebuttal to the 2002 JCA. TT, p. 838 and 840; Stip. Exh. 79. In the written rebuttal, Martinez disputed many of the claims Foster made in the 2002 JCA. *Id.*

112.    Within a day or two of Foster's receipt of the Martinez JCA rebuttal, January 3,

14

2003, Foster and Easton issued Martinez a Loss of Good Standing. TT, p.838; Stip. Exh. 84. Foster had given Martinez her 2002 JCA just weeks before, Stip. Exh. 78, and not mentioned any of the performance problems noted in the Loss of Good Standing. *Id.* All of the incidents on the Loss of Good Standing occurred prior to the issuance of the 2002 JCA. TT, p. 1234. Easton has no explanation as to why these alleged performance deficiencies are nowhere noted on the JCA. TT, p. 1236.

113.    Kurtz was not present when Foster and Easton issued this disciplinary action and no documents show that Kurtz reviewed and approved this disciplinary action prior to it being given to Martinez. TT, pp. 202 and 204. The only managers involved in the January 3, 2003 corrective action were ARAMARK supervisors. TT, pp. 154 and 839.

114.    Jutta Johnson ("Johnson") impeached herself on the issue of what she reported to Foster regarding whether Martinez had requested she falsify training records. TT, pp. 431-32. Johnson originally testified in her deposition that she did not tell Foster that Martinez had falsified records. *Id.* Johnson did so following a pre-trial conversation with PHS' counsel. TT, p. 434.

115.    Martinez had no conversations with Johnson about falsifying employee records. TT, pp. 849-50. The conversation related to the provision of incorrect information to the employees and the non-inclusion of those answers in the grading of the competencies. TT, p. 848. No records were ever falsified. TT, pp. 434 and 860.

116.    Jerry Biggam, an ARAMARK manager, was not present when Martinez spoke with Johnson about the competencies. TT, p. 849. Biggam never had any conversations with Martinez about any alleged falsification of records. TT, p. 855.

117.  Biggam provided no written statement to Foster or Easton prior to the issuance of the Loss Of Good Standing. TT, pp. 1458-59; Stip. Exh. 88. Biggam did not write a statement until approximately 2 weeks after Martinez had received the Loss of Good Standing. Stip. Exh. 88. Foster sought the statement one day after Martinez submitted her rebuttal to the Loss of Good Standing. Stip. Exhs. 85 and 88

118.  Johnson refused to provide a written statement and did not want to be involved in the matter. TT, p. 1459; Stip. Exh. 82.

119.  Foster and Easton did not speak with Martinez about the incident allegedly involving falsification of records until January 3, 2003–three months after the incident allegedly occurred. TT, p. 846; Exh. 84. Martinez had no opportunity to respond to the allegations prior to being disciplined and was not requested to provide a statement. TT. p. 850.

120.  Johnson's request that she no longer be involved after allegedly making a claim of falsification of records against Martinez and Foster's direction to Martinez that Martinez not speak to Johnson about the matter represent misuse and abuse of Policy 308. TT, p. 309.

121.  With respect to item 2 on the Loss of Good Standing, Martinez did not state that the dietitians were on-call 24/7. TT, p. 852.

122.  This conversation about the dietitians being on-call occurred during the first week of Easton's employment at PHS–November 2002–and 2 months before the issuance of the Loss of Good Standing. Stip. Exh. 84.

123.  The circumstances regarding the on-call status of the dietitians was resolved by the time of the issuance of the January 3, 2003 corrective action. TT, p. 1473

124.  Martinez corrected the clocking in issue with respect to the dietitians' education

16

time on the Loss of Good Standing prior to the issuance of the January 3, 2003 corrective action. TT, p.853. Martinez corrected this issue when she learned by Kurtz how the dietitians should be clocked in and out for their education time.  TT, p. 854.

125.   Foster and Easton had no conversations with Martinez about the clocking in and on-call status of the dietitians between November 2002 and January 3, 2003. TT, p. . Foster and Easton had no further problems on these issues between the November 2002 conversations and the January 2003 discipline. TT, pp, 1265 and 1473.

126.   Easton, in the Loss of Good Standing, was digging up items that Martinez had corrected already.  TT, pp. 1265-66.

127.   Martinez signed the Novartis agreement in July 2002 at the request of Foster.  TT, p. 857.

128.   Foster knew about the Novartis agreement months prior to the January 2003 Loss of Good Standing given to Martinez.  TT, p. 1258-59, 1264 and 1266.

129.   Despite knowing about the Novartis agreement, Foster did not speak with Martinez about it between July 26, 2002 and January 3, 2003. TT, p.856.

130.   Foster did, however, speak with Easton about the Novartis agreement in November 2002. TT, p. 1258-59 and 1264-66.

131.   Easton did not speak with Martinez about the Novartis agreement prior to January 3, 2003. TT, p. 856.

132.   Neither Foster nor Easton requested that Martinez submit a statement about the Novartis agreement prior to giving her a Loss of Good Standing.  TT, p. 856.

133.   No documents or statements exist that show that Easton took any statements from

17

any PHS or ARAMARK employee with respect to the claim that Martinez had authorized the use of expired infant formula. TT, pp. 1250-54.

134.    Martinez did not authorize the use of expired infant formula on December 13, 2002 or any other date. TT, p. 858.

135.    Neither Easton nor Foster had any conversations prior to January 3, 2003 about the infant formula incident. TT, p. 858-59.

136.    Kurtz did not participate in any investigation directed towards allegations of misconduct by Martinez. TT, p. 144.

137.    The investigations conducted into the allegations relating to the Loss of Good Standing were incomplete, deficient, and dishonest.

138.    The allegations in the Loss of Good Standing lack corroboration, proof, and any documented basis.

139.    Martinez received no explanation at the January 3, 2003 meeting as to why the progressive nature of the disciplinary action policy of PHS, Policy 308, had been disregarded in issuing her a Loss of Good Standing. TT, p. 845.

140.    The Loss of Good Standing issued to Martinez on January 3, 2003 constitutes a corrective action based upon untimely, stale, and second-hand knowledge. Stip. Exh. 84. Despite these shortcomings, PHS HR, through Kurtz, authorized the issuance of the Loss of Good Standing. TT, p. 152.

141.    Martinez sought to pursue a grievance through PHS' grievance procedure after receiving the Loss of Good Standing. TT, pp. 862 and 863. Kurtz incorrectly stated that Martinez that could not pursue a grievance because Martinez was a manager. TT, p.863.

18

142.     Because Kurtz incorrectly advised Martinez that she could not pursue a grievance on the Loss of Good Standing, Martinez did not pursue such a grievance on either the Loss of Good Standing or the forced resignation.

143.     Pursuant to the travel policy of PHS, Martinez could upgrade to an SUV when weather conditions at the regional hospitals mandated use of a larger vehicle. TT, pp. 381 and 717; Exh. 11, pp. 3 and 4.

144.     Martinez' requests for use of an SUV because of a forecast of bad weather had not been denied prior to February 2003. TT, p. 718. The use of the SUV was related to safety concerns associated with bad weather in Ruidoso. TT, p. 717.

145.     ARAMARK managers had no final signature authority to approve a "desired itinerary" requested by a PHS employee. TT, p. 380; Stip. Exh. 11, p. 22 (Exhibit B).

146.     Hudson took over the travel arrangements of Martinez to the regional hospitals–a change in the practice of having the regional administrators approve the travel. TT, p. 379. Indeed, Hudson knew the regional hospitals paid for Martinez' travel and these travel monies did not come out of any budget that Hudson administered. TT, p. 382.

147.     Easton suspended Martinez without explaining why Martinez was placed on suspension and without indication of when Martinez might return to work. TT, p. 882.

148.     Easton and Foster forced Martinez to resign on March 17, 2003 because of charges of insubordination. Stip. Exh. 93. The corrective action document was originally written as a dismissal action and changed to a "resignation in lieu of dismissal" during the March 17, 2003, corrective action meeting. TT, p. 207.

149.     Insubordination is the refusal to obey an order from a manager or supervisor. TT,

p. 158.

150.    The alleged insubordination described in the corrective action document does not amount to the gross insubordination required under Policy 308 for the dismissal of an employee. Stip. Exhs. 8 and 93. Martinez had not had any prior discipline on the basis of allegations of insubordination and there are no repeated failures to follow her supervisor's instructions, which is required for the issuance of corrective action at the summary of counseling or loss of good standing level. Stip. Exh. 8, p. 6.

151.    Martinez had the responsibility as a chief clinical dietitian to advise the dietitians of any potential changes in schedule and additional duties. TT, pp.885-886 and 958.

152.    Easton had neither authority nor right under the Agreement to give directions to Martinez about job assignments related to the provision of dietitian services to the regional hospitals because ARAMARK provided no services to these hospitals. TT, p. 378.

153.    Easton's instruction to Martinez to not communicate with the regional hospitals about ARAMARK's proposal to evaluate and provide patient dietary care in the regional hospitals was made without privilege or authority. Stip. Exh. 1, § 3.2(b).

154.    Easton told Martinez to not discuss ARAMARK's proposals with the regionals because ARAMARK had no rights nor duties under the Agreement to provide such services. Stip. Exhs. 1 and 3.

155.    Easton's response to Martinez' actions regarding advising the dietitians of possible changes in providing services to the regional hospitals was exaggerated, frivolous, and extreme.

156.    Neither Easton nor Foster provided an opportunity to Martinez to explain her

discussion with the dictitians about the regional hospitals prior to the issuance of the dismissal action–later changed to a forced resignation. TT, p. 886.

157.    With respect to item number 2 on the March 17, 2003 corrective action, Martinez complied with the only policy Easton alleges Martinez violated–the travel policy. TT, pp. 1278-79; Stip. Exh. 90. Further, Martinez complied with the travel arrangements established through years of working with the regional administrators to set up and pay for Martinez' travel to the regional hospitals. TT, pp. 873-876.

158.    PHS, through Kurtz, approved the forced resignation of Martinez, although the charges in the corrective action did not justify the action taken and violated PHS' policies and procedures, particularly Policy 308.

159.    No department director, in consultation with HR, conducted any investigation into the charges that led to the forced resignation of Martinez. TT, p. 144, 208; Stip. Exh. 8, p. 4.

160.    The investigation conducted by Easton does not constitute a "thorough investigation" per Policy 308. Stip. Exh. 8, p. 4. There are no witness statements related to such an investigation. The only statements that could arguably be considered taken during any investigation prior to the forced resignation are Easton's self-serving and disputed statements, which Martinez had no opportunity to see or respond to prior to her forced resignation. Stip. Exhs. 90 and 91.

161.    Martinez was terminated for not following policies. TT, p. 164.

162.    A resignation in lieu of dismissal is not a voluntary resignation. TT, p. 207.

Breach of Implied Contract of Employment–Frank Pacheco

163.    Pacheco understood that the Employment Agreement he signed without

explanation or discussion meant that he was required to follow PHS policies and procedures and that if he failed to do so, he could be written up and perhaps terminated. TT, pp. 583-588; Stip. Exhs. 143-146.

164.    Pacheco had received no corrective-action prior to December 30, 2003 and prior to ARAMARK coming in to PHS. TT, p. 588

165.    Pacheco received his highest JCA ever in December 2003. TT, p. 591.

166.    Pacheco had been employed at PHS for over 23 years at the time he received his first corrective action as a PHS employee.

167.    Neither Kurtz nor any other PHS employee was present when Pacheco received a Summary of Counseling on December 30, 2003 for clocking issues and insubordination. TT, p. 160; Stip. Exh. 60.

168.    John Hughes ("Hughes") and Easton issued Pacheco the summary of counseling. Stip. Exh. 60.

169.    Pacheco had historically worked significant overtime hours during the course of his PHS employment. Stip. Exh. 69.

170.    The December 30th corrective action notes that Pacheco clocked in early during a two-week period in December 2003 and then immediately took a break. Stip. Exh. 60.

171.    There is no evidence that either Easton, Johnson, Hughes, or Liz Sandoval ("Sandoval"), or any other supervisor of Pacheco's, or any employee reported that Pacheco clocked in early and then immediately took a break. TT, pp. 216-17; 435-36.

172.    Pacheco did not clock in early and immediately take a break. TT, p. 603.

173.    When Pacheco received the summary of counseling for clocking in early, there

22

were other employees who were clocking in early. TT, p. 436. Johnson does not know of any employee, other than Pacheco, who received disciplinary action for clocking in early. TT, p. 437.

174.    Neither Easton nor Johnson knew whether Pacheco was authorized to work overtime during the two-week period noted in the Summary of Counseling. TT, p. 446.

175.    Pacheco did not have a loud verbal confrontation with Glenda Pesina on December 23, 2003. TT, pp. 608-09.

176.    Pacheco did go to Johnson's office and raise his voice that day. TT, p. 467, 608. Johnson asked Pacheco to lower his voice. TT, p. 468, 610. Pacheco did lower his voice. *Id.*

177.    No order or instruction was given to Pacheco on December 23, 2002 that Pacheco did not comply with. TT, p. 162, 468, and 610. Pacheco was not insubordinate on December 23, 2003 and did not engage in any repeated failures to follow his supervisor's directions. TT, pp. 162, 608-10; Stip. Exh. 8, p. 6.

178.    There are no documents showing that Easton or Hughes conducted any investigation into any of the issues set forth in the summary of counseling. TT, p. 160.

179.    Neither Hughes nor Easton explained the Manager Review items on the summary of counseling, including Pacheco's right to grieve the corrective action. TT, p. 611.

180.    Despite the fact that the December 2003 corrective action lacked any support, Kurtz approved the issuance of the summary of counseling. Stip. Exh. 60.

181.    No PHS employee was present when Pacheco received the Summary of Counseling. TT, p. 160.

182.    On January 30, 2004, Pacheco received a Loss of Good Standing for allegedly putting raw fish on the cafeteria trayline that day. Stip. Exh. 62.

23

183.   Pacheco did not cook the fish which was allegedly raw. TT, p. 617. The fish was cooked by Ivan and Marcel. TT, p. 617. Both employees were less senior than Pacheco and Ivan was younger. TT, p. 618.

184.   Pacheco was responsible for temping the fish prior to putting the fish on the trayline. TT, p. 617; Stip. Exh. 62.

185.   The procedure for temping a number of fish placed in a pan required that the employee temp the fish from the back to the middle to the front–in three places. TT, pp. 616.

186.   Pacheco temped the fish in accordance with the standard procedure in the PHS kitchen–temping the fish in the pan in the front, middle, and back. TT, p. 618.

187.   The employees who cooked the fish and would have been responsible for not cooking the fish appropriately received no disciplinary action for this incident. TT, p. 618.

188.   Easton, who wrote the Loss of Good Standing, issued it the same day of the incident, before Pacheco went home from his shift. TT, p. 617; Stip. Exh. 61.

189.   Easton took no written statements and did not talk to Pacheco prior to issuing the Loss of Good Standing about what had occurred with the fish. TT, p. 617.

190.   Kurtz approved the Loss of Good Standing, although Pacheco had complied with kitchen procedures in temping the fish. TT, p. 161; Stip. Exh. 62.

191.   Kurtz also approved a kitchen policy which stated that any unsafe food handling incident would result in a Loss of Good Standing. TT, p. 1297.

192.   This per se policy with respect to unsafe food handling violated the progressive nature of Policy 308 and provided for no coaching or informal process with respect to improving employee performance. Stip. Exh. 8, p. 2; Def.'s Contested Exh. N.

193.    The only person that Johnson knows that was written up for a failure to temp food is Pacheco.  TT, p. 439 and 441.  Pacheco knows of no other employee in his 20-plus years as a PHS employee who received a Loss of Good Standing for food not being temped.  TT, p. 621.

194.    On April 15, 2004, Easton terminated Pacheco's employment, with Kurtz' approval, on the ground that Pacheco had created a hostile work environment in the kitchen.  Stip. Exh. 64.

195.    Prior to and including April 15, 2004, no PHS or ARAMARK employee had ever complained that Pacheco had created for him or her a hostile work environment.  TT, p. 238.

196.    The hostile work environment allegedly consisted of Pacheco's use of profanity in the workplace.  Stip. Exh. 64.

197.    Easton had given Pacheco a verbal counseling for claims harassment related to the use of profanity in August 2003.  Stip. Exh. 58.  Easton did not reveal to Pacheco who had made such complaints, what the complaints consisted of, and when the complained of conduct allegedly occurred.  TT, p. 594.

198.    On April 9, 2004, Easton went to the kitchen and asked workers to give statements about whether they had ever heard Pacheco use profanity in the workplace.  TT, p. 1488.  The only statement Easton received was from Judi Rieckenberger, who stated that in her 24 years of working with Pacheco, she had heard Pacheco use profanity a "few" times.  TT, p. 1487; Defendant's Contested Exh. P.

199.    Pacheco had heard profanity commonly used in the kitchen by other employees, including his supervisor John Hughes.  TT, p. 595-96.  Rieckenberger also testified that she heard profanity used by other employees.  TT, p. 1488.  Easton admitted that she had used

25

profanity in the workplace and had not been disciplined for it.  TT, p. 1312.

200.   Pacheco knows of no other employee who worked in the kitchen and was disciplined for using profanity in the workplace.  TT, p. 596.

201.   The April 15th dismissal action also mentions an argument between Pacheco and Tony Griego ("Griego"), another cook, that occurred on April 10, 2004.  Stip. Exh. 64.

202.   The argument was related to a conversation Pacheco had with another employee about the use of a work area in the kitchen.  Stip. Exhs. 63 and 64.

203.   Griego interjected himself into the conversation and Pacheco asked him "What the f--k are you doing."  TT, p. 626.  An argument ensued between Pacheco and Griego.  Stip. Exh. 63.

204.   When Pacheco sought to walk away from Griego, Griego told Pacheco they could take it outside but not at work.  Stip. Exh. 63.  Griego's words constitute a threat of violence to Pacheco.

205.   Easton gave Griego no corrective action for this threat.  TT, p. 1307.  No documents exist that show that Griego even received a verbal counseling for these threats.

206.   No department director nor PHS HR made any investigation into the claim that Pacheco had created a hostile work environment.  TT, pp. 144 and 1309.  Pacheco knows of no complaint of hostile work environment, other than the dismissal action, brought against him.  TT, p. 698.

207.   Kurtz participated in no investigations directed towards allegations of misconduct by Pacheco.  TT, p. 144.

208.   The allegations in the April 15, 2004 dismissal action do not constitute a hostile

26

work environment under the provisions of Policy 314. Stip. Exh. 10, p. 3. Pacheco's actions do not constitute the humiliation or ridicule of a person, substantial interference with an employee's work performance, the creation of an intimidating or hostile work environment, or the cause of severe emotional distress. Stip. Exh. 10, p. 3.

209.   Pacheco did not have any opportunity to respond to the charges of hostile work environment prior to being dismissed. TT, p. 628.

210.   Pacheco requested a grievance hearing on the dismissal action. TT, p. 630. The grievance hearing did not take place because Kurtz advised Pacheco that his alleged accusers, Tony Griego and Angela Ramirez, would not be present at the hearing. *Id.*

211.   No staff employee ever complained to Kurtz that Frank Pacheco used profanity in the workplace. TT, p. 301.

212.   Pacheco was terminated for not following policies. TT, p. 164.

Breach of the Implied Covenant of Good Faith and Fair Dealing

213.   In the cases of Martinez and Pacheco, PHS approved disciplinary actions that had no basis nor foundation in established fact, that relied on incomplete and "phantom" investigations which favored the accusers of Martinez and Pacheco, that denied Martinez and Pacheco the opportunity to respond to the charges prior to the corrective actions being issued, and that contained gross misstatements of fact. Paragraphs 156, 159, and 208-9 above.

214.   PHS approved disparate disciplinary actions against Martinez and Pacheco in circumstances where other employees who engaged in like or similar policy violations received no disciplinary action. Paragraphs 200, 204 and 205, 127 above.

215.   PHS did not administer their policies and procedures in a manner that was

27

consistent, uniform, and fair when dealing with allegations of misconduct involving Martinez and Pacheco.  Paragraphs 139, 140, 208, above.

216.   Kurtz approved and Easton and Foster have admitted that the Loss of Good Standing was based on digging up conduct that had been addressed and corrected by Martinez. TT, p. 1265-66 and 1473.

217.   ARAMARK changed the job description for Martinez on January 8, 2003.  TT, p. 868.  There is no evidence ARAMARK consulted about or received the approval of PHS management prior to making these changes.  Stip. Exh. 1, § 3.2(b).  ARAMARK removed Martinez' supervisory duties over the diet aides and gave those duties to Easton.  TT, p. 869.

218.   PHS and ARAMARK misused the policies and procedures of PHS, particularly Policy 308, to rid themselves of older workers.  Stip. Exh. 8.

219.   Kurtz approved any disciplinary action recommended by an ARAMARK manager against a PHS employee.  TT, p. 180.

Tortious Interference With Contractual Relations, Civil Conspiracy, and ERISA Claims

220.   ARAMARK managers and supervisors knew that PHS employees and ARAMARK supervisors were required to abide by PHS policies and procedures.  TT, p. 347-48, 1243; Stip. Exh. 1, § 3.2(c).

221.   ARAMARK managers and supervisors further understood that PHS employees were to be disciplined in accordance with PHS policies and procedures.  TT, p. 1243.

222.   ARAMARK managers and supervisors received training for the purpose of implementing and enforcing PHS policies and procedures.  TT, p. 347.

223.   ARAMARK employees had full knowledge of the absolute requirement that PHS

employees, in order to maintain their PHS employment, must follow PHS policies and procedures. TT, p. 1243 and 1246, 1449; Stip. Exh. 1, § 3.2.

224.    The disciplinary actions taken by Easton and Foster against Martinez violated the Agreement's requirement that PHS have "sole responsibility" for the discipline and discharge of Martinez. Paragraphs 147 and 148 above.

225.    Neither Easton nor Foster nor any other ARAMARK manager enjoyed any privilege to take disciplinary actions against Martinez and discharge her under the terms and provisions of the Agreement. Stip. Exh. 1, § 3.2(c).

226.    Easton and Foster violated the progressive nature of Policy 308 by immediately giving Martinez a Loss of Good Standing, rather than a Summary of Counseling, on January 3, 2003. Stip. Exh. 8; Stip. Exh. 84.

227.    Easton and Foster violated the informal disciplinary process set out in Policy 308 by not coaching Martinez on the issues of alleged falsification of records, the Novartis agreement, the allegations related to expired infant formula, and the communications related to the on-call status and educational clocking issues pertinent to the dietitians. TT, p. 1246; Stip. Exhs. 8 and 84. Rather, Easton chose to document coaching sessions in the context of a corrective action. TT, p. 1246. Indeed, Easton gave Martinez a document she testified to as a coaching document, which rehashed the issues in the Loss of Good Standing, the same day the Loss of Good Standing was issued to Martinez. TT, p. 1274.

228.    Easton and Foster violated the informal disciplinary policy set forth in Policy 308 by engaging the formal disciplinary process without recurring first to the informal disciplinary process. TT, pp 1246 and 1274. ; Stip. Exhs. 8 and 84.

29

229.   Easton and Foster violated the disciplinary process set forth in Policy 308 by not conducting thorough, fair, and reasonable investigations into the disciplinary actions taken against Martinez.  Paragraphs 148 and 150 above.

230.   Easton and Foster violated the disciplinary process set forth in Policy 308 by not providing additional documentation to support the Loss of Good Standing given to Martinez. Stip. Exh. 8, p. 4.

231.   Easton and Foster violated the disciplinary process set forth in Policy 308 by not having a department director (Foster), in consultation with HR (Kurtz), conduct the investigation of the charges that led to Martinez' forced resignation.  TT, p. 1249; Stip. Exh. 8, p. 4.

232.   Easton and Foster violated the disciplinary process set forth by Policy 308 by dismissing Martinez from her PHS employment on the basis of allegations of "insubordination." Stip. Exh. 93.  Policy 308 requires "gross insubordination" to justify a dismissal.  Stip. Exh. 8, p. 7.  "Gross insubordination," by the policy's definition for a lower level of insubordination–the repeated failure to follow the orders of a supervisor–is something more than a one time failure to follow the order of a supervisor.  Stip Exh. 8, pp. 6-7.

233.   Easton and Hughes violated the disciplinary process set forth by Policy 308 by making incomplete, deficient, cursory, and undocumented investigations of disciplinary actions taken against Pacheco.  Paragraphs 178, 179 and 192 above.

234.   Easton and Hughes violated the disciplinary process set forth by Policy 308 by not engaging the informal disciplinary process prior to disciplining Pacheco on charges on insubordination, unsafe food handling practices, and hostile work environment.  Paragraphs 192, 206 and 237.

235. Easton and Hughes violated the disciplinary process set forth by Policy 308 by giving Pacheco a Loss of Good Standing for complying with policy and procedure related to temping food in the PHS main hospital kitchen. Paragraph 192, above.

236. Easton and Hughes violated the disciplinary process set forth by Policy 308 by not applying Policy 308 in a uniform, consistent, and fair manner with respect to issuing corrective action to Pacheco. Paragraphs 193, 197 and 199, above (OTHER EMPLOYEES NOT DISCIPLINED FOR SAME ACTS–Temping Fish, profanity)

237. Easton and Hughes violated the disciplinary process set forth in Policy 308 by giving Pacheco a corrective action for insubordination where there was no refusal to obey the order of a supervisor and no repeated failures to obey such orders. TT, p. 610; Stip. Exh. 8, p. 6; Stip. Exh. 60.

238. Easton and Hughes violated the disciplinary process set forth in Policy 308 by terminating Pacheco for creation of a hostile work environment in circumstances where neither a department director nor any HR manager conducted any investigation. TT, pp. 144 and 1249; Stip. Exh. 8, p. 4; and Stip. Exh. 10, p. 3.

239. Easton and Hughes violated the disciplinary process set forth in Policy 308 by terminating Pacheco in circumstances where no employee had ever made a complaint against Pacheco of hostile work environment and none of the allegations supposedly supporting the dismissal action met the standard set forth in Policy 314. TT, pp. 238, 698, and 1488; Stip. Exh. 10, p. 3.

240. Easton and Foster made decisions regarding the terms and conditions of Martinez' employment in the regional hospitals without consultation with PHS managers and supervisors.

TT, p. 876, 878-79, 1221, 1239-1242; Stip. Exhs. 86, 90, and 91.

241.    The fact that PHS contracted with Martinez to provide services to the regional hospitals in September 2003, without ARAMARK approval or knowledge, demonstrates that ARAMARK did not have duties or responsibilities in the regionals with respect to the provision of dietitian services.  TT, pp. 1476-77; Stip. Exh. 96

242.    Hudson, Foster, and Easton made decisions regarding Martinez' travel arrangements to the regional hospitals in violation of Policy 903 and established PHS practice, without consulting with PHS management beforehand.  TT, p. 379; Stip. Exh. 11, pp. 3-4; Stip. Exhs. 86 and 90.

243.    No evidence shows that Kurtz or any other PHS employee approved the summary of counseling given to Pacheco on December 30, 2003.  Kurtz did not sign the document until approximately one month afterwards.  Stip. Exh. 60.  No e-mails exist showing Easton or Hughes communicated any knowledge regarding this corrective action to Kurtz.

244.    No evidence shows that Kurtz or any other PHS employee approved the Loss of Good Standing given to Pacheco on January 30, 2004.  Kurtz did not sign the document until a week after the corrective action was given to Pacheco.  Stip. Exh. 61.  No e-mails exist showing Easton or Hughes communicated with Kurtz about the issuance of this corrective action.

245.    No evidence shows that Kurtz or any other PHS employee approved the Loss of Good Standing given to Martinez on January 3, 2003.  Neither Kurtz nor any other PHS employee _ever_ signed this corrective action given to Martinez.  Stip. Exh. 84.  No e-mails exist showing Easton or Hughes communicated with Kurtz about this corrective action.

246.    PHS had clear expectations of the financial benefits envisioned through the

management and administration of the Agreement.  Stip Exh. 1, p.1; Stip. Exh. 5; Stip. Exh. 3, Proforma.

247.  The Proforma established for the Agreement sets out significant cost savings through the reduction of labor costs, including costs related to fringe benefits.  Stip. Exh. 3, Proforma.  The baseline amounts under the Agreement fluctuated on the basis of costs related to fringe benefits.  TT, p. 375.

248.  Hudson and Reifsteck routinely discussed the budgets ARAMARK operated under.  TT, p. 1386.  Hudson had complaints and disagreements with Reiefsteck about how fringe benefits were being allocated to the Hospitality Services Division.  TT, pp. 376 and 1386.

249.  On more than one occasion Foster made comments to the dietitians regarding the number of "older" or "senior" dietitians remaining at PHS.  TT, pp. 62-63, 1449-50.  Foster made these comments in the context of rumors and concerns about the number of older dietitians who were being forced out of PHS employment.  TT, p. 1450.

250.  Easton made comments to dietitians that stated that any "young, new dietitian" could perform a new procedure Easton wanted to initiate.  TT, p. 539.

251.  Hendrixson and Martinez were older, senior PHS employees when they were terminated from their positions as dietitians.  TT, pp. 59 and 819.  Troyanowski and Elisberg were also older, senior PHS employees when they resigned from their dietitian positions as PHS because of problems with ARAMARK management, principally Foster and Easton.  TT, pp. 486 and 704; Stip. Exhs 32 and 125; Pltf's Contested Exh 4.

252.  Easton also targeted older, senior employees in the kitchen, such as Pacheco and Joyce Winn, for termination.  TT, pp. 38-39 and 581; Stip. Exh. 64.

33

253.    None of the terminated employees in this action–Martinez or Pacheco–had received any corrective action during their long PHS careers prior to ARAMARK assuming duties and responsibilities under the Agreement in late 2001.  TT, p 173-74.

254.    Dietitians were among the most costly employees in the Hospitality Services Division.  TT, p. 417.

255.    The Loss of Good Standing given to Martinez on January 3, 2003 was replete with falsehoods and misrepresentations.  Johnson impeached herself on whether she ever told Foster that Martinez had falsified records, Biggam did not provide a statement regarding alleged falsification until _after_ the Loss of Good Standing was given to Martinez, the Novartis agreement issue was simply a misrepresentation for Foster's wrongful act in directing Martinez to sign the contract, and the issue on the infant formula is based upon information never corroborated nor documented.  Paragraphs 114, 117, 127, 134, and 140, above.

256.    Easton never saw Martinez' rebuttal to the Loss of Good Standing, although Policy 308 states that a copy will be sent to the managers.  TT, p. 1269; Stip. Exh., p. 5.  Easton does not know why she did not receive the rebuttal.  TT, p. 1271.

257.    The dismissal action, later changed to a "resignation in lieu of dismissal," is based upon a misunderstanding of ARAMARK's role in the regionals, the exercise of Martinez' supervisory duties over the dietitians, and a conversation regarding the future role of Martinez in the regional hospitals.  TT, pp. 866, 884-85, and 1242; Stip. Exhs. 1, 3, 86, and 90.

258.    Easton would take verbal statements from employees accused of wrongdoing during an investigation.  TT, p. 1258.  Easton did not take such statements from Martinez and Pacheco prior to issuing corrective actions.  Paragraphs 160 and 189, above.

259.    Martinez rightly understood that she was not to communicate Easton's plans regarding the regional hospitals to the regional hospital employees and administrators. TT, p. 879.

260.    After Martinez was forced to resign, Easton began to go to the regional hospitals regularly. TT, p. 1237. Easton wanted to put together a proposal to go to the regional hospitals with regarding patient care and treatment related to dietary services. TT, pp. 1239-40.

261.    Foster became angry and upset with Martinez when Martinez disputed the information on her 2002 JCA through a written rebuttal. TT, p. 839.

262.    The Martinez written rebuttal prompted and caused Foster to give Martinez the Loss of Good Standing. Foster issued the Loss of Good Standing within a day or two of receiving the written rebuttal. TT, pp. 838 and 1464; Stip. Exhs. 78, 79, and 84.

263.    In March 2003, Easton and Foster decided to suspend and then dismiss Martinez from her PHS employment because Martinez disputed ARAMARK's role in the regional hospitals and how travel arrangements were to be handled to the regional hospitals. Stip. Exhs. 90, 91 and 93.

264.    Within a week of making known these disputes, Martinez was placed on suspension without pay. TT, p. 882; Stip. Exhs. 90, 91. A few weeks later, Easton and Foster recommended the dismissal of Martinez. Stip. Exh. 93.

265.    ARAMARK was not privileged under the Agreement or any other document to recommend that disciplinary actions be taken against Martinez on the basis of rumor, misrepresentations, and falsehoods. Stip. Exh. 1, § 3.2©).

Civil Conspiracy

266.   PHS did not have the right to control the daily activities, decision-making processes, and supervisory duties and responsibilities of ARAMARK managers and employees. TT, p. 343-44.

267.   ARAMARK acted as an "independent contractor" under the terms of the Agreement. Stip. Exh. 1, § 3.1(e).

268.   It was ARAMARK's obligation under the Agreement to supervise and manage the administration of the Integrated Support Service. Stip. Exh. 1, p. 1(D).

269.   No document describes ServiceMaster or ARAMARK as an "agent" of PHS. Further, the only reference regarding the nature of the business relationship between ARAMARK and PHS is that of an "independent contractor." Stip. Exh. 1, § 3.1(e).

270.   ARAMARK did not need to go to PHS to receive approval, instruction, or direction with respect to the management of third-party contracts. TT, p. 341-42.

271.   ARAMARK was not required to keep PHS advised of its daily activities because the Agreement did not impose that obligation on ARAMARK. TT, p. 343. However, Hudson did keep PHS advised as a good management practice. *Id.*

272.   Under the terms of the Agreement, ARAMARK acted independently with regards to exercising its managerial and supervisory responsibilities. TT, p. 344. For example, Hudson directed his own activities while employed by ARAMARK at PHS. TT, p. 403.

273.   PHS had no authority to impose upon ARAMARK who would sit on the Joint Advisory Team called for in the Agreement. TT, p. 345.

274.   The Agreement required ARAMARK to absorb the direct operating costs of the

administration and implementation of the Agreement. Stip. Exh: 1, § 1.5; required ARAMARK

to be responsible for payment of taxes incurred in performing its duties and responsibilities, Stip.

Exh. 1, §1.5; and gave ARAMARK discretion to hire employees of its choosing to administer the

Agreement. Stip. Exh., §§ 3.1(a) and (b).

274. No formal process existed that required PHS to approve any employee

ARAMARK chose to hire in furtherance of its duties under the Agreement. TT, pp. 356-57.

276. PHS retained "sole responsibility" with respect to the hiring, firing, and

disciplining of PHS employees. Stip. Exh. 1, § 3.2(c).

277. Kurtz never participated in any investigation that was directed towards allegations

of misconduct against Martinez or Pacheco. TT, p. 144.

278. Kurtz never conducted any investigation into allegations that these Plaintiffs

encountered problems in dealing with ARAMARK management. TT, p. 241. PHS had notice

and knowledge that PHS employees encountered difficulties in dealing with ARAMARK

management. TT, p., 246-47; Pltf's Contested Exh. 1.

Damages–Mary Martinez

279. Under the pay rate Martinez received on the date of her forced resignation, PHS

paid Martinez at a rate which resulted in an annual salary of $53,556.00. TT, pp. 908-09; Stip.

Exh. 80.

280. On March 31, 2003, Martinez started working in a five-year contract position at

the University of New Mexico Hospital (UNMH). TT, p. 923, Stip. Exhs. 102-03.

281. Martinez began work at UNMH at a salary of $3,329.75 a month. *Id.*

282. Effective July 1, 2004, UNMH increased Martinez' annual salary to $48,143.96.

TT, pp. 927-28, 976; Stip. Exh. 104.

283.   Effective July 1, 2005, UNMH increased Martinez' annual salary to $49,106.84.
TT, pp. 931, 976; Stip. Exh. 106.

284.   The employment contract Martinez had with UNMH had an end date of
November 30, 2007.  Stip. Exh. 102.  The department Martinez worked in expected significant
cutbacks and Martinez began to seek out other employment.  TT, pp. 924, 976.

285.   On August 20, 2006, Martinez began working as a full-time instructor with
Central New Mexico (CNM), earning $39,160.00 annually.  TT., pp. 923, 932; Stip Exh. 111.

286.   After PHS forced Martinez to resign, Martinez had to supplement her income with
teaching assignments at TVI and then at UNM.  TT, pp. 925-26, 933, 973-74; Stip. Exh. 110.

287.   Martinez teaches one class per semester at UNM and intends to continue teaching
until her pay increases at CNM.  TT, pp. 925, 932; Stip. Exh. 110.

288.   Martinez' tax returns for 2003, 2004, 2005 includes the income from her full-time
jobs and the part-time work taken to supplement her income.  TT, pp. 933-34; Stip. Exhs. 112-
14.

289.   At no time since her forced resignation has Martinez held a full-time job that paid
her the salary she was earning at PHS in March 2003.

290.   At the time of her termination, the value of Martinez' monthly pension benefit
was $480.79.  TT, pp. 920-21; Stip. Exh. 99.

291.   If Martinez had continued to work at PHS until she retired at the age of 65, the
monthly value of her retirement benefit would have been $3,015.45.  TT, p. 921; Stip. Exh. 100.

292.   Martinez contributed between $50 per pay period to PHS' 401k plan, with PHS

matching that amount. TT, pp. 928-930. The matching amount from PHS amounted to approximately $1500 per year. *Id.* UNM did not have a 401k plan. Stip. Exh. 108.

293.    Martinez was not required to make contributions into the PHS pension plan. TT, p. 929.

294.    While employed with PHS in 2002-03, Martinez paid $50.50 every pay period for medical benefits. TT, p. 917; Stip. Exh. 94.

295.    While employed at UNM, Martinez paid approximately $400 every month for health and welfare benefits. TT, p. 930; Stip. Exh. 105. Medical insurance benefits alone cost Martinez $283.38 per month while Martinez was at UNM. Stip. Exh. 107.

296.    Martinez ceased receiving benefits from UNM in August 2006. TT. p. 928.

297.    Martinez began receiving benefits from CNM in September 2006. *Id.*

298.    Foster had the habit of yelling at Martinez, insulting Martinez, and subjecting Martinez to 2-hour meetings where Foster berated her. TT, p. 935 and 1478.

299.    Martinez suffered mental and emotional distress related to her job because of Easton's and Foster's inappropriate behavior. TT. p. 934. Martinez saw counselors for one to two years because of this emotional distress. TT, pp. 936-37. This distress aggravated an ulcer which had remained dormant for a period of time. TT, pp. 935-36.

Damages–Frank Pacheco

300.    Pacheco's hourly rate when he was terminated from his PHS employment was $12.36. TT, p. 637; Stip. Exh. 57.

301.    In 2004, Pacheco received wages in the amount of $11,755.00. TT, p. 635; Stip. Exh. 73.

302.     In 2005, Pacheco worked for Santa Ana Casino at an hourly wage of $9.75. In 2005, Pacheco was hired by Village Inn, where he currently earns $10.25 an hour. TT, pp. 637-638; Stip. Exh. 74.

303.     Pacheco began receiving a pension benefit of $523.16 from PHS approximately one month after he was terminated. TT, pp. 631, 635.

304.     If Pacheco had remained a PHS employee until retirement at age 65, the monthly value of his retirement benefit amount would have been $1,201.85. TT, p. 633; Stip. Exh. 67.

305.     When terminated from PHS, Pacheco was subject to a 39% early retirement penalty related to his pension benefit. Stip. Exh. 68.

306.     In 2004, Pacheco received $17,765.00 in taxable pension distributions. TT, p. 635; Stip. Exh. 73.

307.     In April 2006, Pacheco received a 401k distribution of all account funds. TT, p. 633; Stip. Exh. 66.

308.     Pacheco is not yet eligible to participate in Village Inn's 401k plan. TT, p. 665.

309.     While employed at PHS, Pacheco paid $29.90 every pay period (2 weeks) for medical, dental, and vision benefits. TT, p. 634; Stip. Exh. 70.

310.     Pacheco currently receives no benefits from Village Inn. TT, p. 638.

311.     Pacheco anticipates he will become eligible for such benefits from Village Inn in December 2006. TT, pp. 664-65; Exh. 72.

312.     Martinez sought treatment through her family physician for the mental, emotional, and psychological distress she suffered as a result of the circumstances leading to her forced resignation. TT, pp. 936-37.

## REVISED PROPOSED CONCLUSIONS OF LAW

### Jurisdiction

1.      This Court has personal jurisdiction over the parties to this action.

2.      The Court has subject matter jurisdiction over the claims raised through this action through the Employee Retirement Income Security Act ("ERISA), 29 U.S.C. § 1101, *et seq.*

3.      This Court further has subject matter jurisdiction over this action because the ERISA claim permits the Court to exercise federal question jurisdiction, 28 U.S.C. § 1331.

4.      Both PHS and ARAMARK are employers withing the meaning of ERISA, 29 U.S.C. § 1140.

### Breach of Implied Contract of Employment

5.      An employment relationship calling only for performance of work and payment of wages is an "employment at will." A person employed at will may be discharged at any time for any reason or for no reason at all, unless an exception to this rule applies. An exception to this rule exists if the discharge, constructive or otherwise, of these Plaintiffs is in violation of an implied agreement or public policy. NM UJI 13-2303 (modified).

6.      The policies and procedures of PHS altered the at-will relationship between PHS and these Plaintiffs and required PHS to follow certain policies and procedures related to the terms and conditions of Plaintiffs' employment. including the implementation of disciplinary action. The policies and procedures of PHS restricted PHS' power to terminate Plaintiffs and otherwise affect the terms and conditions of Plaintiff's employment. *Trujillo v. Northern Rio Arriba Elec. Coop.*, 131 N.M. 607, 615 (N.M. 2001) (*quoting Lopez v. Kline*, 124 N.M. 539 (Ct.

41

App. 1997, stating that "A representation in an employee handbook or personnel policies may contractually modify the at-will presumption."); *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 426-27 (N.M. 1989).

7.      In order for there to be an implied agreement, there must be a promise, representation, or conduct sufficiently specific to create a reasonable expectation in the minds of Plaintiffs that PHS would follow particular procedures in disciplining and discharging Plaintiffs. *Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 731 (N.M. 1996); *Hartbarger v. Frank Paxton, Inc.*, 115 N.M. 665, 670-71 (N.M. 1993). The reasonableness of the expectation is "measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 714 (N.M. 1996).

8.      The policies and procedures of PHS, including Policy 308, constitute sufficiently specific procedures to create in the minds of Martinez and Pacheco reasonable expectations that PHS would abide by its policies and procedures. Martinez and Pacheco also had a reasonable belief that PHS would abide by and enforce it policies and procedures because of their understanding of the language in the Employment Agreements. The ISS Agreement stated clearly the expectations that both PHS and ARAMARK employees would follow, implement, and enforce PHS policies and procedures. Finally, Martinez' and Pacheco's expectations with respect to the binding nature of the PHS policies and procedures were reinforced by communications from managers and supervisors regarding required compliance with PHS policies and procedures.

9.      To determine whether these specific policies and procedures modified the employment relationship requires a "totality of the circumstances" analysis, which would include

42

evaluating the parties words and actions with respect to these policies and procedures. *Garcia,* 121 N.M. at 731; *Hartbarger,* 115 N.M. at 670-71.; *Mealand v. Eastern New Mexico Medical Ctr.,* 131 N.M. 65, 69 (Ct. App. 2001).

10.     At all relevant times PHS expected its managers to enforce its policies and procedures and communicated to all PHS employees that violations of policies and procedures may lead to disciplinary action, up to and including termination.

11.     PHS provided training to all employees regarding the interpretation and content of PHS policies and procedures and specifically required all employees to keep abreast of any policy and procedure changes or modifications.

12.     PHS created a work environment where employees understood that management's expectation was that all employees would abide by policies and procedures at all times. These words and conduct created an objective, reasonable expectation in Plaintiffs that PHS would abide by and enforce its policies and procedures. *See, e.g., Kiedrowski v. Citizen's Bank,* 119 N.M. 572 (Ct. App. 1995). Under these circumstances, the policies and procedures of PHS constitute an implied contract of employment.

13.     No language in the PHS policies and procedures entered into evidence provides that the policies and procedures did not form part of an employment contract which altered the at-will relationship.

14.     The disclaimer in the Employment Agreements signed by Martinez and Pacheco that states that employment could be terminated "in circumstances where PHS deems this appropriate" is ambiguous. A reasonable employee could believe, as did Martinez and Pacheco, that termination could only be effectuated in circumstances deemed consistent with and

appropriate under the PHS policies and procedures. *Twibell v. Wackenhut Corrections Corp.*, No. F035647, 2001 Cal. App. LEXIS 463, at * 14 (Cal Ct. App. Dec. 24, 2001) (noting that language providing that employees could be terminated "at the option of the employer" was ambiguous).

15.     Any disclaimer in the Employment Agreements does not, without more, negate the contractual status of PHS policies and procedures when read in the light of the parties' norms and conduct in this case. *McGinnis v. Honeywell*, 110 N.M. 1, 5 (N.M. 1990).

16.     The ISS Agreement further established that ARAMARK managers and supervisors were required to conform their conduct to and enforce the policies and procedures of PHS, both among and with PHS and ARAMARK employees.

17.     In addition, ARAMARK managers could only recommend disciplinary action against PHS service employees. PHS retained sole responsibility for disciplining and terminating PHS employees. The ISS Agreement further required approval from PHS management prior to any alteration of the terms and conditions of employment affecting PHS employees.

18.     PHS permitted and approved breaches and implied contract of employment by ARAMARK managers by allowing ARAMARK managers to discipline and then terminate Martinez and Pacheco in circumstances where policy requirements, particularly those of Policy 308, were cast aside, ignored, or avoided.

19.     Policy 308 sets forth a progressive correction action procedure. PHS breached this policy by permitting Easton and Foster skip a summary of counseling step with respect to Martinez' Loss of Good Standing in circumstances where this was not merited.

20.     PHS further permitted ARAMARK managers to ignore Policy 308's informal

44

process by not providing coaching in attempting to improve any alleged work deficiencies noted in the Martinez and Pacheco disciplinary actions. PHS breached this policy provision by approving corrective actions in circumstances where the informal process had not been engaged.

21. PHS further breached Policy 308 by not conducting thorough investigations by the individuals set forth in Policy 308 prior to dismissing Martinez and Pacheco.

22. PHS breached Policy 308 by permitting and approving the issuance of a Summary of Counseling to Pacheco in circumstances where Pacheco did not engage in repeated failures to follow the instructions of his supervisors (insubordination) and no evidence supported the claim that Pacheco clocked in and then immediately took a break.

23. PHS additionally breached the provisions of Policy 308 by permitting and approving the issuance of a Loss of Good Standing to Pacheco in circumstances where Pacheco merely followed procedure in temping the fish and other employees who engaged in even more egregious conduct, failing to properly cook the fish, received no discipline. Corrective action under these circumstances does not satisfy the requirement that PHS' policies and procedures be administered in a consistent, fair, and uniform fashion.

24. PHS also breached Policy 308 and Policy 314 by permitting and approving the termination of Pacheco in circumstances where no employees had made any claims of hostile work environment, where Pacheco had used profanity in the workplace, according to Judy Rieckenberger, a "few" times in the space of 20 plus years of employment, where other employees commonly used profanity, including Easton and Hughes, Pacheco's supervisors, where an employee who made a threat of violence against Pacheco received no corrective action, where the conduct complained of does not rise to the level of the creation of a hostile work

environment under Policy 314, and where no investigation was conducted in accordance with the requirements of Policy 314.

25.    PHS also breached Policy 308 with respect to Martinez by not providing Martinez any coaching prior to initiating the formal disciplinary action procedures.

26.    PHS breached Policy 308 by permitting and approving the issuance of a Loss of Good Standing issued to Martinez on January 3, 2003 in circumstances where the corrective action issued a few days following Martinez' exercise of her right under PHS policies and procedures to write a written rebuttal to her JCA, where no thorough or sufficient investigation was conducted prior to the issuance of the Loss of Good Standing, where the claims in the corrective action were stale, dated from up to six months prior, and undocumented, where at least the issues involving the on-call status and clocking in of the dietitians had been resolved months prior, where no evidence supported any falsification of records, and the information regarding the use of infant formula was unreliable and unsubstantiated.

27.    The forced resignation of Martinez constitutes a breach of Policy 308 in that none of the performance actions complained of by PHS on the corrective action form rises to the level of "gross insubordination." "Gross insubordination" is something other than repeated failures to follow the instructions of supervisors, which is the definition of insubordination used at lower levels of corrective action pursuant to Policy 308. Martinez did not engage in insubordination of any kind by advising her staff of suggested changes to the regional hospitals discussed with Easton. It was Martinez' responsibility and duty to advise and train her staff in circumstances where changes in servicing the regional hospitals were to take place.

28.    PHS did not conduct a thorough investigation prior to dismissing Martinez from

46

her PHS employment.

29.     PHS also breached Policy 311, the Problem Resolution Policy, in that PHS did not

permit Martinez to have a grievance hearing on the dismissal action, although Policy 311

requires such a hearing when an employee makes such a request.  Kurtz, in breach of Policy 311,

inappropriately advised Martinez that Martinez could not access the grievance process because

Martinez was a manager.  Further, PHS refused to participate in either the informal or formal

problem resolution process set forth in Policy 311.

30.     PHS further breached its policies and procedures by permitting ARAMARK to

create an intimidating and hostile work environment for Plaintiffs in violation of Policy 314.

31.     Policy 314, the anti-harassment policy of PHS, provides that any improper

conduct towards an individual because of status in a protected category is prohibited.  Further,

Policy 314 describes any threats against PHS employees constitutes harassment.  PHS permitted

and approved ARAMARK managers to harass and intimidate Martinez and Pacheco based upon

the Plaintiffs' age and seniority.

32.     PHS had knowledge of the hostile work environment and failed to do anything to

remedy the harassment complained of.  PHS conducted no investigations into the conduct

complained of, as required under Policy 314.

33.     These failures to act in accordance with Policy 314 constitutes a breach of that

policy.

34.     The policies and procedures of PHS, in conjunction with the duties and

responsibilities set forth in the ISS Agreement, constitute a legally enforceable implied contract

which PHS breached with respect to Martinez and Pacheco in the manner described above.

47

35.     Plaintiffs have suffered damages due to the breaches of the implied contracts of employment described above.

## Breach of the Implied Covenant of Good Faith and Fair Dealing

36.     Each party to a contract is required to perform its obligations under the contract in good faith. NM UJI 13-832, Committee Commentary.

37.     It is a breach of contractual duty to act in bad faith. Good faith requires that a party act honestly and in accordance with standards of fair dealing under the circumstances. NM UJI 13-832, Committee Commentary.

38.     PHS did not act in good faith in permitting, endorsing, and approving the breaches of the implied contracts of employment of Martinez and Pacheco established through the PHS policies and procedures.

39.     PHS acted in bad faith by approving breaches of the implied contracts of employment of Martinez and Pacheco in saturations where PHS' and ARAMARK''s actions constitute violations of the PHS policies and procedures themselves. PHS approved the dismissal/forced resignation of Martinez in circumstances where there is no evidence of gross insubordination. PHS also approved the dismissal of Pacheco in circumstances where no hostile work environment existed and no investigation was ever conducted into such a claim.

40.     PHS further acted in bad faith by choosing to violate the unambiguous duties it assumed under the Agreement to have sole responsibility for the discipline and discharge of PHS employees. In addition, PHS acting in bad faith in breaching the Agreement by permitting ARAMARK managers to do more than merely recommend disciplinary action against PHS employees.

41.     PHS also acted in bad faith by not making an independent review of the corrective actions complained of, not requiring sufficient and thorough investigations prior to the terminations of Martinez and Pacheco, and not exercising independent judgment prior to approving breaches of these implied contracts of employment.

42.     PHS acted in bad faith by permitting and approving ARAMARK conduct that amounted to retaliation against Martinez for seeking to enforce her rights and privileges to submit rebuttals in protection and enforcement of her rights under the implied contract of employment.

43.     PHS is liable for breaching the covenant of good faith and fair dealing with respect to the implied contract established between the Plaintiffs and PHS.

44.     Plaintiffs have suffered damages as a result of the breaches of the implied covenant of good faith and fair dealing described above.

### Tortious Interference

45.     A contractual relationship existed between PHS and Plaintiffs through the policies and procedures PHS required Plaintiffs to abide by and the reasonable expectations Plaintiffs held that PHS would conform its conduct to the policies and procedures. *Leyba v. Renger*, 874 F.Supp. 1218, 1225 (D.N.M. 1994) (citing *Dough v. Adventist Health Systems, Inc.*, 108 N.M. 801. 806 (N.M. 1989).

46.     ARAMARK knew of the contractual relationship between PHS and Plaintiffs established through the implementation and enforcement of PHS policies and procedures. *Leyba*, 894 F. Supp. at 1225.

47.     ARAMARK had an improper motive to interfere with the contractual relationship between Plaintiffs and PHS in that ARAMARK exercised its intent to remove more costly, older,

49

and senior employees from the workplace. *Fikes v. Furst*, 134 N.M. 602, 609 (N.M. 2003); *M & M Rental Tools v. Milchem, Inc.*, 94 N.M. 449, 455 (Ct. App. 1980).

48.     ARAMARK acted on this improper motive and interfered with Plaintiffs' implied contract of employment and employment relationship by disciplining and discharging Plaintiffs in violation of PHS policies and procedures and the ISS Agreement.

49.     ARAMARK further acted on this improper motive and tortiously interfered with Plaintiffs' employment with PHS by making decisions regarding the terms and conditions of Plaintiffs' PHS employment without consulting with or seeking the approval of PHS management–all in clear violation of the terms and provisions of the ISS Agreement.

50.     ARAMARK additionally acted on this improper motive and tortiously interfered with Plaintiffs' employment relationship with PHS by taking adverse employment actions against these Plaintiffs merely for financial and cost-savings reasons, unrelated to any legitimate business reasons.

51.     ARAMARK acted on this improper motive and tortiously interfered with Plaintiffs' employment relationship with PHS by taking disciplinary action against these Plaintiffs without PHS knowledge or approval.

52.     ARAMARK further acted with improper motive in interfering with these Plaintiffs contractual relations by following through on PHS' expectation in the business plan that cost savings would be achieved by labor cost savings aimed at employees who were older and more senior.

53.     ARAMARK also demonstrated improper motive by targeting older and more senior employees for dismissal from the workplace for the sole purpose of reducing the costs of benefits and thereby reducing costs on the ISS Agreement.

50

54.    ARAMARK also used improper means to interfere with Plaintiffs' contract relationship with PHS. *Leyba*, 874 F. Supp. at 1225.

55.    ARAMARK acted through improper means by tortiously interfering with Plaintiffs' employment relationship by intentionally misusing, misinterpreting, misapplying, and perverting the policies and procedures of PHS to accomplish an improper motive of disciplining and dismissing Plaintiffs for unlawful reasons. *Diversey Corp. V. Chem-Source Corp.*, 125 N.M. 748, 755 (N.M. Ct. App. 1998).

56.    ARAMARK further used improper means to interfere with Plaintiffs contract with PHS by threatening, intimidating, and relying upon falsehoods and inventions to inappropriately discipline and dismiss Plaintiffs.

57.    ARAMARK also used improper means by targeting older, more senior employees to accomplish cost savings under the ISS Agreement, in violation of the Plaintiffs' protected status related to their ages.

58.    ARAMARK enjoyed no privilege under the ISS Agreement or PHS policies and procedures to tortiously interfere with Plaintiffs contractual relationship with PHS.

59.    ARAMARK was also not privileged to make recommendations to PHS regarding the discipline and dismissal of Plaintiffs through the use of an improper motive and improper means.

60.    As a result of ARAMARK's tortious interference with Plaintiffs' contractual relations with PHS, Plaintiffs have suffered damages.

### Civil Conspiracy

61.    A conspiracy existed between ARAMARK and PHS with respect to these Plaintiffs for the purpose of accomplishing an unlawful purpose or to accomplish a lawful

purpose by unlawful means. *EEOC v. MTS Corp.*, 937 F.Supp. 1503, 1513-14 (D.N.M. 1996).

62.     The specific wrongful acts accomplished in furtherance of the conspiracy include the following: (1) a joint agreement between ARAMARK and PHS to rid the workplace of older, more senior employees for the purpose of cost cutbacks and savings associated with performance of the ISS Agreement; (2) a joint agreement to accomplish this purpose through improper use and application of PHS' policies and procedures; (3) a joint agreement to permit ARAMARK to violate the ISS Agreement by unilaterally disciplining and dismissing Pacheco and Martinez and affecting the terms and conditions of employment of Plaintiffs; and (4) a joint agreement to invent and exaggerate workplace circumstances for the sole purpose of producing false allegations to accomplish ARAMARK's and PHS' purposes.

63.     ARAMARK did not act as an agent of PHS with respect to the performance of ARAMARK's duties and responsibilities under the Agreement. *Tercero v. Roman Catholic Diocese*, 132 N.M. 312, 317 (N.M. 2002).

64.     PHS did not have the right to control the conduct of ARAMARK with respect to ARAMARK's daily administration and management of the Agreement. Restatement (Second) of Agency §§ 12, 13, and 14. ARAMARK acted independently with respect to its day-to-day administration of the Agreement. Furthermore, under the terms of the Agreement, ARAMARK did not have the power to unilaterally alter the legal relationship between PHS and other parties. *Id.*

65.     The Agreement sets forth and establishes an independent contractor relationship between ARAMARK and PHS in which PHS did not have authority to manage and supervise ARAMARK's daily management of the Integrated Support Services.

66.     The acts and failures to act of PHS and ARAMARK set forth through facts

pertinent to Plaintiffs' breach of implied contract of employment, breach of implied covenant of good faith and fair dealing, and tortious interference claims establish the unlawful purpose and means elements of a civil conspiracy claim.

67.    The evidence shows that PHS and ARAMARK united to accomplish the unlawful scheme of disciplining and then dismissing Plaintiffs. *Las Luminarias v. Isengard*, 92 N.M. 297, 300 (N.M. Ct. App. 1978); *Morris v. Dodge Country, Inc.*, 85 N.M. 491, 492 (N.M. Ct. App. 1973).

68.    Plaintiffs have suffered damages as a result of the civil conspiracy between PHS and ARAMARK.

### Violations of ERISA

69.    At all times relevant hereto, PHS maintained in full force and effect benefit plans for Plaintiffs which included, but was not limited to, pension benefits.

70.    Plaintiffs were eligible participants in PHS benefit plans and had vested interests in the benefit plans provided.

71.    PHS served as the benefits plan administrator.

72.    It is considered wrongful interference under ERISA, 29 U.S.C. § 1140, for any fiduciary or employer to treat a plan participant adversely for the purposes of obstructing any rights to which a participant is entitled. *Ingersoll Rand Co. v. McClendon*, 498 U.S. 133, 144 (1990); *Garratt v. Walker*, 164 F.3d 1249, 1253 (10th Cir. 1998). PHS engaged in such adverse treatment and wrongful interference by discriminating against Plaintiffs on the basis of age and seniority. *Maez v. Mountain States Tel. & Tel.*, 54 F.3d 1488, 1504 (10th Cir. 1995); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 922 (3d Cir. 1990).

73.    PHS, through its wrongful interference with Plaintiffs' participation in these

benefit plans, breached the terms of the pension/retirement plans under which Plaintiffs were entitled to benefits. ERISA provides for a future entitlement to benefits wrongfully interfered with. *Garratt*, 164 F.3d at 1253. The civil enforcement mechanism for ERISA claims, 29 U.S.C. § 1132, is utilized to recover benefits for § 1140 interference claims. *McClendon*, 498 U.S. at 144.

74.    PHS was motivated, at least in part, by the specific intent to interfere with Martinez' and Pacheco's retirement benefit and ERISA rights, specifically those set forth in § 1140. *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1224 (11th Cir. 1990); *Gavalik v. Continental Can Co.*, 812 F.2d 834, 860 (3d Cir. 1987).

75.    PHS discharged Plaintiffs because it unlawfully sought to reduce the costs of benefits PHS would incur should Plaintiffs remain employed with PHS. PHS so acted because of Plaintiffs' ages and seniority.

76.    The unlawful actions of PHS have resulted in severe reductions of retirement benefits to these Plaintiffs. *Felix v. Lucent Technologies, Inc.*, 397 F.3d 1146, 1159 (10th Cir. 1994); *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1535 (10th Cir. 1993);

77.    The benefit considerations led PHS to the decision to approve the discharge of Plaintiffs from the workplace, despite the fact that PHS knew the terminations were without support and substance.

78.    The unlawful actions and decisions of PHS were made with malice and reckless indifference to the federally-protected rights of Plaintiffs.

### Martinez Release

79.    In considering all the factors and circumstances in assessing Martinez' signing of

the Additional Consideration and Release ("Release") under *Torrez v. Public Service Co.*, 908 F.2d 687, 689 (10th Cir. 1990), the Court finds that Martinez did not knowingly and voluntarily execute the Additional Consideration and Release.

80.    ARAMARK is not in privity of the contract with PHS with respect to the Release. The Agreement and Amended Agreement which ARAMARK claims establishes such privity nowhere affords nor states that ARAMARK enjoyed privity with respect to agreements and contracts, including the Release, between PHS and PHS employees.  To the extent the Agreement addresses such issues, ARAMARK is noted as not being a party to any collective bargaining agreements between PHS and PHS employees.

81.    Martinez did not have sufficient time for deliberation prior to signing the Release.

82.    Martinez was required to sign the Release upon presentation in order to effectuate the resignation in lieu of dismissal.

83.    Kurtz' repeated claim that Martinez could return to work at PHS if she signed the Release had the effect of discouraging Martinez from seeking legal counsel or inquiring further about her rights and obligations under the Release.

84.    Martinez neither was acquainted with nor understood the federal employment statutes set forth on pages 2 and 3 of the Release.

85.    Martinez had no opportunity to negotiate any of the terms and conditions of the Release.

86.    The Additional Consideration and Release Agreement, with respect to the claims of Martinez, is, therefore, null and without effect pursuant to *Torrez*.

### Damages

87.    Having determined that PHS and ARAMARK are liable for the acts of its officers,

agents, and employees for the reasons set forth above, the Court must now determine what relief, if any, is appropriate.

88.     Plaintiffs, individually, are entitled to damages in the form of back pay in the following amounts: (1) Pacheco: $40,499.56; (2) Martinez: $18,967.95.

89.     Back wage losses for Pacheco are calculated by taking Pacheco last annual salary of $32,084 less the annual wages received from Santa Ana Casino and Village Inn as indicated on Pacheco's 2004 and 2005 income tax returns. For 2006, the wage calculation was made on the basis of a 40-hour week for the period January 1, 2006 through October 31, 2006.

90.     Back wage losses for Martinez are calculated by taking Martinez' actual, full-time wages earned less the last annual wage Martinez earned at PHS, $53,556.00.

91.     Plaintiffs, individually, are entitled to front pay damages in the following amounts: (1) Pacheco: $36,591.00; (2) Martinez: $178,611.15.

92.     Pacheco's front wages are calculated by using the difference between his last PHS annual wages of $32,084 and deducting current wages earned at Village Inn for the date range of November 1, 2006 through March, 1, 2010–Pacheco's retirement date.

93.     Martinez' front wages are calculated by using the difference between her last PHS wage of $53,556 and deducting the current wage earned at CNM, $39,160, for the date range of November 1, 2006 through March 17, 2018–Martinez' date of retirement.

94.     Plaintiffs, individually, are entitled to the loss of retirement benefits and other benefits in the following amounts: (1) Pacheco: $82,257.23: (2) Martinez: $465,363.58.

95.     The pension benefit losses of Pacheco are calculated by taking the benefit amount to which Pacheco would have been entitled if he had worked for PHS through date of retirement in 2010, $1201.85, minus the $523.16 which he currently receives in pension payment. This

amount was then multiplied by 121.20, the number of months of benefit pay from retirement to estimated life expectancy of 75.1 years.

96.     The pension benefit losses of Martinez are calculated by taking the benefit amount to which benefit Martinez would have been entitled if she had worked through date of retirement in 2017, $3015.45, minus $480.79, the benefit amount for which Martinez is now eligible upon retirement. This amount was then multiplied by 180.6, the number of months of benefit pay from retirement to estimated life expectancy of 79.8 years.

97.     Martinez has suffered health and welfare benefit losses in the amount of $32,646.02. This amount is calculated by using the difference between the monthly costs for family medical benefits at PHS, $101.00, and the monthly cost for family medical benefits at UNM, $283.38. This amount was then multiplied by 179 months, the period of time from Martinez' termination to date of retirement.

98.     The Court finds that Plaintiffs have appropriately mitigated their damages and are therefore entitled to the damages enumerated above.

99.     The Court awards Plaintiffs mental, emotional, and psychological distress damages, individually, in the following amounts: (1) Pacheco $10,000.00; (2) Martinez: $25,000.00.

100.     The Court awards Plaintiffs pre- and post-judgment interest.

### Attorney's Fees

101.     The Court awards, pursuant to ERISA and Rule 1-054 of the New Mexico Rules of Civil Procedure, Plaintiffs' attorney's fees and costs in an amount to be determined at a subsequent date.

Respectfully submitted.

LAW OFFICES OF MICHAEL E. MOZES, P.C.

MICHAEL E. MOZES
Attorney for Plaintiffs
5732 Osuna N.E.
Albuquerque, NM 87109
(505) 880-1200

**I HEREBY CERTIFY** that a copy of
the foregoing was sent first class,
regular mail to opposing counsel
of record on this 27th day of October, 2006.

58