06 OCT 27 PM 3: 57

CLERK ALBUQUERQUE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

SALLY GOMEZ, TERRI P. ELISBERG,
SHIRLEY GARCIA, LINDA GIVENS,
SCOTT COHERNOUR, DENISE HENDRIXSON,
MARY MARTINEZ, FRANK PACHECO,
PATRICIA TROYANOWSKI, SALLY URIOSTE,
JOYCE WINN, JOSEPH RUIZ and DAVE PACHECO,

       **Plaintiffs,**

vs.

       **No. CIV 2005-461 JH/KBM**

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
and ARAMARK MANAGEMENT SERVICES, L.P.,

       **Defendants.**

---

## DEFENDANT ARAMARK MANAGEMENT SERVICES, L.P.'S SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

       Defendant, ARAMARK Management Services, Limited Partnership ("ARAMARK"), submits the following supplemental requested findings of fact and conclusions of law based on the trial testimony in this matter:

### FINDINGS OF FACT

1) Plaintiffs, at all material times, were employees in the Hospitality Services Division of Presbyterian Healthcare Services, Inc. ("PHS").

2) Plaintiffs Frank Pacheco and Mary Martinez understood and acknowledged that their employment with PHS was at-will employment. Transcript of Proceedings, October 4, 2006,



H:\Attorney\afp\71218\0002\pleading\AFP3195.DOC

Testimony of Frank Pacheco, Page 639, lines 13-25; Page 640, lines 1-8. Stipulated Exhibits 141-146.

3) On August 29, 2000, PHS contracted with ServiceMaster for administration of the Hospitality Services Division. Stipulated Exhibit 1.

4) ServiceMaster was acquired by ARAMARK in October 2001. Thereafter, ARAMARK became the administrator of the contract. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, page 1367, lines 2-4; Stipulated Exhibit 2.

5) The contract was administered by ARAMARK through its management employees, David Foster, Bob Hudson, Mary Beth Easton, and John Hughes. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, page 1367, lines 2-4; Stipulated Exhibit 2.

6) PHS amended its Integrated Support Service Agreement with ServiceMaster on September 1, 2000 to change all references to ServiceMaster to ARAMARK/ServiceMaster effective April 7, 2003. Stipulated Exhibit 2.

7) The Integrated Support Service Agreement was created as a result of a desire on the part of PHS to consolidate, restructure and integrate its service departments (including plant operations and maintenance, housekeeping, food service, linen distribution, bio-medical engineering, grounds, and support assistance) into a single Integrated Support Service in order to decrease costs, improve service and enhance employee morale. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, page 1363, lines 1-25 and page 1364, lines 1-17; Stipulated Exhibit 1.

8) The Integrated Support Service Agreement required ServiceMaster/ARAMARK to deliver Integrated Support Service using the Presbyterian Healthcare personnel employed on the date

of the Agreement. ServiceMaster/ARAMARK was to provide supervisory personnel to implement the business plan it developed and to supervise and manage the Integrated Support Service. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, page 1363, lines 10-14; Stipulated Exhibit 1.

9) Under the Agreement, ServiceMaster/ARAMARK would make recommendations in connection with wage and wage-related matters but ServiceMaster/ARAMARK would not make any decisions with respect to wages, hours or other working conditions for its employees. Transcript of Proceedings, October 3, 2006, Testimony of Robert M. Hudson, page 357, lines 14-23 and Page 359, lines 2-19; Stipulated Exhibit 1.

10) Under the terms of the ISS Agreement, PHS retained sole responsibility to hire, discipline and discharge its service employees. PHS also retained the responsibility for paying all wages and salaries of its service employees and all payroll and other taxes, fees and other charges or insurance levied or required by a federal, state or local statute relating to the employment of its service employees. Transcript of Proceedings, October 3, 2006, Testimony of Robert M. Hudson, Page 362, lines 9-25 and page 363, lines 125 and Page 364, lines 1-7; Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck page 1388, lines 3-21; Stipulated Exhibit 1.

11) In practice, ARAMARK consulted and worked in cooperation with PHS Human Resources Department (HR) with respect to such matters as the discipline of employees and recommendations for the discharge of employees. Transcript of Proceedings, October 6, 2006, Testimony of Mary Beth Easton, page 1093, lines 9-23; Transcript of Proceedings,

October 3, 2006, Testimony of Betty Kurtz; Page 250, lines 5-25; Transcript of Proceedings, October 11, 2006, page 1406, lines 5-13.

12) PHS follows a course of progressive discipline which may include coaching, written counseling, suspension and/or dismissal. Stipulated Exhibit 8.

13) PHS recognizes a progressive disciplinary process consisting of informal and formal counseling procedures which may be bypassed or accelerated based on the seriousness of the situation. Transcript of Proceedings, October 3, 2006, Testimony of Betty K. W. Kurtz, page 258, lines 17-25; Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, page 1316, lines 12-25 and page 1317, lines 1-3; Stipulated Exhibit 8.

14) Coaching may occur at any time and need not be documented in writing. Coaching is not considered part of the formal disciplinary action process and is intended to place the employee on notice that performance expectations are not being met. Transcript of Proceedings, October 3, 2006, Testimony of Betty K. W. Kurtz, page 275, lines 12-25 and page 276, lines 1-23; Stipulated Exhibit 8.

15) When an employee's work performance or behavior is not at a satisfactory level, a supervisor may meet with the employee and inform him of the problem and expectations necessary for correction. This is referred to as a summary of counseling. Stipulated Exhibit 8.

16) If the written counseling fails to produce expected results or other work performance problems occur, a Loss of Good Standing should be initiated which will remain in effect for a 12-month period. Transcript of Proceedings, October 3, 2006, Testimony of Betty K. W. Kurtz, page 278, lines 2-10; Stipulated Exhibit 8.

17) An employee who is in Loss of Good Standing is not eligible for certain benefit programs including performance salary adjustments, gain share, tuition reimbursement, transfer/promotion, any Career Advancement Program, or personal or educational leave. Stipulated Exhibit 8. ·

18) If those disciplinary procedures fail to produce the expected results or other issues occur, notice of dismissal should be issued by PHS. Stipulated Exhibit 8.

19) When problem behavior is serious enough, use of disciplinary suspension or dismissal by PHS is appropriate. Stipulated Exhibit 8.

20) PHS did not give a direction to reduce nor have any intention of reducing the workforce or to terminate any group or class of PHS employees. Transcript of Proceedings, October 3, 2006, Testimony of Robert M. Hudson, page 406, lines 20-25; Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, page 1363, lines 20-25 and page 1364, lines 1-6; page 1404, lines 14-25 and Page 1405, lines 1-25.

21) PHS was interested in reducing the level of employee turnover. PHS was hoping to stabilize the staff by being able to provide a richer employment situation for staff so that staff would stay at PHS. During the period covered by the ISS Agreement, the employee turnover was reduced. Reduction of staff was not PHS' goal. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1363, lines 20-25; Page 1364, lines 1-6.

22) ARAMARK had no involvement with PHS benefits or benefit plans. It did not serve as the benefits plan administrator for PHS. ARAMARK had no influence over decisions made by PHS pertaining to benefits. ARAMARK was not made aware of which employees

participated in any of its benefit plans.  Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1364, lines 7-17.

23) The ISS Agreement was entered into by PHS and ARAMARK for the purpose of improving the quality of the work and was not entered into for any unlawful or improper purpose. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1363, lines 1-25; Page 1364, lines 1-17; Page 1404, lines 14-25; Page 1405, lines 1-25; Page 1406, lines 1-8.

24) Age was not a consideration with any disciplinary or other employment action taken against the Plaintiffs in this action. Transcript of Proceedings, October 3, 2006, Testimony of Betty Kurtz, Page 302, lines 24-25; Page 303, lines 1-3; Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 1139, lines 3-25; Page 1140, line 1; Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton Page 1176, lines 20-23; Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1403, lines 4-19.

25) There was no intent or practice to get rid of employees in order to affect any health, retirement or other benefit plan made available by PHS to its employees.  Transcript of Proceedings, October 6, 2006, Testimony of Mary Beth Easton, Page 1139, lines 3-25; Page 1140, line 1; Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1176, lines 20-23; Page 1403, lines 4-19; Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1364, lines 7-17.

26) There were numerous management problems at PHS prior to bringing in ServiceMaster. There was not a strong management team in place and PHS needed to have external help to

build that team. Patient satisfactions scores were not high, the hospital was not clean or well maintained to hospital standards, there were major employee issues including the buying, selling and use of illegal drugs in the work environment and PHS felt that things were out of control. If PHS had a strong management team in place, PHS would not have had the need of the services provided by ServiceMaster/ARAMARK. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck; Page 1365, lines 21-25; Page 1366, lines 1-21.

27) There was substantially more accountability under ARAMARK's management of employees at PHS. Changes made by ARAMARK and ARAMARK's management style was met with resistance by PHS employees. Transcript of Proceedings, October 3, 2006, Testimony of Betty Kurtz, Page 240, lines 6-8; Transcript of Proceedings, October 3, 2006, Testimony of Robert Hudson, Page 413, lines 23-25; Page 414, line 1; Page 415, lines 10-12; Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1406, lines 20-24; Page 1407, lines 15-25; Page 1408, lines 1-7; Page 1412, lines 1-10; Page 1426, lines 7-13.

28) ARAMARK and PHS could mutually agree to revise any of the terms of the ISS agreement, including the management of dietician services performed at the regional hospitals. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1392, lines 22-25 and Page 1392, lines 1-4.

29) Presbyterian Healthcare Services, Inc. is a holding company under which all hospital operations report up. Presbyterian Kaseman Hospital is wholly owned by Presbyterian Healthcare Services. Presbyterian Healthcare Services wholly owns the Espanola Hospital, PRC, the Clovis Plains Regional Medical Center and the General Hospital in Socorro. The assets of the Lincoln County Hospital and Dan C. Trigg Hospital in Tucumcari are owned by

those respective counties. PHS leases Lincoln County Hospital and Dan C. Trigg Hospital and operates them under a lease. PHS takes full profit and loss responsibility for those operations. The Regional Hospital Administrators report to a Regional Vice President who reports to the Vice President/Chief Operating Officer of PHS. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1368, lines 20-25, Page 1369, lines 1-23.

30) The regional hospitals operate under the policies and procedures of Presbyterian Healthcare Services. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1369, lines 24-25; Page 1370, lines 1-6. The main Presbyterian Hospital in Albuquerque provides consultation on dietary matters to the regional hospitals. The dietitians are employed and are managed from the main Presbyterian Hospital and their accountability and responsibility was to management at the main hospital. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1370, lines 1-6; Page 1371, lines 10-24.

31) The ARAMARK managers at the main facility had authority over the dietitians to the extent they traveled to the regional hospitals. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1372, lines, 8-11. The ARAMARK managers had authority for determining how services would be provided to the regional hospitals. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1372, lines 23-25; Page 1373, lines 1-10. PHS never objected to ARAMARK managers' oversight of the dietitians' activities at the regional hospitals and in fact encouraged it. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, Page 1373, line 25; Page 1374, lines 1-25; Page 1375, line1.

**FRANK PACHECO**

32) PHS employed Frank Pacheco as a cook in its dietary department beginning in 1979.
Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 581, lines 10-
12.

33) Mr. Pacheco's employment was terminated by PHS effective April 15, 2004 for misconduct
in the workplace including the use of foul language and abusive conduct toward other PHS
employees.   Stipulated Exhibit 64.

34) His termination followed a series of progressive discipline steps, as documented on 7/11/00,
3/30/03, 8/29/03, 12/15/03, 12/30/03, 1/30/04, 4/10/04, 4/14/04 and 4/15/04.  Defendants'
Exhibit K, Defendants' Exhibit M, Stipulated Exhibits 58, 59, 60, 61, 63, 64 and Defendants'
Exhibit R.

35) Prior to the signing of the Integrated Support Service Agreement between PHS and
ServiceMaster/ARAMARK, on July 11, 2000, his supervisor, Linda Givens, a PHS
employee, spoke with Frank Pacheco about his responsibility as a lead employee and warned
him not to contribute to rumors and warned him about how he stated his opinions to fellow
employees.  Frank was not agreeable to her suggestions and had a difficult time recognizing
and taking responsibility for his behavior.  Transcript of Proceedings, October 2, 2006,
Testimony of Linda Givens, Page 97, lines 5-19; Page 119, lines 17-25; Page 120, lines 1-19;
Defendants' Exhibit K.

36) On April 18, 2001, Frank Pacheco was given a notice that his job as Lead Cook was
eliminated and he was being assigned a position as Cook.  His rate of pay remained
unchanged.  Because he was no longer a Lead Cook, he was no longer responsible for

providing instruction or supervision over the cooks in the absence of a supervisor. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 587, lines 23-25; Page 588, lines 1-5.

37) On March 30, 2003, Mr. Pacheco became engaged in a dispute with two fellow employees in the food service area. Even though he had no supervisory authority over Judy Martinez, a PHS employee, he insisted she prepare onions and peppers as directed by him. Although he received no disciplinary action for this incident, it was the first example of conflict with fellow employees caused by his attempt to supervise fellow employees even though his lead duties had been taken away. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 672, lines 24-25; Page 673, lines 1-23; Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1296, lines 7-17.

38) On August 29, 2003, Frank Pacheco received a documented verbal counseling from John Hughes and Mary Beth Easton for not consistently taking food temperatures during the months of June-August 2003, based on the absence of food temperature entries in a log kept in the department, as required. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 593, lines 14-20. Mr. Pacheco did not dispute that temperatures were not taken or logged on the dates addressed in the counseling. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 644, lines 9-18. The taking of food temperatures on the patient tray line is a matter of food safety, which merited a loss of good standing. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 644, lines 19-22; Page 645, lines 1-5. Instead Mr. Hughes and Ms Easton chose to simply give Mr. Pacheco a verbal counseling, rather than recommend that he be placed in a loss of

good standing for food safety violations.  Transcript of Proceedings, October 4, 2006,
Testimony of Frank Pacheco, Page 645, lines 6-16.

39) Mr. Pacheco was also verbally counseled for complaints received regarding his harassment
of others.  He was reminded during that counseling that foul language is not tolerated in the
workplace.  Stipulated Exhibit 58.  This counseling was the second verbal counseling he had
received concerning conversations or remarks to fellow employees in the workplace.
Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 645, lines 17-
25; Page 646, lines 1-9.

40) On December 30, 2003, Frank Pacheco received a Corrective Action Memorandum and was
placed in summary of counseling regarding clocking and overtime issues.  Stipulated Exhibit
60.  It was reported to Mary Beth Easton that Mr. Pacheco was clocking in early and taking a
break instead of beginning work, in violation of rules and practices of PHS to take overtime
without the approval of management.  Transcript of Proceedings, October 4, 2006,
Testimony of Frank Pacheco, Page 647, lines 1-3. The time clock records confirmed that Mr.
Pacheco had been clocking in at 10:30 AM instead of his regular 11:00 AM shift starting
time.  His clocking in prior to his regularly scheduled shift effectively allowed him to
recover overtime which was not approved by any manager.  Following the counseling, Mr.
Pacheco's time cards reflect that he began work at the appropriate time of 11:00 AM. This
counseling was effective in changing Mr. Pacheco improper conduct.  Transcript of
Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 646, lines 21-25; Page
689, lines 8-25; page 690, lines 1-15; Stipulated Exhibit 60.

41) In addition, Mr. Pacheco had a loud verbal confrontation on December 23, 2003 with a Food Service Zone Lead regarding discarding food. He was aware that unmarked or undated food items in the food storage areas had to be thrown out, without exception. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 647, lines 4-10. On December 30, 2003, he was reminded that he was expected to practice safe food handling and storage techniques. Stipulated Exhibit 60.

42) There had been previous discussions about responsibility for safe food handling practices at PHS and Mr. Pacheco understood that unsafe food handling practices would result in a Loss of Good Standing. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 645, lines 1-10. On January 12, 2004, Mr. Pacheco received and signed a memo memorializing discussions at a meeting regarding responsibility for safe food handling practices. On January 13, 2004, he received and signed a memo regarding food replenishment and the necessity of taking food temperatures to assure foods have reached correct cooking/holding temperature. He had no disagreement or problem with any of the items discussed in those memoranda. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 649, lines 2-25; Page 650, lines 1-25; Page 651, lines 1-25; Page 652, lines 1-2; Defendants Exhibits N & O.

43) On January 30, 2004, he received a Loss of Good Standing from PHS, again due to unsafe food handling practices, which resulted in raw food being served by Mr. Pacheco on the cafeteria line and the receipt of a customer complaint regarding uncooked food. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 652, lines 6-25; Page 653, lines 1-11; Stipulated Exhibit 61.

44) It was among Mr. Pacheco's responsibilities to take the temperature of the food on the tray line. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 644, lines 1-3. On the date of the incident, it was specifically his responsibility, in replenishing the cafeteria line, to see that food was properly cooked and properly checked for temperature. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 653, lines 7-11.

45) Mr. Pacheco had previously been counseled about yelling in the workplace and using foul language in the workplace. He understood that foul language is not tolerated in the workplace, that employers should address employees who have used foul language, and that he could eventually be terminated for using foul language. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 641, lines 4-24; Page 656, lines 1-8; Page 675, lines 3-25; Page 676, lines 1-6. Stipulated Exhibits 58, 60, 61, 64.

46) On April 9, 2004 Judi Rieckenberger, a PHS diet aid, wrote a memo complaining about Mr. Pacheco's cussing in the workplace. She stated that she heard Mr. Pacheco say "those fuckin' diet aides." She had heard him say that type of remark and had heard him use foul language in the workplace on prior occasions. Transcript of Proceedings, October 11, 2006, Testimony of Judi Rieckenberger, Page 1482, lines 20-21; Page 1484, lines 8-14. She observed him display misconduct toward more than one Diet Aide. Transcript of Proceedings, October 11, 2006, Testimony of Judi Rieckenberger, Page 1485, lines 19-25.

47) On or about April 10, 2004, Mr. Pacheco was involved in another confrontation with two food service employees over work space. Although it was not his responsibility to provide assignments to other cooks or to supervise their work, Mr. Pacheco attempted again to give

orders to a fellow co-worker, Angela Ramirez. This is another example of Mr. Pacheco having difficulty adjusting to the loss of his lead position and continued attempts to supervise fellow employees.    As a result of that incident, Mr. Pacheco yelled at another co-worker, Tony Griego, at work. The employee indicated that he was tired of Frank Pacheco using foul language in the workplace, and a verbal altercation took place. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 656, lines 5-25; Page 657, lines 1-6; Page 678, lines 7-9; Stipulated Exhibit 64.

48) As a result of that incident and his previous counseling/discipline, Mr. Pacheco was dismissed by PHS. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 656, lines 1-8; Stipulated Exhibit 64.

49) Mr. Pacheco has no knowledge about the supervisor's investigation of the incidents which led to his termination and no information that Mary Beth Easton did not believe what she learned about the incident which led to his termination. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 656, lines 9-12.

50) Mr. Pacheco received all steps of the PHS progressive discipline system including coaching and verbal counseling, a summary of counseling and a loss of good standing before being dismissed from PHS. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 657, lines 22-25; Page 658, lines 1-9.

51) Mr. Pacheco was fully vested in his pension plan with PHS. On May 1, 2004 he began receiving pension benefits of $523.16 per month. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 631, lines 19-25; Stipulated Exhibit 68.

52) Mr. Pacheco earned $32,083.97 with PHS in 2003. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 637, lines 10-12; Stipulated Exhibit 69.

53) Mr. Pacheco became employed by Santa Ana Star Casino on December 20, 2004, earning $9.50 per hour. On April 16, 2005 he began earning $9.75 per hour at the Casino. He worked there until May 20, 2005. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 637, lines 7-9; Stipulated Exhibit 72.

54) He was eligible for medical, vision and dental insurance as well as life insurance, short term disability and long term disability, profit sharing and a 401(K) plan. He was eligible to take advantage of an Employee Assistance Program (EAP). Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 637, lines 13-19; Stipulated Exhibit 72.

55) On May 22, 2005, Mr. Pacheco became employed by Village Inn (VICORP) earning $10.25 per hour and is still employed with that company. Transcript of Proceedings, October 4, 2006, Testimony of Frank Pacheco, Page 638, lines 1-5. VICORP offers medical, dental, life, dependent life and personal accident insurance. VICORP also offers long term disability benefits and a 401(k) plan for its employees. Stipulated Exhibit 75.

## MARY MARTINEZ

56) Ms. Martinez was the Chief Clinical Dietician at PHS. She was employed with PHS from September 1982 to March 17, 2003. Stipulated Exhibit 94.

57) Ms. Martinez' employment with PHS ended in March 2003. Stipulated Exhibits 97 and 93.

58) As early as December 2001, David Foster, the Director of Hospitality had concerns regarding Ms. Martinez' willingness to follow and support department initiatives. He was further concerned that Ms. Martinez would not follow directions or present factual information. He

feared that Ms. Martinez had some type of agenda and that she would continue to relay inaccurate information. Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1407, lines 15-23; Page 1409, lines 3-23; Page 1410, lines 10-25; Page 1411, lines 1-25; Page 1412, lines 1-25; Page 1413, lines 1-20. Defendants' Exhibit D.

59) On December 31, 2001, Mr. Foster prepared a Job Competency Assessment (JCA) for Mary Martinez for the annual period 2001. In that JCA, he indicated that Ms. Martinez is a very experienced qualified Chief Clinical Dietitian. He noted that she has extensive knowledge of nutrition and all of the technical aspects of her job. He encouraged her to focus on CARES behaviors and being positive in her comments to staff, her peers and others in the organization. He further recognized that she has significant influence in the impressions and perceptions of change in her circle of influence. He asked her to focus on being 100% accurate in her communication and get clarification when she feels she may have been misunderstood. He asked her to become more flexible with proposed solutions. She did not change any of her behaviors following this advice. Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1414, lines 6-25; Page 1415, lines 1-25; Page 1416, lines 1-24; Page 1428, lines 4-7; Stipulated Exhibit 77.

60) In April 2002, David Foster coached Ms. Martinez about her absences from the hospital without informing the Service Center, about the labeling and dating of food which Ms. Martinez did not feel was necessary under State Health Department regulations, and about an initiative for outpatient nutrition and support for regional hospitals. Mr. Foster expressed concern that Ms. Martinez was unwilling to follow reasonable requests and make needed changes. He expressed his concern about her pattern of divisive behavior, her criticism of

PHS leadership and a pattern of spreading inaccurate information. Ms. Martinez did not change her behavior following this coaching. Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1419, lines 5-14 and 25; Page 1420, lines 1-23; Page 1421, lines 125; Page 1422, lines 1-25; Page 1423, lines 1-25; Page 1424, lines 1-25; Page 1425, lines 1-25; Page 1426, lines 1-22.

61) On December 19, 2002, Ms. Martinez was presented with her Job Competency Assessment for the year 2002. In that JCA, David Foster raised concern that Ms. Martinez' decisions have not always been consistent with the direction given by the Hospitality Director and that she has been resistant to changes in the department. He further outlined that Ms. Martinez had resisted decisions made by her managers and had questioned Bob Hudson on the JCAHO requirements. He concluded by stating that she had been less than 100% accurate in statements made to senior leaders and her director. She was once again encouraged to be supportive of department changes, avoid negative divisive comments to her peers and employees and to support department changes even when she would not have made them the way they were made. Ms. Martinez did not believe these to be valid criticisms and did not change her behavior. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, Page 832, lines 2025; Page 833, lines 1-25; Page 834, lines 1-25; Page 835, lines 1-25; Page 836, lines 1-25; Page 837, lines 1-25; Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1427, lines 7-25; Page 1428, lines 1-25; Page 1429, lines 1-25; Page 1430, lines 1-25; Page 1431, lines 1-7; Page 1432, lines 2-17.

62) On January 3, 2003, Ms. Martinez received a Corrective Action Memorandum, which placed her in a loss of good standing for her work performance and professional conduct. This

resulted from several incidents. One incident involved Mary Martinez instructing a PHS employee to falsify training documents. The other had to do with misrepresentations by Ms. Martinez regarding requirements that Dietitians be on call and clock out for clinical education. The issue of Ms. Martinez lacking the authority to sign purchasing agreements was also addressed. Finally, the Corrective Action Memorandum addressed an incident in which Ms. Martinez approved the use of expired formula. It is strictly forbidden to dispense expired formula/enteral product to patients under any circumstances. Stipulated Exhibit 84. The incident involving approval of the use of expired formula was a serious food safety violation which warranted a Loss of Good Standing. Based on CMS or Joint Commission standards, the use of expired formula is an extremely serious incident. If expired formula is given to a sick baby, there could be serious and dangerous consequences. The other matters were of sufficient importance to be included in the corrective action because they showed a pattern of poor judgment. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1149, lines 11-25; Page 1150, lines 25; Page 1151, lines 1-25; page 11-52, lines 1-25; Page 1153, lines 1-25; Page 1154, lines 1-23.

63) There is no evidence that the corrective action at the loss of good standing level was taken because of Ms. Martinez' age or because of her entitlement to retirement benefits or for any other improper reason. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1176, lines 20-25; Page 1177, lines 1-8; Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1403, lines 4-19;

64) On February 27, 2003, Mary Beth Easton and David Foster met with Mary Martinez to discuss Ms. Martinez' travel to and activities at the regional hospitals. Mary Beth Easton

directed Ms. Martinez to gather data regarding each regional hospital she and another dietitian support including daily census, number of patients for which she is asked to provide nutrition assessment and planning, number of outpatients seen and other activities.  Ms. Easton informed Ms. Martinez that she believed Ms. Martinez' role at the regional hospitals would change and told her she needed the data in order to make a determination regarding needs.  Finally, Ms. Easton specifically asked Ms. Martinez not to involve others with the project and not to go to the Hospitals or anyone else regarding possible plans, outcomes, or scenarios.   Time and data was needed to make recommendations regarding the best nutritional care for each of the regional hospitals.  Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1161, lines 1-25; Page 1162, lines 1-25; Page 1163, lines 1-25; Page 1164, lines 1-25; Page 1165, lines 1-4; Transcript of Proceedings, October 11, 2006, Testimony of David Foster, Page 1305, lines 3-25; Page 1396, lines 1-25; Stipulated Exhibit 93.

65) Ms. Easton was advised that Ms. Martinez made an announcement on March 5, 2003 at lunch that she would not be traveling to the regionals after 90 days and that Trish Troyanowski didn't want to travel to the regionals any more and that a full time registered dietitian would have to travel alone to the regionals.  By going to the clinical nutrition staff, Ms. Martinez ignored Ms. Easton's express order not to involve anyone else.  She was suspended as a result. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1163, lines 3-25; Page 1164, lines 1-25; Page 1165, lines 1-4, 23-25; Page 1166, lines 1-6; Page 1167, lines 19-25; Page 1168, lines 1-9; Page 1170, lines 10-25; Page 1171, lines 1-4

and 15-22; Page 1172, lines 4-25; Page 1173, lines 1-25; page 1174, lines 1-25; Page 1175, lines 1-6; Defendants' Exhibit I; Stipulated Exhibit 93.

66) Ms. Martinez resigned in lieu of dismissal on or about March 17, 2003. Stipulated Exhibit 93.

67) Ms. Martinez consistently showed an inability to model support for directives given to her by her immediate managers. policies and procedures of PHS and to provide accurate information which affects others in the Management Team or those who reported directly to her. Testimony cited above; Stipulated Exhibit 93.

68) Ms. Martinez consistently provided inaccurate information.

    a.    Ms. Martinez testified that prior to December 19th, 2002 she had not had any coaching or counseling with David Foster about not being consistent with the directions he had given.   The evidence shows that Mr. Foster did address his concerns in the December 2001 Job Competency Assessment he prepared for Ms. Martinez.  Transcript of Proceedings, October 11, 2006, Testimony of David Foster, page 1414. lines 24-25; page 1415, lines 1-25; page 1416. lines 1-24; Stipulated Exhibit 77.

    b.    Ms. Martinez denied that David Foster ever spoke with her about one person traveling to the regional hospitals.   Transcript of Proceedings, October 6. 2006, Testimony of Mary Martinez, page 988, lines 22-25; page 989, lines 19-25. The evidence shows that David Foster on or about April, 2002 discussed the outpatient nutrition initiative with Ms. Martinez wherein they discussed other ways to support the regional hospitals such as hiring a dietitian for regions combined with a half-time outpatient

dietitian.   In that discussion they discussed travel of one dietitian to the hospitals. Defendant's Exhibit B.

c.      Ms. Martinez testified that she was not calling in to the Service Center to check in because she would come in early and the Service Center was not open.  Once she advised Mr. Foster of this problem, he put an answering machine or answering service in place that she could call into.  The evidence shows that there was someone working at the service center at 6:00 a.m. and that Ms. Martinez felt that because she would let her staff know when she was there, she did not need to report to the service center as she was coming or going.  She did not relate concerns to Mr. Foster about the time she arrived and the availability of someone at the service center.  Transcript of Proceedings, October 11, 2006, Testimony of David Foster, page 1421, lines 4-19.

d.      Ms. Martinez testified she never had to use Policy 308, page 845.  The evidence shows that she, in fact, used Policy 308 to discipline former Plaintiff, Sally Gomez. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 991, lines 23-25; page 992, lines 3-8.

e.      Ms. Martinez testified she did not communicate to anyone that Dietitians work 24 hours/7 days a week.  Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 851.  The evidence shows that Ms. Martinez advised Mary Beth Easton that Dietitians were on call "24/7" and that Ms. Easton contacted PHS Human Resources to confirm whether dietitians get call-back pay or on-call pay, in reliance on Ms. Martinez' representations.  Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1146, lines 21-25; Page 1147, lines 1-24.

f.       Ms. Martinez testified that she signed the Novartis Agreement because her boss, David Foster, asked her to sign it.   Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, pages 856-857.  The evidence shows Mr. Foster did not have the capacity as a manager to sign purchase agreements and never directed anyone under his authority to sign a purchase agreement. Transcript of Proceedings, October 10, 2006, Testimony of David Foster, page 1344, lines 25; page 1345, lines 1-5.

g.       Ms. Martinez claims that she asked a Diet Aide to get back with her if there was no specialized infant formula available that was not expired.   When she was not contacted, she assumed the Diet Aide found the appropriate formula.   Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 857-858.   The evidence shows that Mary Beth Easton spoke with an employee in the diet office who advised that Ms. Martinez gave her permission to use the expired formula.  When Ms. Easton spoke to Ms. Martinez about the incident, Ms. Martinez explained that that formula had only been expired for a month and that the only result of the expiration was that the potency of the vitamins was reduced.  She further reported that she had talked with a pediatric physician who had approved of the use of expired formula.  Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, pages 1152, lines 8-25; page 1153, lines 1-14.

h.       Ms. Martinez testified that she approached Jutta Johnson after the January 3, 2003 Corrective Action and asked her if she had gone to David Foster and Mary Beth Easton to tell them she and Ms. Martinez had falsified documents.  She testified that Jutta Johnson denied going to Mr. Foster and Ms. Easton.  Transcript of Proceedings, October 5, 2006,

Testimony of Mary Martinez, pages 860-861. The evidence shows that Ms. Martinez did request that Ms. Johnson fix the wrong answers and make them right. Transcript of Proceedings, October 3, 2006, Testimony of Jutta Johnson, page 433, lines 7-20. Ms. Martinez testified that she did not ask Jutta Johnson to sign anything. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 998, lines 14-19. The evidence shows that Ms. Martinez asked Jutta Johnson to write a statement saying that Ms. Martinez had only been joking about the request. Transcript of Proceedings, October 3, 2006, Testimony of Jutta Johnson, Page 447, lines 21-25. Ms. Martinez denies that she asked Jutta Johnson to change answers to the test in front of Jerry Biggam. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 998, lines 20-25; page 999 lines 1-7. The evidence shows that Mr. Biggam overheard Ms. Martinez instruct Jutta Johnson that they would have to change the answers to the questions and asked Jutta Johnson to make the changes. Stipulated Exhibit 88; Deposition of Jerry Biggam, page 82, lines 1-25; page 83, lines 1-18.

i.      Ms. Martinez testified that she understood there is a possibility that expired infant formula could lack critical nutrients. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 1012, lines 17-20. As the Chief Clinical Dietitian, she believed it is not dangerous to give a sick child formula lacking all the required vitamins and that she would never give an expired formula to an infant. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 1013, lines 6-7. In her deposition Ms. Martinez testified that hospitals do it if the physician approves it and there is no other feeding for the child or adult and the patient would starve. She testified that

the formula would be a little less potent in vitamins but it is not dangerous. She testified that it's not something that is dangerous or considered against the law, but it would be something they would discuss with other people if they had to do it. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1013, lines 1-25; page 1014, lines 1-23.

j.      Ms. Martinez testified that she did not have discussions on February 27, 2003 with David Foster and Mary Beth Easton about Regional money for travel and confidence in her ability to perform as a manager. She claims those discussions were held in early March, 2003 with Mary Beth Easton. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, pages 872-873. The evidence shows that Ms. Easton and Mr. Foster met with Ms. Martinez on February 27, 2003 to discuss the travel policy, lack of confidence in Ms. Martinez' ability to perform as a manager, a 90-day review of work at the regional hospitals and instructions to Ms. Martinez that she should not share the information with anyone. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, pages 1161-1165.

k.      Ms. Martinez testified that she understood there is a possibility that expired infant formula could lack critical nutrients. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 1012, lines 17-20. As the Chief Clinical Dietitian she believed it is not dangerous to give a sick child formula lacking all the required vitamins and that she would never give an expired formula to an infant. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 1013, lines 6-7. In her deposition Ms. Martinez testified that hospitals do it if the physician approves it and there is no other

feeding for the child or adult and the patient would starve. She testified that the formula would be a little less potent in vitamins but it is not dangerous. She testified that it's not something that is dangerous or considered against the law, but it would be something they would discuss with other people if they had to do it. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1013, lines 1-25; page 1014, lines 1-23.

l.       Ms. Martinez testified she did not believe that Presbyterian Healthcare Systems own the regional hospitals. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 877. The evidence shows that Presbyterian Kaseman Hospital, Espanola Hospital, PRC, Clovis Plains Regional Medical Center and General Hospital in Socorro are wholly owned by PHS. The assets of Lincoln County Hospital and Dan C. Trigg in Tucumcari are owned by the Lincoln and Quay Counties and are leased by PHS. Transcript of Proceedings, October 11, 2006, Testimony of Mark Reifsteck, pages 1368, lines 20-25; page 1369, lines 1-11.

m.       Ms. Martinez testified that she was told she would no longer be traveling to the regionals in 90 days. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 878. She further testified that Ms. Easton only told her not to discuss the conversation they had about the regionals with anyone at the regional hospitals. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 879. The evidence shows Ms. Easton and Mr. Foster instructed Ms. Martinez not to involve anyone else in gathering the data requested. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, page 1164, lines 9-19; Transcript of Proceedings,

October 11, 2006, Testimony of David Foster, page 1399, lines 2-25; page 1400, lines 1-2.

n.      Ms. Martinez testified that she was suspended on March 5, 2003 and remained on suspension until March 17, 2003. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 882. She testified that prior to her resignation, no one explained to her why she had been suspended. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 883. The evidence shows that Mary Beth Easton spoke with Mary Martinez about her suspension and the reasons for her suspension. Transcript of Proceedings, October 10, 2006, Testimony of Mary Beth Easton, Page 1226, lines 1-25; Page 1227, lines 1-5; Defendants' Exhibit I.

o.      Ms. Martinez advised her staff that fellow Dietitian, Patricia Troyanowski, would also stop traveling and that they would start looking for someone to take her place. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 884. The evidence shows Ms. Easton did not tell Ms. Martinez who would be traveling in 90 days or what the plans were for future dietary services for the regionals. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 957 lines, 13-18.

p.      Ms. Martinez testified that she did not get paid during her suspension. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 887. The evidence shows that Ms. Martinez was indeed paid during the period of suspension. She received a check in the amount of $3,857.35 dated March 31, 2003 which represents the last two weeks of work after Ms. Martinez was terminated. Transcript of Proceedings, October 11, 2006, Testimony of Betty Kurtz, page 1502, lines 7-24. Ms. Martinez was an exempt

employee and she automatically received payment for eight hours per day. Transcript of Proceedings, October 11. 2006. Testimony of Betty Kurtz, page 1503, lines 15-21. In fact, Ms. Martinez mistakenly received and cashed 80 hours of overpayment for March 17-March 28, 2003 in the amount of $1,877.95. Transcript of Proceedings, October 11, 2006, Testimony of Betty Kurtz, page 1505, lines 11-25.

q.     On March 17, 2003, when Ms. Martinez requested a resignation, she also requested $3,000 and additional money from PHS. Transcript of Proceedings, October 5, 2006, Testimony of Mary Martinez, page 890.: Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez. page 1005, lines 3-6; Defendants' Exhibit J. In her Affidavit, Ms. Martinez represented to the Court that at no time prior to seeing the Agreement did she request a severance agreement. Defendants' Exhibit J; Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1004, lines 24-25; page 1005, lines 1-2.

r.     Ms. Martinez has a bachelor's degree from the University of California Berkeley and a master's degree from the University of New Mexico. She has taken classes at the Anderson School of Business at the University of New Mexico and teaches at a college level. Yet, she testified that because she came from parents whose first language was not English, she has a hard time with the English language. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez. pages 962-963.

s.     Ms. Martinez testified that she had never signed a document before that waives claims. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 963, lines 23-25. The evidence shows that she signed a settlement agreement as a result

of a divorce, waiving claims against her husband and property. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1025, lines 2-21; page 1027, lines 16-25; page 1028, lines 16-23.

t.        Ms. Martinez represented to the Court by Affidavit that at the time she signed the agreement, she did not have any savings or financial reserves she could rely upon to withstand an extended period of unemployment. Defendants' Exhibit J; Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 969, lines 12-17. The evidence shows that on the same day she signed the Agreement, she was promised employment by the University of New Mexico Hospital. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 971, lines 5-25. She had participated in a 401K account that she could have withdrawn from or borrowed against. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 972, lines 1-23. She was receiving $3,500 a month for alimony. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 973, lines 2-7. Ms. Martinez' marital settlement agreement reveals that she received and retains half of the gold coins owned by the couple. She received and retains an IRA from Washington Mutual Group. She received an IRA with Investment Company of America. She received the Washington Mutual funds; She received and retains the entire interest in her husband's profit sharing plan. She received and retains an IRA account with Fiduciary Trust. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1031, lines 13-25; page 1032, lines 1-20.

u.    In her Affidavit, Ms. Martinez represented to this Court that she was advised at the March 20, 2003 meeting that the possibility of her resigning her employment was contingent upon her agreeing to the release.    Defendants' Exhibit J; Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 978, lines 2-6.   The evidence shows that she had already resigned her position on March 17, 2003.   Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 978, lines 12-25; page 979, lines 1-11.

69) At the time of her resignation from employment with PHS, Mary Martinez requested and PHS agreed to pay additional consideration to Ms. Martinez of $6,179.51, which amount was over and above all other compensation, expenses, benefits and allowances to which she was entitled upon her resignation from employment. Stipulated Exhibit 95.

70) In consideration for the payment of additional compensation of $6,179.51 to Mary Martinez, she executed and delivered to PHS an Additional Consideration and Release Agreement on March 20, 2003. Stipulated Exhibit 95.

71) Ms. Martinez was not otherwise entitled to the consideration given. Stipulated Exhibit 95.

72) By entering into the Additional Consideration and Release Agreement, Ms. Martinez waived all rights or claims and released and forever discharged PHS, its officers, directors, assigns and all entities in privity with them, from any and all claims and causes of action of every kind, nature or description which she has, known or unknown, related to or arising from her employment with or cessation of employment from PHS, and any other event occurring up to the date of the Release. Stipulated Exhibit 95.

73) By signing the Additional Consideration and Release Agreement, she acknowledged that she had the opportunity to and carefully read all the terms and conditions in the Agreement and understood the Agreement to be a release of all claims that she had arising out of her employment by PHS or the cessation of employment. Stipulated Exhibit 95.

74) The release specifically includes claims asserted under the New Mexico Human Rights Act, the ADEA and ERISA. Stipulated Exhibit 95.

75) Ms. Martinez acknowledged and was advised to review the Agreement with an attorney and then she signed it voluntarily. Transcript of Proceedings, October 3, 2006, Page 267, lines 17-25; She did not attempt to negotiate the terms of the Agreement. She did not ask any questions about the Agreement. Transcript of Proceedings, October 3, 2006, Testimony of Betty Kurtz, page 305, lines 6-20.

76) At the time she signed the Additional Consideration and Release Agreement, Ms. Martinez had available to her for withdrawal $17,204 in PHS' 403(b) plan and $2,840 in PHS' 401(a) plan. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, Page 972, lines 12-23.

77) During the years 2003 and 2004, Ms. Martinez received $42,000 per year in alimony payments. Transcript of Proceedings, October 6. 2006, Testimony of Mary Martinez, page 973, lines 2-7; Stipulated Exhibits 112 and 113.

78) Ms. Martinez had seven days after signing the Release to revoke the waiver/release of rights or claims under the ADEA. The Agreement clearly advises her to consult with an attorney regarding execution of the Release. Stipulated Exhibit 95.

79) Ms. Martinez has a Bachelor degree from the University of California Berkeley in food nutrition and dietetics which she obtained in 1975.   She worked with NASA in the Department of Public Health and at Berkeley's research facility doing research on cholesterol, weightlessness and the loss of calcium from the bones of astronauts and on wine and digestibility.  Stipulated Exhibit 109.

80) She received a Master of Science in Nutrition from the University of New Mexico in 1992. She took a year of business classes at the Anderson School of Business.  She took exercise science courses, statistics, advanced classes in some biological fields and public health. Stipulated Exhibit 109.

81) She has worked as a Corporate Dietitian, Consultant Dietitian, Clinical Dietitian and Clinical Nutrition Manager in entities such as La Vida Llena, Charter Behavioral Systems, Coram Healthcare, San Francisco City College, and Presbyterian Hospital, where she managed 14 Clinical Dieticians, directed Clinical Nutrition Services for six hospitals, managed clinical nutrition services for state wide homecare services and outpatient clinics and provide continuing education programs for nurses dietitians and physicians.  She has also been an educator for wellness nutrition, community nutrition and continuing education. See Mary Martinez Resume.  Stipulated Exhibit 109.

82) She has been an instructor of clinical and introductory nutrition classes at the University of New Mexico School of Medicine and T-VI (now CNM). Stipulated Exhibit 109.

83) She has served as President and Legislative Network Coordinator of NM Dietetic Association, Board Member of Presbyterian Homecare and Board Member of St. Pius X High School. Stipulated Exhibit 109.

84) Ms. Martinez earned approximately $52,794.97 at PHS, the year prior to her resignation. She was fully vested in PHS' Pension Plan.   Transcript of Proceedings. October 6, 2006 Testimony of Mary Martinez, page 921, lines 7-25; page 922, lines 1-12; Stipulated Exhibit 101.

85) On March 20, 2003, the same date Ms. Martinez signed the Additional Consideration and Release Agreement, her application for employment with the University of New Mexico was approved and she started work at the University of New Mexico as a Senior Research Nutritionist effective March 31, 2003. As a Senior Research Nutritionist, she initially earned $39,957.00. Her salary increased to $47,199.96 and eventually to $48,143.96 effective July 2004. Transcript of Proceedings. October 6, 2006, Testimony of Mary Martinez, page 976, lines 16-25; page 977, lines 1-16; Stipulated Exhibit 102.

86) In 2003, Ms. Martinez earned $50,534 in wages. Stipulated Exhibit 112.

87) In 2004, Ms. Martinez had earnings of $50,120. Stipulated Exhibit 113.

88) In 2005, Ms. Martinez earned about $47,000 at UNM. Ms. Martinez is eligible for health and dental insurance through her employer. She has earned on average $8,000-11,000 per year teaching at T-VI. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 980, lines 20-25; page 981, lines 1-22.

89) Ms. Martinez was earning more at UNM and CNM than she did at PHS and had no future lost wages. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 981, lines 23-25; page 982, lines 1-8.

90) A month and a half before trial, she has taken a lesser paying job. She gave up her position at the University of New Mexico in 2006 to go to work for CNM (T-VI). She was not laid

off. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 981, lines 23-25; page 982, lines 1-8. On April 13, 2006, T-VI Community College confirmed that Ms. Martinez had been hired as a full-time instructor in the discipline of nutrition for a two-semester work load. Her base salary there for the 2006-2007 academic year would be $39,168.00. If she teaches additional classes, she is eligible for payment of $42,000 for the year. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 982, lines 9-25; page 983, lines 1-4; Stipulated Exhibit 111. She continues to receive money from the University of New Mexico as a consultant in the amount of $3,000 per semester. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1034, lines 12-16. She is currently contracting with La Vida Llena as a consultant earning $400 per month. Transcript of Proceedings, October 6, 2006, Testimony of Mary Martinez, page 1035, lines 4-11.

## CONCLUSIONS OF LAW

1.    The Court has jurisdiction over the parties and over the subject matter of this action.

2.    There is no evidence of an employment relationship between Plaintiffs and ARAMARK and, therefore, Counts I, II, III, IV, V and VII do not state a claim for relief against ARAMARK.

3.    There is no evidence that Mary Martinez and Frank Pacheco had a reasonable expectation that the terms of the personnel policy constituted an implied contract.

4.    Each of these plaintiffs signed and acknowledged an agreement which expressly provided that the handbook did not constitute a contract and therefore they had no reasonable expectation that the handbook constituted an implied contract.

5.    There is no evidence of a contract between Plaintiffs and PHS that was breached. However, even if any contract was breached, the evidence fails to demonstrate that ARAMARK played any role in inducing any breach.

6.    The acts of ARAMARK regarding Plaintiffs' employment with PHS were done with justification or privilege.

7.    There is no evidence that ARAMARK acted either with an improper motive or by use of improper means.

8.    ARAMARK was, by contract, PHS' administrator for the Hospitality Services Department. ARAMARK acted as the agent of PHS.

9.    Agents cannot conspire with their corporate principal.

10.    There was, therefore, no conspiracy between PHS and ARAMARK.

11.    In the alternative, because there is no evidence that PHS and ARAMARK engaged in any scheme involving either an unlawful purpose or using unlawful means, the conspiracy claim fails. Plaintiffs' mere allegations and subjective belief is insufficient to establish a conspiracy.

12.    Civil conspiracy is achieving an unlawful purpose or using an unlawful means to achieve a lawful goal.

13.   The existence of a conspiracy must be shown either by direct, specific evidence or by circumstances from which a conclusion of the existence of a conspiracy may be reasonably inferred.

14.   The absence of evidence of an unlawful purpose or use of unlawful means defeats a civil conspiracy claim.

15.   There is no evidence that ARAMARK's motive for recommendation of the corrective actions taken was based on hatred or ill will toward Ms. Martinez or to discriminate against her because of her age.

16.   There is no evidence that ARAMARK used improper means such as violence, threats, intimidation, or deceit, misrepresentation, bribery, unfounded litigation, defamation or disparaging falsehoods in making its recommendations regarding corrective actions.

17.   PHS and ARAMARK are in Privity of Contract, by virtue of the ISS Agreement.

18.   The release language contained in the Additional Consideration and Release Agreement signed by Mary Martinez is clear and specific.

19.   Mary Martinez waived all rights or claims and released and forever discharged PHS and ARAMARK from any and all claims and causes of action of every kind, related to or arising from her employment with or cessation of employment from PHS.

20.   Based on her education and experience, Mary Martinez knew and understood, or reasonably should have known and understood, the meaning and the purpose of accepting additional compensation and signing a release of all claims on March 20, 2003.

21.   Plaintiffs have failed to establish a cause of action of conspiracy between

PHS and ARAMARK.

22.   Plaintiffs have failed to establish that ARAMARK tortiously interfered with

their contractual relations with PHS.

23.   Plaintiffs have failed to establish that their alleged damages are attributable

to ARAMARK.

Respectfully Submitted,

BUTT THORNTON & BAEHR PC

Agnes Fuentevilla Padilla
Michael P. Clemens
Attorney for Defendant ARAMARK
P.O. Box 3170
Albuquerque NM  87190-3170
Telephone: (505) 884-0777

I hereby certify that a true copy of the
foregoing pleading was mailed to all
counsel of record on this 27th day
of October, 2006:

Michael E. Mozes, Esq.
Attorney for Plaintiffs
5732 Osuna Road NE
Albuquerque, NM  87109


Robert M. St. John, Esq.
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Attorneys for Defendant
    Presbyterian Healthcare Services, Inc.
P.O. Box 1888
Albuquerque, NM  87103


Agnes Fuentevilla Padilla
Michael P. Clemens