## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TERRI P. ELISBERG, MARY**
**MARTINEZ, FRANK PACHECO,**
**and PATRICIA TROYANOWSKI,**

**Plaintiffs,**

**vs.**                                                    **Case No. 05-CV-00461 JCH/KBM**

**PRESBYTERIAN HEALTHCARE**
**SERVICES, INC., and ARAMARK**
**MANAGEMENT SERVICES, L.P.,**

**Defendants.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** comes before the Court on a seven-day bench trial commencing October

2, 2006.  At trial, Plaintiffs Terri P. Elisberg, Mary Martinez, Frank Pacheco, and Patricia

Troyanowski ("Plaintiffs") were represented by Michael E. Mozes, Esq., Defendant Presbyterian

Healthcare Services, Inc., was represented by Robert M. St. John, Esq., and Defendant Aramark

Management Services, L.P., was represented by Agnes Fuentevilla Padilla, Esq., and Michael P.

Clemens, Esq.  At the close of Plaintiffs' case in chief, Defendants moved for judgment as a

matter of law against Plaintiffs pursuant to Federal Rule of Procedure 52(c), and the Court

granted the motion with respect to Plaintiffs Elisberg and Troyanowski, dismissing all of their

claims against Defendants, but denied the motion with respect to Plaintiffs Martinez and Pacheco.

After trial, the parties submitted proposed findings of fact and conclusions of law.  The Court,

having considered the parties' submissions, as well as the evidence presented at trial and the

relevant law, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.      Presbyterian Healthcare Services, Inc. ("PHS") is a nonprofit corporation organized under the laws of the State of New Mexico with its principal office in Albuquerque, New Mexico.  PHS operates the main Presbyterian Hospital in Albuquerque, the Presbyterian Kaseman Hospital in Albuquerque, and various regional hospitals, clinics, and urgent care centers in the State of New Mexico.

2.      On August 29, 2000, PHS entered into an Integrated Support Service Agreement with ServiceMaster Management Services Limited Partnership ("ServiceMaster") ("ISS Agreement") to consolidate, restructure, and integrate various technical and customer service functions, including plant operations and maintenance, housekeeping, and food service, into a single integrated support service in order to decrease costs, improve service, and boost employee morale.  In October 2001, ServiceMaster was acquired by Aramark Management Services, L.P. ("Aramark").  As used herein, the term "Aramark" refers to both ServiceMaster and Aramark.

3.      Before PHS entered into the ISS Agreement, PHS had numerous management problems at its hospitals, which led PHS to believe that its facilities were out of control.  Patient satisfaction scores were not high, the hospitals were not clean or well maintained, and there were major employee issues including the buying, selling, and use of illegal drugs in the workplace. Furthermore, the housekeeping, maintenance, and dietary departments needed to improve the quality of their services and the delivery of those services.  The PHS management team in place was not addressing these problems, so PHS looked to Aramark to create a strong management team to address these problems.  If PHS had had a strong management team in place, PHS would not have needed Aramark's services.

4.     Under the terms of the ISS Agreement, Aramark furnished management personnel to carry out the purposes of the ISS Agreement, but PHS retained all responsibility to hire, discipline, and discharge service employees.  Aramark consulted and worked in cooperation with the PHS Human Resources Department with respect to such matters as the coaching, corrective action, discipline, and discharge of employees.  While providing services under the ISS Agreement, Aramark personnel required all employees to comply strictly with PHS's policies. PHS's regional hospitals also operated under the policies and procedures of PHS.

5.     The dietitians at the main Presbyterian Hospital in Albuquerque provided consultation to the regional hospital regarding dietary matters.  PHS management decided how to provide dietitian services at the regional hospitals.

6.     Aramark and PHS could revise any of the terms of the ISS Agreement, including management of dietician services performed at regional hospitals, by mutual consent.

7.     The main Presbyterian Hospital employed and managed PHS's dietitians, and the dietitians were accountable and responsible to the management at the main hospital.

8.     The Aramark managers at the main facility had authority over the PHS dietitians to the extent they traveled to the regional hospitals to provide consultation to those hospitals on dietary matters.  The Aramark managers had the authority to determine the manner in which the dietitians provided services to the regional hospitals.  PHS did not object to Aramark's oversight of the dietitians' activities at the regional hospitals and in fact encouraged it.

9.     PHS employed Plaintiff Frank Pacheco as a cook and Plaintiff Mary Martinez as a clinical dietitian.  Terri Elisberg and Patricia Troyanowski were also clinical dietitians.

10.     On October 6, 2006, the Court dismissed Elisberg and Troyanowski from this case

at the close of Plaintiffs' case-in-chief pursuant to Defendants' Federal Rule of Civil Procedure 52(c) motion for judgment as a matter of law.

11.     Plaintiffs Pacheco, Martinez, Elisberg, and Troyanowski worked in Food and Nutrition Services, a department which fell within the scope of the ISS Agreement.  Aramark therefore had management and supervisory responsibility over Plaintiffs.  Among the Aramark managers who had supervisory responsibility over Plaintiffs were Robert Hudson, David Foster, Mary Beth Easton, and Jerry Biggam.

12.     When PHS entered into the ISS Agreement, PHS did not direct any PHS employee or anyone at Aramark to reduce PHS's workforce, and PHS did not have any intention to reduce the workforce or terminate any group or class of PHS employees.  To the contrary, one of PHS's principal reasons for entering into the ISS Agreement was to reduce the level of employee turnover.  During the period that the ISS Agreement was in effect, employee turnover was in fact reduced.  Furthermore, PHS had no incentive to replace older dietitians because PHS had had difficulty in the past finding seasoned dietitians with experience to hire.

13.     Plaintiffs entered into Employment Agreements specifying that employment with PHS was not for a fixed period of time and could be terminated when PHS deemed it appropriate.  Pacheco and Martinez understood and acknowledged that their employment with PHS was at-will.  The Employment Agreements provided in relevant part,

> I understand that my employment with [PHS] is not for a fixed period of time, and that my employment may be terminated in circumstances where [PHS] deems this appropriate.  However, should I have any disagreement or problem with my employment or the termination of my employment, I agree that these are subject to the [PHS] problem-solving procedure which is my sole and exclusive remedy for any dispute.  I understand that the Employee Handbook does not constitute a contract or any part of a contract and that my employment with [PHS] is not

-4-

subject to any terms different from or inconsistent with those stated in this Employee Agreement.

14.     The PHS Employment Agreements provided that the policies and procedures contained in the PHS Employee Handbook did not constitute part of the Employment Agreements.

15.     The employees Aramark engaged to perform duties pursuant to the ISS Agreement were qualified by education and training to work as managers and to oversee the work of service employees in healthcare facilities.

16.     PHS and Aramark did not enter the ISS Agreement for any unlawful or improper purpose, and the ISS Agreement did not operate to effect any unlawful or improper purpose. Specifically, PHS and Aramark did not enter into the ISS Agreement for the purpose of terminating or adversely affecting the employment of older and/or long-service employees.  In carrying out its management duties under the ISS Agreement, Aramark did not act to terminate or adversely affect the terms of employment of PHS employees because they were older and/or had longer terms of service.

17.     There is no evidence that PHS and Aramark conspired to deprive Plaintiffs of their employment or rights and benefits associated with their employment at PHS.  There is no evidence that Plaintiffs committed wrongful acts pursuant to the alleged conspiracy.

18.     There is no evidence that Defendants considered the factors of age, length of service, or benefits in terminating Pacheco, accepting the resignation in lieu of termination of Martinez, or accepting the voluntary resignations of Elisberg and Troyanowski.

19.     There is no evidence that Defendants had any intention and/or practice of

eliminating employees for the purpose of affecting health, retirement, or other benefit plans.
There is no evidence that PHS directed Aramark to reduce its workforce or terminate any group
or classes of PHS employees.  There is no evidence that the termination of Pacheco, the
resignation in lieu of termination of Martinez, or the voluntary resignations of Elisberg and
Troyanowski had any effect on the cost to PHS of its benefit plans.

20.     There is no evidence that PHS took any action against Plaintiffs that breached any
agreement or any rights to which Plaintiffs were entitled under the retirement or other benefit
plans that PHS provided to its employees.

21.     PHS was not under any contractual or other obligation to continue indefinitely its
retirement or other benefit plans.  PHS had the right to make changes to its retirement or other
benefit plans from time to time, including the right to terminate any plans in effect.

22.     PHS recognized a progressive disciplinary process consisting of informal and
formal counseling procedures which could be bypassed or accelerated based upon the seriousness
of the situation.

23.     Defendants did not violate PHS's policies or procedures, including the progressive
discipline policy, in the course of supervising, managing, or disciplining Plaintiffs.

24.     Coaching is not part of PHS's formal disciplinary action process and is intended to
place an employee on notice that the he or she is not meeting PHS's performance expectations.
Coaching may occur at any time and need not be documented in writing.

25.     Summary of council[1] occurs when a supervisor meets with an employee to inform

---

[1] In its written forms and in its pleadings, PHS refers to this level of corrective action as a
"summary of council."   The Court therefore uses "council" herein.

the employee of work performance or behavior that is not at a satisfactory level and of the expectations necessary to correct the performance or behavior problems.

26.     Loss of good standing occurs when written counseling fails to produce expected results or other work performance problems occur.  A loss of good standing remains in effect for a twelve-month period.

27.     An employee who is in loss of good standing is not eligible to participate in certain benefit programs, including performance salary adjustments, gain share, tuition reimbursement, transfer or promotion, career advancement programs, or personal/educational leave.

28.     If coaching, summary of council, and/or loss of good standing do not produce expected results or if other issues occur, it is appropriate for PHS to issue a notice of dismissal.

29.     When problem behavior is sufficiently serious, use of disciplinary suspension or dismissal by PHS is appropriate.

30.     PHS management need not reduce investigations under the progressive discipline policy to writing.

31.     PHS holds a manager to a higher standard than a staff employee under the progressive discipline policy.

32.     Safe handling of food at hospitals is important to patient health, and safety food problems can particularly jeopardize immune-compromised patients' health.  Safe handling of food is also necessary to comply with requirements of the Center on Medicare and Medicaid Services, the County Health Department, and the City of Albuquerque.

33.     In the case of serious employee infractions, such as food safety problems, PHS may dispense with steps in the coaching and progressive discipline policy.

-7-

34.     Aramark instructed PHS employees regarding food safety.  Chief Operating Officer Mark Reifsteck instructed Aramark employees to be certain PHS food service facilities were not shut down as a result of unsafe food handling practices.

35.     There is no evidence that PHS or Aramark violated any of the procedures relating to coaching and discipline contained in the PHS Employee Handbook.  There is no evidence that PHS or Aramark violated any other PHS policies in carrying out the coaching and discipline of PHS employees.

36.     The Court previously has ruled by its Memorandum Opinion and Order entered August 10, 2006, that Plaintiffs have not raised any evidence demonstrating that the Employee Handbook constitutes a contract and that Plaintiffs' breach of an express contract claim based upon violation of the Handbook therefore must fail.

37.     There is no evidence that PHS violated any implied contract of employment or any covenant of good faith and fair dealing between PHS and Plaintiffs.

38.     The PHS Travel and Business Expense Policy (the "Travel Policy") defines allowable travel expenses for PHS employees.  Employees traveling to regional hospitals are subject to this policy.  The Travel Policy provides that PHS will only reimburse employees for the least expensive travel option.  Employees must use their personal vehicles for in-state travel unless (a) the employee requires a larger vehicle to accommodate additional passengers or material, (b) the cost of renting a vehicle would be less than the mileage reimbursement for use of a personal vehicle, or (c) the employee's personal vehicle is not reliable.  Employees may rent mid- or full-size vehicles only when transporting three or more passengers.  If an employee chooses to upgrade a vehicle to a larger and/or more luxurious model, the employee must pay for the

upgrade personally.

### Mary A. Martinez

39.     PHS hired Martinez on September 30, 1982, as a clinical dietitian.  Martinez later
became the Chief Clinical Dietitian at PHS.  Martinez was a manager until March 2003 when her
employment with PHS ended.

40.     From 1982 through 1999, Martinez was not a full-time employee at PHS.
Martinez worked on either a part-time or PRN (on-call) basis.  Martinez did not begin working at
PHS as a full-time employee until 1999.

41.     As part of her 2001 Job Competency Assessment, Martinez's supervisor Foster
met with Martinez and coached her to be more positive, accurate, and flexible.  Foster was
concerned because Martinez was relaying inaccurate information and was unwilling to follow and
support department initiatives.  Martinez did not read her Competency Assessment after her
meeting with Foster.

42.     PHS believed that Martinez had made erroneous representations that dietitians
were on-call at all times; this representation, if true, meant that PHS should have been providing
dietitians with additional compensation.

43.     In addition, Martinez incorrectly instructed her subordinates about the
requirements for clocking in and out for time spent attending educational programs.  This error
made it impossible for Defendants to track the number of employee hours worked and the amount
of educational expenditures.

44.     Martinez also signed a purchase agreement that she was not authorized to sign.

45.     When Aramark managers attempted to coach Martinez on her performance

deficiencies and caution her that PHS's rules applied equally to her, Martinez responded by being argumentative and unreceptive.

46.     In April 2002, Foster met with Martinez to discuss (a) her absences from the main PHS hospital without informing the PHS service center, (b) the labeling and dating of food that Martinez did not feel was necessary, (c) the initiative for out-patient nutrition, and (d) support for regional hospitals.  Foster expressed his concern that Martinez was unwilling to follow reasonable requests and make necessary changes; Foster also expressed his concern about Martinez's pattern of divisive behavior, criticism of PHS leadership, and spreading of inaccurate information.

47.     There is no evidence that considerations of age, length of service, or retirement benefits motivated Foster's concerns about Martinez.  The evidence establishes that Defendants' concerns were prompted by a regard for patient safety, compliance with PHS policies, and a desire to ensure strict compliance with the health and safety requirements imposed by the Center for Medicare and Medicaid (CMS) and Joint Committee on the Accreditation of Healthcare Organizations (JCAHO).

48.     In Martinez's 2002 Job Competency Assessment, Foster indicated, "Overall Mary has performed her duties as a Clinical Manager, and has been an advocate for the needs of the clinical staff and the organization. . . .  Mary has also been resistant to comply with many of the request [sic] of her Director.  Examples of this are resistance to calling the service center, challenging procedure changes in regards to HACCP, and in being less than 100% accurate in statements to senior leaders and her director."

49.     Foster used job competency assessments to improve employee performance.  Martinez's Job Competency Assessments were consistent with the PHS goals and procedures for

-10-

coaching and progressive discipline of employees.

50.     In January 2003, Biggam, a manager, and Jutta Johnson reported that Martinez had provided incorrect instruction to a class of food service workers regarding questions for a JCAHO competency test and that she subsequently sought to have the workers' answers on the test changed.

51.     In addition, Martinez's managers learned that Martinez had informed a Food and Nutrition Service worker that expired baby formula could nonetheless be fed to a baby.  This instruction was a direct violation of PHS policy and basic nutrition principles.  In addition, the use of expired baby formula violated PHS's conditions of participation in Medicaid and any such use could have resulted in the withholding of Medicaid funds.

52.     On January 3, 2003, Martinez's supervisors Foster and Easton gave her a corrective action at the level of a loss of good standing.  Foster and Easton gave Martinez this corrective action based upon (a) reports that Martinez had requested another employee to falsify training documents, (b) the fact that Martinez had made misstatements to her supervisors about the work requirements of dietitians, (c) the fact that Martinez had signed a purchase agreement without authority, and (d) the fact that Martinez had authorized the use of expired cans of baby formula in the pediatric unit.

53.     At the time of the corrective action in January 2003, Easton attempted to coach Martinez to improve the situation.

54.     Foster and Easton reasonably believed that the matters listed in Martinez's loss of good standing were true and that they warranted the corrective actions taken.

55.     In giving Martinez a loss of good standing corrective action, Foster and Easton did

not consider Martinez's salary level or benefits.  There is no evidence that Foster or Easton took the corrective action because of Martinez's age or her entitlement to retirement benefits.

56.     The PHS Travel Policy was binding on Martinez.  The Travel Policy had not been strictly enforced in the past.  Martinez and Troyanowski protested complying with the PHS Travel Policy.

57.     In February 2003, Martinez became engaged in a dispute with her supervisors regarding travel to PHS's regional hospitals.  Martinez had requested that PHS provide her with a sports utility vehicle to make the trips, and PHS had denied that request.  In violation of the Travel Policy and the ISS Agreement, Martinez indicated that she would ask the directors of the regional hospitals to approve her travel rather than the administrative director of the main Presbyterian Hospital in Albuquerque.

58.     Easton and Foster met with Martinez on February 27, 2003, to discuss Martinez's travel to the regional hospitals and her activities at the regional hospitals.  Easton and Foster told Martinez that Aramark had planned a 90-day data collection and analysis to measure the utilization of dietitians' time in traveling to the regional hospitals.  Easton told Martinez that her role at the regional hospitals could change, depending on the outcome of the data collection.  Easton specifically instructed Martinez not to mention the data collection plan to the other dietitians.

59.     In contravention of this direct instruction, Martinez announced to other dietitians that she no longer would be traveling to the regional hospitals.  Martinez's announcement resulted in confusion and stress among the other dietitians.  Martinez's failure to comply with Easton's explicit directive constituted insubordination.  It also was disruptive and made management of the

dietitians more difficult.

60.     The disputes that Martinez had with her managers in January and February 2003, including the disputes over providing service to the regional hospitals, were not related to and did not occur because of Martinez's age, term of service, or benefits.  They also were unrelated to and did not occur because of the ages, terms of service, or benefits of any other dietitians.   The managers's concerns were legitimate and directly related to proper administration of PHS and its regional hospitals.

61.     On March 10, 2003, Martinez was suspended during an investigation of her performance deficiencies.  On March 17, 2003, as a consequence of the conclusions reached from the investigation, Martinez was informed that she was being terminated because of her conduct and her repeated failures to follow directives and policies.

62.     At her request, PHS allowed Martinez to resign in lieu of termination effective March 17, 2003.  At the time Martinez submitted her resignation from employment, Martinez requested additional compensation.   Presbyterian Human Resources representative Betty Kurtz agreed to discuss the possibility of paying Martinez additional compensation with Martinez's supervisors.

63.     Subsequently, PHS offered Martinez additional compensation in exchange for Martinez's written release and discharge of any and all claims she might had related to her employment or cessation of employment against PHS and its officers, directors, assigns, and entities in privity with them.  PHS agreed to pay Martinez an additional sum of $6,179.51, less necessary deductions.  Martinez accepted the additional compensation and signed the Additional Consideration and Release Agreement ("Release") on March 20, 2003.

-13-

64.     The Release clearly stated that by accepting the money paid in settlement, Martinez was waiving all rights or claims against PHS and was releasing PHS and all entities in privity with PHS.

65.     Martinez received a Bachelor of Science degree from the University of California, Berkeley, and a Master of Science in Nutrition degree from the University of New Mexico. Martinez took classes at the Anderson School of Business.  Martinez taught at a college level. Martinez was capable of reading and understanding the meaning of the Additional Consideration and Release Agreement.  Based upon her education and experience, Martinez knew and understood, or reasonably should have known and understood, the meaning and the purpose of accepting additional compensation and releasing all claims against PHS.

66.     Kurtz's practice when offering additional consideration for a release was to review the release paragraph by paragraph, emphasizing in particular an employee's right to 21 days to consider the release and seven days to revoke the release once signed.

67.     The Release, in clear, unambiguous language, informed Martinez that she had the right to revoke the Release by giving written notice to PHS within seven days of signing the Release.

68.     When Kurtz provided Martinez with the Release, she gave Martinez time to read and review the terms of the Release.  Kurtz recalls telling Martinez that she could take the document to an attorney.

69.     Martinez signed the Release, accepted the sum of $6,179.51, less required deductions, and did not exercise her right to revoke the Release.  Martinez negotiated the check the same day that she picked it up, April 4, 2003, more than seven days after she signed the

Release.

70.     The affidavit that Martinez provided to the Court concerning the Release states, "At the time I signed the Agreement, I did not have any savings or financial reserves I could rely upon to withstand an extended period of unemployment."   At the time she signed the Release, however, Martinez had a 403(b) investment account and a matching contribution account with PHS from which she could have withdrawn.   Moreover, under a Marital Settlement Agreement, Martinez also had numerous accounts from which she could have withdrawn funds.   Martinez also had gold coins and other valuable and liquid assets and she was receiving $3,500 a month in spousal support.

71.     In addition, although Martinez testified that she was not paid during her suspension period, the evidence indicates that PHS paid her in full during her suspension.   In fact, the evidence indicates that PHS actually paid Martinez for an additional 80 hours in error.

72.     Furthermore, Martinez applied for employment at the University of New Mexico either prior to or at the time of her resignation from PHS, and on March 20, 2003, the same day that Martinez signed the Release, the University of New Mexico approved her application. Martinez began working at the University of New Mexico as a full-time senior research nutritionist effective March 31, 2003.

73.     The evidence does not indicate that Martinez was under financial pressure to sign the Release.   To the contrary, Martinez signed the Release voluntarily and did not revoke the Release within seven days as she was entitled to do.

74.     PHS did not require Martinez to sign the Release as a condition to changing her "dismissal" designation to a "resignation in lieu of termination" designation.   During her meeting

with Kurtz on March 17, 2003, Martinez asked Kurtz to change the dismissal to a resignation in lieu of termination, and Kurtz agreed; the change was made on the corrective action memorandum that day and was initialed by both Kurtz and Martinez.  The Release, however, was signed three days later.

75.     The Release provides that if either party breaches the Release, the other party may sue to enforce the release and wavier provisions, or for damages, or both.  If successful, the Release provides that the party may recover from the other all costs and attorney fees incurred in enforcing the Release.

76.     PHS filed its counterclaim seeking the enforcement of the Release.  PHS did not put forth evidence of damages and did not put forth evidence of its costs or attorneys fees in enforcing the release.

77.     Martinez, in entering into the Release and not revoking it, is bound by the agreement and has released the claims she has filed in this case.

78.     At no time has Martinez filed a charge or a complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission, or any other governmental agency claiming that she has been a victim of discrimination or retaliation in any way related to her employment or termination from employment at PHS.

79.     There is no evidence that Martinez was subject to discrimination based upon her age or term of service, or upon any other unlawful ground, during the term of her employment at PHS.  There likewise is no evidence that Martinez was subject to discrimination based upon her age or term of service, or upon any other unlawful ground, in connection with her coaching, corrective actions, or termination.

80.     There is no evidence that Martinez's eligibility for retirement benefits or her right to receive any other employment benefits was related to any coaching, discipline, or corrective action she received as a PHS employee, the proposed dismissal of Martinez by PHS, the resignation in lieu of termination of her employment, or the offer and acceptance of additional compensation in exchange for a release of claims.

### Frank Pacheco

81.     PHS hired Pacheco in 1979.  Pacheco worked as a cook and lead cook at PHS until his termination in April 2004.

82.     PHS terminated Pacheco's employment effective April 15, 2004, for misconduct in the workplace, including the use of foul language and abusive conduct towards other PHS employees.

83.     Pacheco's termination followed a series of progressive discipline steps, as documented on July 11, 2000, March 30, 2003, August 29, 2003, December 15, 2003, December 30, 2003, January 30, 2004, April 10, 2004, April 14, 2004, and April 15, 2004.

84.     On July 11, 2000, Linda Givens,[2] the director who was at that time responsible for the food service area in which Pacheco worked, met with Pacheco to discuss his responsibility as a lead employee, the importance of not contributing to rumors, and the importance of stating his opinions to fellow employees carefully.  Givens had learned that Pacheco was spreading rumors that she was not adequately performing her job.  During this meeting,  Pacheco was not agreeable to her suggestions and had a difficult time recognizing and taking responsibility for his behavior. Nevertheless,  the incident did not result in any corrective action or other discipline against

[2]Givens was formerly a PHS employee who was an original plaintiff in this action.

Pacheco.

85.     On April 18, 2001, Pacheco was given a notice that as part of a reorganization PHS was eliminating his job as lead cook and giving him the position of cook.  The change had no effect on Pacheco's pay, benefits, or job duties.

86.     On March 30, 2003, Pacheco became engaged in a dispute in the food service area with two fellow employees, Beth Tapia, who was a weekend supervisor, and Judy Martinez. Pacheco was insisting that Judy Martinez cut onions and peppers to be held for the morning cook. Pacheco and Judy Martinez were yelling at each other, and although Pacheco was no longer a lead cook, Pacheco insisted that Tapia call their supervisor, Jutta Johnson, at home.  Both Tapia and Judy Martinez wrote memoranda about the incident.  Pacheco received no discipline for this conflict.

87.     On August 29, 2003, Easton and the executive chef, John Hughes, gave Pacheco a verbal warning and counseling for Pacheco's failure to complete work assignments.  Easton and Hughes also gave Pacheco a verbal warning and counseling regarding his failure to take and log food temperatures on the tray line on a number of days during June, July, and August 2003, which was a failure that compromised patient safety.  Easton also gave Pacheco notice that several employees had complained that Pacheco was harassing and coercing them.  Easton warned and counseled Pacheco that it was a serious offense to harass co-workers in the workplace and that foul language in the workplace was impermissible.  Pacheco received a corrective action memorandum, at the level of verbal counseling, for these deficiencies.

88.     Pacheco acknowledged that it was his responsibility to take the temperatures of food on the tray line, and, except for one holiday, did not dispute that he failed to take the

temperatures or enter the temperatures on the logs for the days shown.

89.     On December 30, 2003, Easton and Hughes gave Pacheco a corrective action memorandum, at the level of summary of council, for clocking issues and insubordination. Summary of council is the next level of discipline after a verbal warning or counseling. Easton and Hughes provided Pacheco with a copy of his time card report from December 7, 2003, to December 20, 2003, which showed significant unapproved overtime on eleven of the twelve days. Easton and Hughes advised Pacheco that they had learned that he was clocking in early and then immediately taking a break in the cafeteria, which resulted in his recovering overtime pay that had not been approved by a manager. Easton and Hughes also spoke to Pacheco about a loud verbal confrontation with another employee, Glenda Pesina, the food service zone lead, who was discarding food from the walk-in cooler because Pacheco, in violation of food safety standards, had not properly dated or stored the food.

90.     Pacheco admitted that he had not obtained approval for the overtime. After the counseling, Pacheco did not continue that conduct. Pacheco also admitted interfering with the employee who was throwing away the undated food.

91.     There is no evidence that Pacheco made a written response or requested a review of the summary of council corrective action.

92.     On January 12 and 13, 2004, Pacheco, along with other food service employees, signed a memorandum identifying responsibilities with respect to sanitation and cleanliness in the work area and the safe practices for handling food. The January 12 memorandum indicated that unsafe food handling practices would result in a loss of good standing.

93.     On January 30, 2004, PHS gave Pacheco a loss of good standing for unsafe food

handling practices.  A customer in the cafeteria approached Foster with two plates of fish that had not been cooked thoroughly.  Easton investigated the incident.  Pacheco admitted that it was his responsibility to ensure that cafeteria food was properly cooked.  Easton, Hughes, and Jutta Johnson gave Pacheco a corrective action memorandum, at the level of loss of good standing, concerning the undercooked fish served in the cafeteria.  Pacheco was placed on loss of good standing for 12 months.  The corrective action memorandum pointed out that Pacheco and other employees had been instructed about the temperature of food and safe food handling practices.

94.     Under the terms of policy 308, upon receipt of a loss of good standing corrective action, another corrective action during the period of the loss of good standing will result in dismissal.

95.     Pacheco wrote a rebuttal to the loss of good standing corrective action.  In this rebuttal, Pacheco did not deny that he was responsible for ensuring the food on the cafeteria line complied with safety requirements on the day of the incident.  Pacheco's supervisors reviewed the rebuttal but did not make a change in the corrective action.

96.     As stated above, Easton previously had counseled Pacheco about the use of foul language in the workplace.  Pacheco's use of foul language was offensive to other employees working in proximity to him.  On April 9, 2004, Judi Rieckenberger, a diet aide, wrote a memorandum complaining about Pacheco's use of profanity in the workplace generally and his use of profanity specifically in reference to the diet aides; Rieckenberger also complained about Pacheco telling new employees that bad people were all around the workplace.

97.     On April 15, 2004, Pacheco received a final corrective action, a memorandum of dismissal, for creating a hostile work environment.  The memorandum of dismissal identified a

confrontation between food service employees regarding work space that occurred on April 10, 2004.  Pacheco apparently had yelled at Angela Ramirez, and Ramirez wrote an account of the incident.   Easton investigated the incident and obtained statements.  Easton gave the other employee involved in the incident a corrective action.  The corrective action memorandum Easton gave Pacheco indicated that Easton previously had counseled Pacheco about inappropriate language and summarized the three previous corrective actions (verbal warning, summary of council, and loss of good standing) that Pacheco had received.

98.     Pacheco requested a grievance hearing, which PHS scheduled in accordance with its progressive discipline policy.  After PHS had set the hearing, Pacheco canceled it.

99.     Pacheco admitted that Defendants followed each of the disciplinary steps leading up to his dismissal.  Pacheco also admitted that Defendants followed PHS's progressive discipline policies.

100.     Pacheco's verbal counseling and loss of good standing both concerned violations of safe food handling practices.  Pacheco's summary of council involved Pacheco's interference with an employee's effort to comply with safe food handling practices.

101.     Pacheco's verbal counseling, summary of council, and dismissal all involved the use of offensive language in the workplace and confrontations with other employees.

102.     Easton believed that the matters addressed at each stage of Pacheco's progressive disciplinary process were true and warranted the corrective actions she took.  Easton did not subject Pacheco to discipline because of his age, length of service, or benefits.

103.     There is no evidence that the Pacheco's discipline or dismissal were related to his age, gender, race, national origin, or other similar factor.

104.     There is no evidence that Pacheco's eligibility for retirement benefits or his right to receive any other benefits available to him as a result of his employment with PHS was in any way related to his discipline or dismissal from employment.

105.     Pacheco has not filed a charge or complaint with the New Mexico Human Rights Commission, the Equal Employment Opportunity Commission, or any other governmental agency claiming that he has been a victim of discrimination or retaliation.

106.     At the time PHS terminated his employment, Pacheco was fully vested in the PHS defined benefit retirement plan.  Since his retirement commencing May 4, 2004, PHS has been paying Pacheco a monthly benefit of $523.16 from the PHS retirement plan.

### Terri P. Elisberg

107.     PHS hired Elisberg in 1975, as a clinical dietitian.  Elisberg held this position until she resigned effective January 1, 2004.

108.     The Job Competency Assessments Elisberg received for the calendar years 2000, 2001, 2002, and 2003, show that she was ranked in the "very good" or "excellent" categories in the skills for which she was evaluated.

109.     On December 11, 2003, Elisberg submitted her resignation from employment at PHS, stating, "I regret to inform you that after 26 years of employment with PHS Healthcare Services I will be resigning from my Clinical Dietitian position at PHS Kaseman Hospital effective January 1, 2004, 3 weeks from today.  I would however, like to be considered for PRN status, whereby I could work a holiday or one day of a weekend occasionally if needed.  I have enjoyed my years of service with PHS Healthcare.  This has been a most difficult decision for me."

110.     Elisberg and Joan Hagen had a disagreement over scheduling and paid time off, but

the disagreement did not result in any disciplinary action toward Elisberg.  During the entire time

of her employment at PHS, other than one verbal counseling in October of 2003, neither PHS nor

Aramark took any disciplinary or corrective actions with respect to Elisberg.

111.    At the time she submitted her resignation, Elisberg already had applied for and

obtained another job that paid  $0.50 more per hour than PHS paid her.

112.    Elisberg stated that she resigned because she did not like Aramark, the manner in

which Aramark treated employees, the fact that Martinez resigned in lieu of termination, and the

fact that PHS did not support her.

113.    There is no evidence that prior to the time Elisberg submitted her resignation that

her working conditions were so intolerable that a reasonable person would have no choice but to

resign.

114.    There is no evidence that discrimination on the basis of age, or on any other basis,

provoked or was a cause of Elisberg's voluntary resignation from her employment.

115.    There is no evidence that Elisberg's eligibility for retirement benefits or her right to

receive any other benefits available as a result of her employment with PHS was in any way

related to her decision to submit her resignation from employment at PHS or to any of the events

or conditions in her employment prior to the time she submitted her resignation.

## Patricia Troyanowski

116.    PHS hired Troyanowski in 1989, as a clinical dietitian.  Troyanowski continued to

be a registered dietitian until she submitted her resignation from employment effective June 1,

2003.

117.    During the time PHS employed her, neither PHS nor Aramark gave Troyanowski

any corrective actions or other forms of discipline.

118.    Troyanowski had numerous objections concerning her employment at PHS:  (a) the failure of PHS and/or Aramark to invite her to meetings with outside representatives, (b) the use of Aramark's educational materials, (c) the manner in which Aramark enforced PHS's Travel Policy, (d) the change in outpatient education, (e) the arrangements for travel to regional hospitals, (f) the comments of Easton, (g) the procedure dealing with total parenteral nutrition, and (h) the handling of reports at the regional hospitals.

119.    Troyanowski's objections, taken together, do not constitute working conditions so intolerable or an environment in the workplace so hostile that a reasonable person would have no choice but to resign.

120.    On May 9, 2003, Troyanowski submitted her resignation from employment at PHS stating, "David and Mary Beth, I am sending this second notice of resignation, it seems the first one did not go through on Presnet.  This is to inform the management of the Food & Nutrition Services Department of PHS, that I will relinquish my position as clinical dietitian and regional representative, effective Sunday, June 1, 2003.  Thank you for the opportunity to practice my profession for these past years."

121.    There is no evidence that Troyanowski resigned as a result of discrimination on the basis of age, seniority, or any other basis.  There is no evidence that the PHS and/or Aramark managers' behavior was caused by or resulted from considerations of age, seniority, or any other improper or discriminatory considerations.

122.    Approximately three weeks prior to the date on which she submitted her resignation to PHS, Troyanowski applied for employment with Specialty Hospital Trans, Inc., and

accepted that employment at a salary of approximately $3.00 per hour more than her compensation at PHS.  Troyanowski resigned from PHS when she received notice that she had been hired by Specialty Hospitals.  Since resigning from her employment at PHS, Troyanowski has earned more than she was paid at PHS.

123.    There is no evidence that Troyanowski's eligibility for retirement benefits or her right to receive any other benefits available as a result of her employment with PHS was related to her decision to submit her resignation to PHS or to any events or conditions in her employment prior to the time she submitted her resignation.

## CONCLUSIONS OF LAW

1.    The Court has jurisdiction over the parties and subject matter of this action.

2.    The Release entitled "Additional Consideration and Release Agreement" executed by Martinez is clear and unambiguous.

3.    Martinez was not coerced into signing the Release.

4.    There is no evidence of misrepresentation, fraud, undue influence, coercion, or mutual mistake in connection with Martinez's execution of the Release.

5.    Considering the totality of the circumstances, Martinez's execution of the Release was knowing and voluntary.  The Release therefore is enforceable in its entirety.

6.    PHS fully complied with the terms of the Release.  Martinez breached the terms of the Release when she filed and pursued this lawsuit.

7.    PHS was required to defend itself against Martinez's claims and to enforce the Release signed by Martinez.  PHS is entitled to judgment in its favor against Martinez for enforcement of the Release.  Martinez's claims against PHS are therefore dismissed.

8.     PHS set forth no evidence of damages, costs, or attorneys fees, and therefore no damages will be awarded.

9.     Aramark was in contractual privity with PHS by virtue of the ISS Agreement.  In signing the Release, Martinez therefore waived, discharged, and released any and all claims against Aramark.  Martinez's claims against Aramark are therefore dismissed.

10.     PHS did not discipline or dismiss Pacheco or Martinez with the specific intent to interfere with their attainment of rights under Employee Retirement Income Security Act (ERISA).

11.     PHS articulated legitimate, nondiscriminatory reasons for disciplining and terminating Pacheco and Martinez.

12.     PHS's reasons for disciplining and terminating Pacheco and Martinez were not pretextual.

13.     PHS did not discharge, fire, suspend, expel, discipline, or discriminate against Plaintiffs for exercising their ERISA rights.

14.     PHS did not violate ERISA with respect to any actions it took towards Martinez or Pacheco.  PHS did not take any action with respect to Martinez or Pacheco in order to limit or deprive them of any interest or benefit to which they are or would be entitled under the provisions of any pension or welfare plan or any other benefit plan offered by PHS to its employees.  PHS has not discriminated against Pacheco or Martinez or withheld or denied benefits to either of them under any retirement or pension plan or other benefit plan under which either of them was entitled to benefits.

15.     PHS did not breach its fiduciary duties owed to Pacheco or Martinez established

under ERISA or otherwise owed to Pacheco or Martinez under any benefit plan.

16.     Martinez and Pacheco failed to exhaust administrative remedies relating to their claims of discrimination.

17.     New Mexico does not recognize a tort for age discrimination outside of the context and requirements of the New Mexico Human Rights Act (NMHRA).

18.     PHS was not motivated by Pacheco's or Martinez's age in terminating their employment.

19.     PHS did not violate the NMHRA in disciplining and/or discharging Martinez and Pacheco.

20.     PHS did not discriminate against, retaliate against, or otherwise treat Martinez or Pacheco, or any other similarly situated PHS employee, differently with respect to any terms and conditions of their employment at PHS because of their age, gender, national origin, or any other protected status.

21.     No employment relationship existed between Plaintiffs and Aramark.  Plaintiffs' claims in Counts I, II, III, IV, V, and VII against Aramark therefore are dismissed.

22.     PHS did not breach any express contract of employment with Pacheco or Martinez.

23.     The Employment Agreements that Pacheco and Martinez signed were clear and unambiguous.

24.     In disciplining and terminating Martinez and Pacheco, PHS did not violate its policies and procedures.  Pacheco and Martinez were afforded all of applicable steps of PHS's progressive disciplinary system.

25.     Defendants did not breach any PHS policy, procedure, or practice, and did not breach any implied contract of employment, in their treatment of Martinez or Pacheco.

26.     Aramark's recommendations regarding Plaintiffs' corrective actions were not made as a result of any improper motive or accomplished by the use of any improper means.

27.     Aramark did not have an improper motive to interfere with any contractual relationship between Plaintiffs and PHS.  Aramark did not use any improper means to interfere with Plaintiffs' contractual relationship with PHS.

28.     Aramark did not tortiously interfere with Plaintiffs' contractual relationships with PHS.

29.     PHS did not breach any implied covenant of good faith and fair dealing in its treatment of Martinez and Pacheco.

30.     By failing to mention the negligent misrepresentation claim in the Pretrial Order, Pacheco and Martinez have abandoned or are deemed to have abandoned the claim.

31.     Neither PHS nor Aramark are liable for civil conspiracy because neither committed an unlawful act that caused Pacheco or Martinez harm.  Additionally, Aramark was PHS's contractual administrator for the Hospitality Services Department.  As such, Aramark was PHS's agent and no conspiracy can exist between them as a matter of law.

32.     PHS and Aramark did not conspire to defeat any of Martinez's or Pacheco's rights, including those contained in the state or federal statutes listed in their complaint, including, without limitation, the NMHRA, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Family Medical Leave Act.

33.     The resignations of Elisberg and Troyanowski from their employment with PHS

were in all respects voluntary and not the result of hostile conditions in the workplace.

34.     Neither Troyanowski nor Elisberg was constructively discharged.  Therefore, none of Troyanowski's or Elisberg's claims against Defendants can survive.

35.     PHS is entitled to a judgment dismissing with prejudice all of the claims which have been made against it by Plaintiffs Frank Pacheco, Terri Elisberg, Mary Martinez, and Patricia Troyanowski.

36.     Aramark is entitled to a judgment dismissing with prejudice all of the claims which have been made against it by Plaintiffs Frank Pacheco, Terri Elisberg, Mary Martinez, and Patricia Troyanowski.


Dated this 27th day of April 2007.


                                        JUDITH C. HERRERA
                                        UNITED STATES DISTRICT JUDGE